# EXHIBIT 615

PLAINTIFFS' EXHIBITS 012898

```
         IN THE UNITED STATES DISTRICT COURT
    FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                CHARLESTON DIVISION


IN RE:  DIGITEK PRODUCT          MDL NO. 1968
        LIABILITY LITIGATION



Kathy McCornack, an individual;    MDL No.
Daniel E. McCornack, Jr., an       2:09-CV-0671
individual; and Ralph J. McCornack,
a minor by and through his guardian
ad litem,
          Plaintiffs

    V.

Actavis Totowa, LLC, et al.,
          Defendants.
```

Videotaped deposition of EDWARD J. BARBIERI, Ph.D., taken at the Philadelphia Airport Marriott, One Arrivals Road, Philadelphia, Pennsylvania, on Monday, July 11, 2011, commencing at 10:48 a.m., before Dianna R. Pugliese, a Registered Merit Reporter, Certified Realtime Reporter, Certified Shorthand Reporter-NJ, and Notary Public, pursuant to notice.

PLAINTIFFS' EXHIBITS 012899

Page 2

```
 1   A P P E A R A N C E S

 2   FOR THE PLAINTIFF:

 3       Don A. Ernst Esquire
         Ernst Law Group
 4       de@ernstlawgroup.com
         1020 Palm Street
 5       San Luis Obispo, California  93401
         805-541-0300
 6

 7   FOR THE DEFENDANTS:

 8       Matthew P. Moriarty Esquire
         Tucker Ellis & West LLP
 9       matthew.moriarty@tuckerellis.com
         1150 Huntington Building
10       925 Euclid Avenue
         Cleveland, Ohio  44115-1475
11       216-696-2137

12
         Alicia J. Donahue, Esquire
13       Shook, Hardy & Bacon, LLP
         Adonahue@shb.com
14       One Montgomery Tower
         San Francisco, California  94105
15       415-544-1900

16
     ALSO PRESENT:
17       Edward Amber, II, Video Operator
         Zanaras Court Reporting
18

19
                 EXAMINATION INDEX
20
     EDWARD J. BARBIERI, Ph.D.
21       BY MR. MORIARTY . . . . . . . .    6
         BY MS. DONAHUE . . . . . . . . .  114
22       BY MR. ERNST . . . . . . . . .    121
         BY MR. MORIARTY . . . . . . . .   165
23       BY MS. DONAHUE . . . . . . . .    174
         BY MR. ERNST . . . . . . . . .    175
24       BY MR. MORIARTY . . . . . . . .   177
         BY MR. ERNST . . . . . . . . .    178
25
```

PLAINTIFFS' EXHIBITS 012900

1                    EXHIBIT INDEX

2                                           MARKED
    Barbieri
3
    Exhibit 1   Curriculum Vitae of Edward John      5
4                Barbieri, Ph.D.

5   Exhibit 2   NMS Labs, Phone Log History Report   17

6   Exhibit 3   NMS Labs, NMS Legal Database Report  17

7   Exhibit 4   Plaintiffs' Summary of Non-Retained  20
                Expert Opinions Pursuant to Federal
8                Rules of Civil Procedure Rule
                26(a)(2)(c)
9
    Exhibit 5   AHFS Drug Information 2011 excerpt    32
10
    Exhibit 6   9/22/09 NMS Labs report              39
11
    Exhibit 7   5/29/09 NMS Labs report              40
12
    Exhibit 8   6/24/08 NMS Labs Supplemental        48
13                Toxicology Report

14  Exhibit 9   July/August 2011 Journal of          78
                Analytical Toxicology Letter to the
15                Editor by Fred Apple

16  Exhibit 10 Article from International Journal of  83
                Legal Medicine, Is vitreous humour
17                useful for the interpretation of
                3,4-methylenedioxymethamphetamine
18                (MDMA) blood levels?

19  Exhibit 11 Clinical Toxicology article, Key      85
                Concepts in Postmortem Drug
20                Redistribution

21  Exhibit 12 British Journal of Clinical           88
                Pharmacology article, Post-mortem
22                clinical pharmacology

23  Exhibit 13 Clarke's Analysis of Drugs and        90
                Poisons, Third edition, Volume I
24                excerpt

25

PLAINTIFFS' EXHIBITS 012901

1    EXHIBIT INDEX CONTINUED

2                                                    MARKED

3    Exhibit 14 Clarke's Analysis of Drugs and        94
                Poisons, Third edition, Volume II
4                excerpt

5    Exhibit 15 Journal of Clinical Pathology         96
                article, Estimating antemortem drug
6                concentrations from postmortem blood
                samples: the influence of postmortem
7                redistribution

8    Exhibit 16 Journal of Analytical Toxicology      100
                article, Mechanisms Underlying
9                Postmortem Redistribution of Drugs: A
                Review
10
     Exhibit 17 Excerpt from Postmortem Toxicology of 102
11               Abused Drugs by Steven B. Karch, M.D.

12   Exhibit 18 Article by Gideon Koren, M.D. and     107
                Ruth Parker, M.D., Interpretation of
13               Excessive Serum Concentrations of
                Digoxin in Children
14
     Exhibit 19 Excerpt from Legal Medicine 1993 by   110
15               Cyril H. Wecht, M.D., J.D.

16   Exhibit 20 5/2/2008 letter to Daniel McCornack   138
                from CVS Caremark

17

18

19

20

21

22

23

24

25

PLAINTIFFS' EXHIBITS 012902

 1               (Exhibit Barbieri-1 was marked for

 2     identification.)

 3               VIDEO OPERATOR:  This is the video

 4     deposition of Dr. Edward Barbieri, taken by the

 5     Defendant, in the matter of Kathy McCornack, et al.,

 6     versus Actavis Totowa, LLC, et al., in the U.S.

 7     District Court for the Southern District of West

 8     Virginia, Charleston Division, Case Number 2:09-CV-

 9     0671.

10               This deposition is being held at the

11     Marriott Hotel in Philadelphia, Pennsylvania, on July

12     11th, 2011.

13               My name is Edward Amber, and I'm the

14     videographer from the firm of Zanaras Court Reporting

15     with offices located in Philadelphia, Pennsylvania.

16               The reporter is Dianna Pugliese from the

17     firm of Rennillo Court Reporting with offices located

18     at 1301 East Ninth Street, Cleveland, Ohio.

19               We're going on the record at 10:48.

20               Counsel, please introduce yourselves.

21               MR. ERNST:  Don Ernst representing Kathy

22     McCornack and the McCornack children as plaintiffs.

23               MS. DONAHUE:  Alicia Donahue, Shook

24     Hardy & Bacon, representing the Mylan defendants.

25               MR. MORIARTY:  Matthew Moriarty,

PLAINTIFFS' EXHIBITS 012903

Page 6

1    representing the Actavis defendants.

2                    VIDEO OPERATOR:  Court reporter, please

3    swear the witness in.

4                    EDWARD J. BARBIERI, Ph.D., having been

5    duly sworn, was examined and testified as follows:

6                    VIDEO OPERATOR:  You may proceed.

7                            EXAMINATION

8    BY MR. MORIARTY:

9         Q.    Tell us your full name, please.

10        A.    Edward John Barbieri, spelled

11   B-a-r-b-i-e-r-i.

12        Q.    And you go by Doctor by virtue of your

13   Ph.D.?

14        A.    Yes.

15        Q.    Is this your most recent curriculum

16   vitae?

17        A.    Yes, it is.

18        Q.    And it is marked as Barbieri Exhibit 1

19   to this deposition, is it not?

20        A.    Yes, it is.

21        Q.    And the last revised date in the upper

22   right-hand corner is February 1st, 2011.

23        A.    That's correct.

24        Q.    Correct.

25              Now, to put it plainly, are you a

1    forensic toxicologist?

2          A.     Yes.

3          Q.     Do you have a degree in toxicology?

4          A.     No, my degree is in pharmacology.

5          Q.     Is toxicology a recognized specialty?

6          A.     Yes.

7          Q.     Have you made a career of toxicology?

8          A.     In the last 13 years I have.

9          Q.     All right.  And correct me if I'm wrong,

10   but I believe there are two paths that one can take to

11   get to the career of toxicology, one being the one you

12   have chosen, through a Ph.D. and practical experience;

13   correct?

14         A.     That's one.

15         Q.     And another is that there are medical

16   doctors who have toxicology residencies or

17   fellowships; correct?

18         A.     Yes.  And they're usually considered as

19   medical toxicologists.

20         Q.     Right.

21                Are you still a member of the Society of

22   Forensic Toxicologists?

23         A.     I am.

24         Q.     And SOFT, as it's known, does it have

25   ethical guidelines for people like yourself testifying

PLAINTIFFS' EXHIBITS 012905

1    in settings such as this?

2         A.        Yes, it does.

3         Q.        Do you remember how many times you have

4    testified in a civil case as an expert?

5         A.        Not specifically, but multiple times.

6         Q.        More than 50?

7         A.        I'd probably say less than 50.

8         Q.        Have you testified in criminal cases?

9         A.        Yes.

10        Q.        Do you have any idea how many of those

11   you have testified in?

12        A.        Definitely more than 50.

13        Q.        More than a hundred?

14        A.        I think combined in court I've

15   testified, civil and criminal, over a hundred times.

16                  By deposition, again, the total is

17   probably around 35 times.

18        Q.        All right.  Because you probably don't

19   have depositions in criminal cases?

20        A.        Occasionally, but not often.

21        Q.        Do you have any idea about the

22   percentage split of your forensic work between

23   criminal and civil?

24        A.        I haven't -- I haven't logged those, no.

25        Q.        In how many other digoxin cases have you

PLAINTIFFS' EXHIBITS 012906

Page 9

1    given testimony?

2        A.      One.

3        Q.      How many other pharmaceutical cases,

4    pharmaceutical civil products liability cases?

5        A.      I would say three others that I can

6    remember.

7        Q.      Have you given testimony about

8    postmortem blood analysis and postmortem

9    redistribution?

10       A.      Yes.

11       Q.      In the interest of -- let me take a step

12   back.

13               After those instances in which you gave

14   testimony about postmortem blood analysis or

15   postmortem redistribution, did you ever have an

16   opportunity to review the transcript of your

17   testimony?

18       A.      In one specific case I did.

19       Q.      All right.  Do you know about any

20   others?

21       A.      In the others I have not.

22       Q.      Did you have that opportunity in the

23   others?

24       A.      All of them I had opportunity to do

25   that.

PLAINTIFFS' EXHIBITS 012907

```
 1      Q.      In order to be efficient today, I don't
 2  wish to repeat too many things that you may have
 3  testified to in prior occasions.
 4              Do you understand that?
 5      A.      Yes.
 6      Q.      Are you confident that the testimony you
 7  have given previously was recorded accurately?
 8      A.      Yes, I am.
 9      Q.      And did you make any efforts to change
10  answers in prior testimony because on reflection you
11  thought you had made errors?
12      A.      No, I did not.
13      Q.      So you would stand by answers that you
14  have given under oath in previous cases?
15      A.      Yes.
16      Q.      Do you have any publications on
17  postmortem redistribution?
18      A.      No.
19      Q.      Do you have any on postmortem blood
20  analysis?
21      A.      No.
22      Q.      In other words, your own publications.
23      A.      No.
24      Q.      In the last eight months, have you
25  attended any continuing education conferences on
```

1    postmortem blood analysis or redistribution?

2         A.    No, not in the past eight months.

3         Q.    Do you know whether anyone from NMS Labs

4    was on the faculty of any continuing education

5    conferences regarding subjects of postmortem blood

6    analysis?

7         A.    There was a session in Philadelphia

8    involving opioids in which postmortem came up as a

9    peripheral topic, which I attended.

10              But that was not the main purpose of the

11   session.  And there were two gentlemen from NMS that

12   were involved in that session.

13        Q.    Do you --

14        A.    But I don't know if they -- there was no

15   specific topic on postmortem redistribution at those

16   conferences.

17        Q.    Okay.  So -- I mean, I know you're not

18   responsible for the constant monitoring of your fellow

19   toxicologists, but are you aware of any other

20   conferences at which your colleagues at NMS have been

21   on the faculty of continuing education regarding

22   postmortem blood analysis?

23        A.    I'm not aware of it.

24        Q.    Is Dr. Middleberg still one of your

25   colleagues --

1        A.       Yes.

2        Q.       -- at NMS?

3        A.       Yes, he is.

4        Q.       Have you given any presentations at

5    professional meetings about postmortem blood analysis?

6        A.       I have discussed the topic, yes, at

7    coroner's conventions.

8        Q.       All right.  Have you ever talked about

9    postmortem redistribution?

10       A.       Yes, I have.

11       Q.       And when was that?

12       A.       Last year, there was a coroner's

13   conference -- Pennsylvania coroner's conference in

14   Pittsburgh that I mentioned PMR associated with

15   several drugs.

16       Q.       Do you have a slide deck or any hard

17   materials from that conference or your presentation of

18   that conference?

19       A.       Yes, I do.

20       Q.       Where are those?

21       A.       In my computer and on a -- on a CD.

22       Q.       Okay.  I would only ask that you keep

23   those intact.

24       A.       Uh-huh, of course.

25       Q.       And maybe get access to those.

PLAINTIFFS' EXHIBITS 012910

1      A.      Certainly.

2      Q.      Have you ever done any experiments or

3  research, other than reading literature, into

4  postmortem blood analysis or postmortem

5  redistribution?

6      A.      I have not.

7      Q.      Does NMS Labs perform serum digoxin

8  assays on living people?

9      A.      Rarely.

10      Q.      In the non-litigation setting, do you

11  have any personal experience with postmortem analysis

12  -- I'm sorry -- postmortem blood analysis of digoxin?

13      A.      In the non-litigation setting.  Can you

14  be more specific as to what you mean?

15      Q.      Sure.

16      A.      You mean other than testifying about the

17  topic?

18      Q.      Yeah.  Other than a civil lawsuit or a

19  criminal case --

20      A.      Well --

21      Q.      -- I assume digoxin wasn't involved in

22  criminal cases, but --

23          MR. ERNST:  I'm going to object.  I

24  mean, I realize that I can only object, but he may be

25  testing for autopsies for a lot of different things

PLAINTIFFS' EXHIBITS 012911

1    and it may or may not be considered litigation.

2              THE WITNESS:  And that's what I was

3    going to say.  I mean, I've seen data coming through

4    the lab on postmortem blood levels of digoxin which I

5    have -- I have reviewed --

6    BY MR. MORIARTY:

7         Q.    Okay.

8         A.    -- for report.  So I don't know if

9    they've ever gone to litigation.

10        Q.    Okay.

11        A.    I mean, this case is one that is now in

12   litigation.

13        Q.    All right.  So how often does that

14   happen?

15        A.    Very rarely.  We don't do very many

16   digoxins.  It's not a common compound that comes up in

17   our postmortem toxicology work.  It has -- it's a

18   specialty test.  It usually is requested.

19        Q.    Very unusual for that to come up?

20        A.    For us, yes.

21        Q.    Okay.  Do you recall ever a case in

22   which you actually consulted with a coroner about a

23   postmortem blood analysis of digoxin?

24        A.    No.

25              There was a case that goes back several

PLAINTIFFS' EXHIBITS 012912

1    years in which there was a consultation that I had

2    with a researcher who was involved with a coroner in a

3    death case with digoxin.  But never directly with a

4    coroner or medical examiner.

5         Q.      Got it.

6                 Now, I've been asking you about

7    postmortem blood analysis regarding digoxin.  What

8    about tissue, either vitreous, liver, or any other

9    tissue specimens; do you have any personal experience

10   with that regarding digoxin?

11        A.      No.  At NMS, I have not seen a single

12   case that's come through with a tissue or vitreous

13   level for digoxin personally.

14        Q.      You have been involved, though, in a

15   litigation setting regarding a vitreous sample, have

16   you not?

17        A.      Yes, I was.

18        Q.      So are you aware that in the fall of

19   2009 I asked for a deposition of an NMS employee who

20   could talk about this stack of materials regarding

21   blood and tablet sampling in the McCornack case?

22        A.      I'm aware of that now.

23        Q.      Okay.

24        A.      I wasn't aware at the time.

25        Q.      When did you first become aware of that?

1          A.          Let me describe what happened and when I

2    became aware of it.

3                      Mr. Ernst contacted me about this case,

4    I believe it was the end of May.

5                      When I pulled up the work order number

6    for the particular case -- that's the biological part

7    of it -- I found out that we had produced a litigation

8    package on that case.

9                      And that's when I became aware that

10   there was a deposition that had been done about this

11   case and the tablet involved with the case.

12         Q.          All right.  Are you done --

13         A.          Before that, I knew nothing about that.

14         Q.          Are you done with your answer?

15         A.          Yes, sir.

16         Q.          All right.  Now, you did bring an NMS

17   file with you today; correct?

18         A.          Yes, I did.

19         Q.          And I don't know whether these are

20   duplicates for us today, but I assume they can come

21   out of a computer and be easily reproduced; correct?

22         A.          They can be, yes.

23         Q.          So can I mark these as exhibits with no

24   difficulty?

25         A.          Yes, you may.

PLAINTIFFS' EXHIBITS 012914

1            (Exhibit Barbieri-2 was marked for

2    identification.)

3    BY MR. MORIARTY:

4        Q.      So what I'm marking as Dr. Barbieri

5    Exhibit 2, is this an NMS phone log history report?

6        A.      Yes, it is.  This goes -- this goes from

7    April 2008 through September 16, 2009.

8        Q.      All right.  And the September 16, 2009

9    entry is actually the one about Dr. McMullin being

10   scheduled for a deposition with me or my office;

11   correct?

12       A.      Yes, that's correct.

13           MR. ERNST:  May I look at that, please?

14   (Attorney reviews document.)

15           Thank you.

16           (Exhibit Barbieri-3 was marked for

17   identification.)

18   BY MR. MORIARTY:

19       Q.      Now, the next thing I'm going to mark is

20   Barbieri Exhibit 3.

21           And it is a two-page document; correct?

22       A.      Yes.

23       Q.      And essentially what this is is sort of

24   an adjunct to Exhibit 2 in that it documents phone

25   calls regarding the legal aspects of setting up

1    depositions and such; is that right?

2         A.      Yes.  Once a case goes into our legal

3    database system, the office staff generates this

4    format and then adds any notes to it for the case.

5         Q.      Got it.

6                 All right.  So the first entry after

7    September of 2009 is May 27, 2011; is that right?

8         A.      Yes.

9         Q.      It says in this note that AMC -- who I

10   assume is Angela Cubbler?

11        A.      Cubbler.

12        Q.      Cubbler?

13        A.      Yes, that's correct.

14        Q.      -- was asking why you were going to be

15   deposed since Dr. McMullin was already deposed;

16   correct?

17        A.      Yes.

18        Q.      Do you see that?

19        A.      Yes.

20        Q.      Did you ever find out why you were going

21   to be deposed given the fact that he had already been

22   deposed?

23        A.      Well, the short answer is Mr. Ernst

24   requested that I be deposed.

25        Q.      Is there any reason?

PLAINTIFFS' EXHIBITS 012916

Page 19

1        A.        I don't -- I don't know.

2        Q.        Okay.  And then on Page 2, three more

3    dates of communication about setting up this

4    deposition.

5        A.        Yes, that's correct.

6               MR. ERNST:  Can I look at those, too?

7    (Attorney reviews document.)

8               Thank you.

9    BY MR. MORIARTY:

10       Q.        Did you receive an e-mail from Terry

11   Kilpatrick of Mr. Ernst's office about whether you

12   were engaged, not engaged as an expert in this case?

13       A.        Yes.

14       Q.        Does it appear in this stack over here?

15       A.        I believe there is a document here, yes.

16       Q.        So what is your current understanding of

17   your status with respect to being an expert in the

18   McCornack versus Actavis case?

19       A.        My understanding from that -- from the

20   discussion with Mr. Kilpatrick and the e-mail and the

21   discussion with Mr. Ernst was that I'm listed as a

22   non-retained expert --

23       Q.        Okay.

24       A.        -- to talk specifically about what we

25   did on this case in terms of the testing.

PLAINTIFFS' EXHIBITS 012917

1          Q.      Okay.

2          A.      I have no -- I have not received any

3    information, other than what we have in the litigation

4    package, in terms of the case history, medical

5    records, or any other -- adjunct material about

6    Mr. McCormack or -- Mr. McCornack or the situation

7    involved.

8          Q.      From looking at your documentation --

9    contact documentation in Exhibits 2 and 3, can you

10   tell whether you personally had any discussions with

11   Don Ernst or Terry Kilpatrick before May 15, 2011?

12         A.      I know for a fact I did not.

13         Q.      All right.

14                 (Barbieri Exhibit 4 was marked for

15   identification.)

16   BY MR. MORIARTY:

17         Q.      Okay.  Dr. Barbieri, I am handing you

18   what I have had marked as Barbieri Exhibit 4, since it

19   is my intention to off-load as much paper as possible

20   before I carry it home.

21                 That is a document called Plaintiffs'

22   Summary of Non-Retained Expert Opinions Pursuant to

23   Federal Rule of Civil Procedure 26(a)(2)(c).

24                 Do you see that on the copy?

25         A.      I do.  I see that.

PLAINTIFFS' EXHIBITS 012918

1      Q.      And if you go back to Page 9, does your

2    name appear in Paragraph 4?

3      A.      Yes, it does.

4      Q.      And then it says Subject of Testimony,

5    Summary of Facts and Opinions, et cetera.  And the

6    section regarding you spills over into about halfway

7    through Page 10; is that right?

8      A.      Yes.

9      Q.      Have you ever seen this before?

10     A.      I've seen Pages 9 and 10 before.

11     Q.      When did you first see Pages 9 and 10?

12     A.      I saw them when you -- your office

13   responded to a contact from us inquiring why this

14   deposition was to go forward.  And you provided a

15   piece of this document, Pages 9 and 10, to me.

16     Q.      And there are letters in the stack here

17   that you brought.  Those letters were in June of 2011;

18   correct?

19     A.      Yes.

20     Q.      So you did not have any discussions with

21   Mr. Ernst or Kilpatrick, or I assume anyone else from

22   his office, before this document was filed with the

23   Court May 16th, 2011; right?

24     A.      That's correct.  I had no contact with

25   them at that time, or prior to that time.

1      Q.      Have you had any discussions with

2  Mr. Ernst or Kilpatrick about whether you are, in

3  fact, going to render the opinions that are listed on

4  Pages 9 and 10 if called to testify as a witness at a

5  trial in this case?

6      A.      I did have discussions.

7      Q.      And tell me about that discussion.

8      A.      I told them I would not render any

9  expert opinions concerning this case since I did not

10 have -- other than the testing that we had performed,

11 since I had no knowledge of all the things that I

12 talked about before in terms of medical records,

13 history, et cetera.

14     Q.      Okay.

15             MR. MORIARTY:  We have to just keep

16 these in an orderly way in here.

17             MS. DONAHUE:  Yes.

18 BY MR. MORIARTY:

19     Q.      So other than the stack of NMS materials

20 that you brought, have you written any reports or

21 opinion letters in this case?

22     A.      No, sir, I have not.

23     Q.      Without rehash -- have you read

24 Dr. McMullin's deposition testimony?

25     A.      No, I have not.

1        Q.       Do you know whether this stack of

2    material, such of it as was available in the fall of

3    2009 when I came here and deposed him, is the same

4    material that was produced at his deposition?

5        A.       I can only assume so since we kept that

6    in the file under the work -- under the expert number

7    for that deposition.

8        Q.       Okay.  So I do need to make sure that I

9    understand because there are some specific things I

10   need to know about.

11                There is an expert report in this case

12   by a pharmacist named Keith Gibson.  Have you ever

13   seen his report?

14       A.       No.

15       Q.       And I assume you have not seen his

16   deposition testimony?

17       A.       I have not.

18                And the name is not familiar.  I've not

19   heard his name at all.

20       Q.       Do you have a pharmacy license, by the

21   way?

22       A.       Yes, I do.

23       Q.       It's my understanding that you

24   personally do not render opinions on cause of death;

25   is that correct?

PLAINTIFFS' EXHIBITS 012921

1     A.     That's correct.

2     Q.     Do you render opinions on the diagnosis

3  of any diseases?

4     A.     No.

5     Q.     Why not?

6     A.     Our job is to produce factual data for

7  the laboratory.  If asked by a medical examiner my

8  opinion in terms of potential causes of death or

9  influence of diseases on the data that we have, I'll

10  give opinions on that.

11          But I will not give scientific opinions

12  either on cause of death or disease -- disease states.

13     Q.     Does Pennsylvania have a state law

14  against the practice of medicine by non-licensed

15  physicians?

16     A.     I'm sure they do.

17     Q.     And in most or all cases, would

18  rendering diagnoses about cause of death be the

19  unauthorized practice of medicine?

20     A.     It would be, yes.

21     Q.     Have you ever looked up any digoxin

22  dosing calculators on the Internet?

23     A.     Not that I can recall.

24     Q.     Do you know what the volume of

25  distribution of digoxin is off the top of your head?

PLAINTIFFS' EXHIBITS 012922

1       A.      It's very -- it's very large.

2       Q.      Do you --

3       A.      Specific -- well, a specific number from

4    a reference that I have here, the volume of

5    distribution is between 5 and 7 liters per kilogram.

6       Q.      Okay.  So in a -- let's just say a

7    225-pound man, what would that volume of distribution

8    be?

9       A.      Well, that's about 10 kilograms, so it

10   would be 10 times that number, between 50 and 70

11   kilograms -- or liters.

12      Q.      The reference that you looked over at by

13   your left hand there, is that from Baselt's lab

14   manual?

15      A.      Yes.  This is the monograph on digoxin

16   by -- by Baselt.  It's the 8th edition.

17      Q.      Okay.  Do you know whether digoxin is

18   universally distributed throughout the entire body?

19      A.      Well, it's distributed throughout --

20      Q.      I'm sorry, let me rephrase that because

21   I may have misspoken.

22              Do you know whether digoxin is uniformly

23   distributed throughout the human body?

24      A.      Well, it is not.

25      Q.      Okay.  Is it true that there's a high

PLAINTIFFS' EXHIBITS 012923

1    concentration of digoxin in heart, brain, kidneys, but

2    the skeletal muscle forms the largest store of

3    digoxin?

4         A.      In terms --

5              MR. ERNST:  Objection as compound,

6    but...

7              THE WITNESS:  In terms of total, because

8    there's much more skeletal muscle than there is the

9    other components.

10             On a concentration basis it's not.  It's

11   certainly on a total amount, total mass, the answer

12   would be yes.

13   BY MR. MORIARTY:

14        Q.      So skeletal muscle could include

15   deltoids, triceps, biceps, pectorals, things of that

16   nature; correct?

17        A.      Well, not could, it does.

18        Q.      It does.  Okay.

19             Does the Baselt reference that you have

20   there say what the bioavailability of digoxin in

21   tablet form is?

22        A.      Yes, there's a notation of that.

23        Q.      What does it say?

24        A.      In tablet form, the bioavailability of

25   oral preparations ranges from 67 percent for tablets.

1    It goes on.

2              MR. ERNST:  67.

3              THE WITNESS:  67.

4              So bioavailability for oral tablets is

5    0.67 according to this reference.

6    BY MR. MORIARTY:

7         Q.    67 to what?

8         A.    Of a hundred percent of the dose given.

9              So of a -- of a hundred units of

10   medication taken orally --

11        Q.    Right.

12        A.    -- 67 percent would get into the

13   systemic circulation through the liver --

14        Q.    I got you.

15        A.    -- and circulate.

16        Q.    I got you.

17              So they expressed it as a number, not a

18   range.

19        A.    Yes.

20        Q.    So you tell me as a toxicologist, if

21   that is true that the bioavailability is 67 percent,

22   could the bioavailability of digoxin tablets increase

23   by more than 50 percent?

24        A.    More than 50 percent of what?

25              MR. ERNST:  Objection.  Vague.  I

PLAINTIFFS' EXHIBITS 012925

1  don't...

2          THE WITNESS:  Yeah, I'm asking for a

3  clarification, too.  I'm not sure what you mean.

4  BY MR. MORIARTY:

5      Q.     Okay.  You just said that according to

6  Baselt's the bioavailability is 67 percent.

7      A.     Yes.

8      Q.     Okay.  Let's assume hypothetically that

9  there was something about the patient or the drug that

10  was going to increase the bioavailability of a

11  particular dose.  Okay?

12      A.     Uh-huh.

13      Q.     Could it increase by more than 50

14  percent?

15          MR. ERNST:  Objection.  And I would

16  place it on the record what my objection is, but I'm

17  limited under Court Rule 22, so there's a number of

18  reasons, but that's what it is.

19          THE WITNESS:  The bioavailability could

20  increase based on the factors you stated.  Whether it

21  can go up to 50 percent, I don't know.

22  BY MR. MORIARTY:

23      Q.     No, I said by more than 50 --

24      A.     By more than 50 percent, I don't know.

25  It seems -- it seems a lot.  But I don't know the

PLAINTIFFS' EXHIBITS 012926

1    answer to that.

2         Q.      Okay.  Well, you could never have more

3    than a hundred percent bioavailability, could you?

4         A.      You could not.

5         Q.      So there were some other expert reports

6    in this case.  There's a Dr. Hurd, who's a medical

7    toxicologist in Colorado.

8                 Have you read his report?

9         A.      No.

10        Q.      Do you know who Dr. Hurd is?

11        A.      No.

12        Q.      And you haven't reviewed any company

13   documents from Actavis?

14        A.      No, I have not.

15        Q.      No medical records of Dan McCornack?

16        A.      None whatsoever.

17        Q.      Have you read either of the two versions

18   of the autopsy report that were done by the coroner in

19   California?

20        A.      No, I have not.

21        Q.      And I assume you haven't seen either

22   versions of the death certificate.

23        A.      No, I have not.

24        Q.      Do you see anywhere in the NMS records

25   that you or any other NMS toxicologist had any contact

PLAINTIFFS' EXHIBITS 012927

Page 30

1    directly with Dr. Mason, the coroner?

2          A.      We had no direct contact that I can find

3    from any of the records that I saw with Dr. Mason.

4          Q.      Is that --

5          A.      Other -- let me -- let me preface it.

6                  Other than the initial -- the original

7    test requisition form for the bio -- for the blood

8    work in which there was data written on that.

9                  Now, whether Dr. Mason himself wrote it

10   or one of his colleagues wrote on that.  That would be

11   the only contact I would have, but it was through that

12   one page.

13         Q.      Okay.  Now, if a toxicologist such as

14   you or Dr. McMullin had actually had a personal

15   discussion with Dr. Mason or a member of his staff, is

16   that the sort of information that would be documented

17   in your files?

18         A.      Yes.  That's one of the SOPs that when

19   we have phone conversations, we list a brief summary

20   of that conversation on our phone log notes.  So that

21   would be in the files.

22         Q.      So is there any evidence in the NMS file

23   that Dr. Mason contacted NMS to discuss the analysis

24   of either the tablet results or the blood results?

25         A.      Not that I saw.

1      Q.      Have you ever talked to Dr. Mason about

2  any case ever?

3      A.      I probably have.

4      Q.      Why do you say that?

5      A.      Well, we have contact with a lot of our

6  clients, but I -- I don't have anything specific that

7  I can point to.

8      Q.      I believe this is Santa Cruz County, but

9  is Santa Cruz County considered a client of NMS?

10     A.      Yes, they are.

11     Q.      This Baselt's book that you have at the

12 office and part of which you brought today, is that

13 something you refer to pretty much every day in your

14 practice?

15     A.      Pretty much.

16     Q.      Do you refer to Clarke's Analysis of

17 Drugs and Poisons?

18     A.      Yes, I do.

19     Q.      Goodman & Gilman?

20     A.      Yes, I do.

21     Q.      And there is something called the

22 American Hospital Formulary Service --

23     A.      Uh-huh.

24     Q.      -- something like that?

25     A.      I refer to that also.

PLAINTIFFS' EXHIBITS 012929

1      Q.      What is that?

2      A.      That's a publication put together by a

3  group of -- national group of pharmacists and

4  physicians.

5              It's a various -- they have very

6  extensive monographs on many drugs, including the

7  pharmacology of the drug, the chemistry of the

8  compound, stability information, a lot of information

9  from the PDR, blood levels if they're available, et

10 cetera.

11             (Exhibit Barbieri-5 was marked for

12 identification.)

13 BY MR. MORIARTY:

14     Q.      I've marked that as Barbieri Exhibit 5.

15             Is this the book that you're talking

16 about?

17     A.      This is -- yes, this is the most recent

18 edition.  I don't have this one.  I have the one

19 that's a little earlier than this one.

20             But this is -- this is the same text

21 that we're talking about.

22     Q.      While I've got this out, I want to ask

23 you about it.

24     A.      Okay.

25     Q.      If you go back to Page -- oh, gosh.

PLAINTIFFS' EXHIBITS 012930

1    A.     On the bottom.

2    Q.     Yeah, it's cut off, but it looks like

3   it's four digits, maybe 1737 -- no, 1727 is what it

4   is.

5    A.     Okay.  I have it.

6    Q.     Is that the digoxin monograph from this

7   AHFS book that you're referring to?

8    A.     Yes.

9    Q.     And this is a book that you refer to in

10   your own practice?

11    A.     Yes.

12    Q.     On the second-to-last page of Exhibit 5

13   --

14    A.     You're on Page 1729?

15    Q.     Yes, sir.

16    A.     Okay.

17    Q.     In the beginning it says, Absorption:

18   Following oral administration of digoxin in a tablet

19   or elixir, approximately 60 to 85 percent of the dose

20   is usually absorbed.

21         Do you see that?

22    A.     I do.

23    Q.     Is that different from bioavailability?

24    A.     Well, it could be different.  Absorption

25   is usually considered movement -- oral absorption --

1  movement from the gastrointestinal tract into the

2  portal circulation.  Bioavailability includes movement

3  through the liver as well.

4      Q.     Got it.

5             The next full paragraph in that section,

6  it says, There are interindividual variations in

7  plasma concentrations of digoxin with a -- with a

8  specific dose and in plasma concentrations of the drug

9  that produce therapeutic and toxic effects.

10            Did I read that correctly?

11     A.     You did.

12     Q.     Do you agree with it?

13     A.     I do.

14     Q.     Tell me what it means.

15     A.     It means that person to person taking

16 the same dose and even at the same body weight you

17 could have variations in the measured plasma

18 concentrations circulating.

19     Q.     All right.  And in the therapeutic and

20 toxic effects; correct?

21     A.     Oh, yes.  Because the -- the individual

22 sensitivity is not only based on plasma concentration

23 but it's based on the sensitivity of the individual to

24 that drug.

25     Q.     Right.

PLAINTIFFS' EXHIBITS 012932

1          So a -- to be more specific, a serum

2     digoxin concentration of 2.0 nanograms per milliliter

3     in one person may have a different effect and -- than

4     the same level on their twin; right?

5          A.     Yes.

6          Q.     A little further down, I think it's

7     maybe two sentences, three sentences down, it says, If

8     plasma concentrations of the drug are to be

9     determined, blood samples should be obtained at least

10    six to eight hours after the daily dose and preferably

11    just prior to the next scheduled daily dose.

12              Did I read it correctly?

13         A.     You did.

14         Q.     Is that your understanding that that's

15    sort of the consensus in the scientific community?

16         A.     Yes.  The -- my understanding is at

17    minimum, the blood level -- the serum level should not

18    be taken for at least six hours.  So six hours would

19    be the minimum.  This says six to eight.

20              And prior to the next scheduled dose.

21    Basically they're looking at the -- the therapeutic

22    levels at trough concentrations.

23         Q.     So if somebody said that when you sample

24    serum for digoxin that you were looking for peaks,

25    that's not consistent with your understanding of the

1    methodology; is that right?

2         A.     No, it's not.

3         Q.     Let's skip one sentence.

4                Well, let's not skip it.  Therapeutic

5    plasma concentrations of digoxin in adults generally

6    are 0.5 to 2.0 nanograms per milliliter; correct?

7         A.     Yes.

8         Q.     Is that consistent with your

9    understanding?

10        A.     Yes.  I've seen references that go up

11   to -- from 0.5 to 2.5.

12        Q.     Okay.

13        A.     But other than that, we're in the same

14   range.

15        Q.     The next sentence says, In some patients

16   with atrial fibrillation, slowing of ventricular rate

17   may require steady-state plasma concentrations of 2.0

18   to 4.0 nanograms per milliliter.

19               Do you see that?

20        A.     I do.

21        Q.     Do you have any reason to agree or

22   disagree with it?

23        A.     No.

24        Q.     Do you agree with it?

25        A.     Well, that's something that a physician

PLAINTIFFS' EXHIBITS 012934

1    would really be involved with, and we would not get

2    involved normally with that.  So that's not a number

3    that I keep in my head.

4         Q.    Does that reflect back on the first

5    sentence of that paragraph where you're talking about

6    interindividual variations?

7         A.    Yes, it would.

8         Q.    So somebody who had a -- hypothetically,

9    somebody who had a serum level of -- digoxin level of

10   4.0, that would not necessarily mean that they have

11   digoxin toxicity; is that correct?

12            MR. ERNST:  Objection.

13   BY MR. MORIARTY:

14        Q.    You can answer.

15        A.    Okay.

16            MR. ERNST:  You can answer.

17            And I would love to clarify it so the

18   record is clear.  There are some rules that we are

19   still guided by.  Normally when you make an objection,

20   lawyers can state the reasons why they wish to make

21   the objection.

22            There has been some limitation placed by

23   the Court and all we can say is objection.

24            THE WITNESS:  Okay.

25            MR. ERNST:  So I am trying desperately

PLAINTIFFS' EXHIBITS 012935

1    to abide by these rules, but it doesn't seem to make

2    sense to me.  But I -- that's all I have.

3                    THE WITNESS:  Yeah, I'm sorry, could you

4    repeat the question for me.

5    BY MR. MORIARTY:

6        Q.      I believe my question was, if you assume

7    hypothetically somebody had a serum digoxin level of

8    4.0 nanograms per milliliter, that doesn't necessarily

9    mean that that patient has digoxin toxicity; correct?

10                   MR. ERNST:  Objection.

11                   THE WITNESS:  That's correct, it doesn't

12   necessarily mean that.

13   BY MR. MORIARTY:

14       Q.      So if you look at the end of that

15   paragraph, there's an italicized sentence, isn't

16   there?

17       A.      Yes.

18       Q.      Serum concentrations of digoxin should

19   be interpreted in the overall clinical context.  Thus,

20   an isolated serum concentration measurement should not

21   be used alone as the basis for adjusting dosage.

22                   Do you see that?

23       A.      I do.

24       Q.      Is that your understanding of the

25   consensus in the toxicological community?

PLAINTIFFS' EXHIBITS 012936

1      A.      Well, whether it's my understanding or

2   not in terms of the general consensus, as a

3   toxicologist, if a -- whether we're talking about a

4   toxic level in blood postmortem or an antemortem

5   level, a number is a number.

6           All of the information around that case

7   that helps to make someone understand that number is

8   just as important as the actual number that we get in

9   terms of the concentration.

10      Q.      Okay.

11      A.      So in isolation, a number is a starting

12   point.  And one should not make a decision on any case

13   based upon just a number.

14      Q.      And when you say "a decision on any

15   case," you're talking about whether it's adjusting a

16   dose, assigning a cause of death, any decision.

17      A.      Any of those, yes.

18      Q.      Did you read the tablet test results

19   done by NMS to prepare for your testimony here today?

20      A.      I flipped through that section of the

21   litigation package, so I'm aware of what the result is

22   on that published report.

23           (Exhibit Barbieri-6 was marked for

24   identification.)

25   BY MR. MORIARTY:

PLAINTIFFS' EXHIBITS 012937

1      Q.      Okay.  I want to hand you what I've

2   marked as Dr. Barbieri Exhibit 6.  Okay.  And I'm

3   sorry about all the fax headers, but I had to have

4   this faxed to the hotel this morning.

5              This is a two-page document.  Let me

6   just ask if that looks familiar to you.

7      A.      I don't remember this one.

8      Q.      All right.

9      A.      I remember seeing one with a single

10  digoxin weight and thickness.  I don't remember this

11  one.  It may be in this package, but I just don't

12  remember.  I may have missed it when I reviewed the

13  documentation.

14             MR. MORIARTY:  Well, let's do this

15  systematically.

16             (Exhibit Barbieri-7 was marked for

17  identification.)

18  BY MR. MORIARTY:

19     Q.      I'm marking this as Barbieri Exhibit 7.

20  It was previously marked in Matt McMullin's depo as

21  Exhibit 2.

22             Do you see that?

23     A.      Yes.

24     Q.      Is this the one that looks familiar to

25  you --

1          A.        Yes, sir.

2          Q.        -- as being in this litigation package?

3          A.        Yes, it is.

4          Q.        Now, if a lawyer sent a second set of

5    tablets, would that get a separate work order number

6    at NMS?

7          A.        Not necessarily.  If it came in and we

8    knew it was coming in under the same work order, we

9    would like to put them together if we could.

10              If we're not aware of that, they may be

11   logged in under a separate work order.

12         Q.        Do you know -- well, this Exhibit 6

13   purports to be an NMS report to what was then the law

14   firm of Ernst & Mattison; correct?

15         A.        Yes, it is.

16         Q.        And it refers to Dan McCornack right on

17   here, doesn't it?

18         A.        Yes, it does.

19         Q.        And it has a work order, 9154008.

20              Do you see that?

21         A.        Yes, I do.

22         Q.        Is that the same work order number that

23   is with the tablet analysis in the stack that you

24   brought with you?

25         A.        No, it's not.

PLAINTIFFS' EXHIBITS 012939

1      Q.      And then underneath it has a prior NMS

2   work order number, does it not?

3      A.      Yes.

4      Q.      09107925.

5      A.      25.

6      Q.      Is that the work order number for the

7   tablet analysis that you brought?

8      A.      Yes.

9      Q.      Just based on what I've shown you, does

10  it appear that there was a second set of tablets sent

11  and analyzed by NMS?

12              MR. ERNST:  Objection.

13              THE WITNESS:  Yes, that's what it looks

14  like.

15  BY MR. MORIARTY:

16      Q.      Were those tablets within the

17  specifications?

18              MR. ERNST:  Objection.

19              THE WITNESS:  Well, within

20  specifications, I don't -- I can't answer that.

21              I see the results of what is listed

22  here, and if I assume that they are 0.25 milligram

23  tablets, then it looks like at least most of them

24  would be within specifications.

25              There are two listed as 0.227.  I don't

Page 43

1   know if that is outside the manufacturer's

2   specifications for the tablet.

3   BY MR. MORIARTY:

4       Q.      Okay.

5       A.      But if they were 0.125, actually, then

6   they were not.

7               So without -- without knowing what the

8   tablets were, I really can't answer that question.

9       Q.      Okay.  If the -- if you assume these are

10  0.250 digoxin tablets and you assume that the

11  manufacturer's spec on the low side, which is FDA

12  approved, is 90 percent, then those two tablets are

13  still within the specs; correct?

14              MR. ERNST:  Objection.

15              THE WITNESS:  Yes.

16  BY MR. MORIARTY:

17      Q.      All right.

18      A.      They would all be within spec.

19      Q.      Okay.  And when you came here today, why

20  is it that NMS would not do a sweep, for lack of a

21  better term, for all of the McCornack work order

22  materials and that one be included in the stack?

23      A.      Well, it's not that we wouldn't or we

24  couldn't.  I was focused on -- at least I was asked to

25  talk about the biological testing that was done.

PLAINTIFFS' EXHIBITS 012941

1          And only because the original litigation

2    package had one of those tablet cases involved was it

3    included here.

4          Q.    Got it.

5          A.    So, you know, I wasn't asked to review

6    that other documentation.

7          Q.    Okay.

8          A.    But we certainly would have if

9    requested.

10         Q.    All right.  And just for clarity of the

11   record so people don't always have to refer to the

12   exhibits, there were five additional tablets in

13   Exhibit 6; correct?

14         A.    That's the way --

15               MR. ERNST:  Object --

16               THE WITNESS:  I'm sorry.

17               MR. ERNST:  Objection.  That makes an

18   assumption.

19   BY MR. MORIARTY:

20         Q.    Go ahead.

21         A.    That's the way it looks from the report.

22         Q.    Dr. Barbieri, I know you haven't seen

23   this before, but when it describes the specimen, does

24   it say Five white pills in a cinnamon Altoids

25   container?

PLAINTIFFS' EXHIBITS 012942

Page 45

1       A.      Yes, it does.  That's stated exactly the
2  way it's stated there.

3       Q.      Does it say anything about whether that
4  was packed with tissue?

5       A.      No, it doesn't.

6       Q.      And just assuming that there was nothing
7  else in that Altoids container but five digoxin
8  tablets, would you agree with me that there would be
9  plenty of room for those tablets to rattle around in
10 the shipping process from California to Philadelphia,
11 Pennsylvania?

12              MR. ERNST:  Objection.

13              THE WITNESS:  Well, I know that there
14 are big-sized Altoids packages and there's also these
15 minis.  So if we're assuming that it's the regular
16 sized package, then, yes, I'd agree.  If it's the
17 small one, maybe not.

18 BY MR. MORIARTY:

19      Q.      Okay.  Well, even a small one, five
20 digoxin tablets wouldn't take up a lot of space;
21 right?

22      A.      Wouldn't take up a lot of space.

23      Q.      Okay.  Now, when NMS gets something in a
24 container like that, do they just take the tablets out
25 or do they also assess the degree of residue that may

1    be left in the container from a digoxin tablet that

2    may have come off those in the shipping process?

3        A.        That's a good question.  I don't know

4    the specific answer to that.

5                  If there was a single tablet and there

6    was a significant amount of residue in the container,

7    typically the chemist in charge of the case would

8    rinse all of that material out because that would have

9    all come from one tablet.

10                 In the case of five tablets, that may

11   have caused -- we could have a problem because we

12   don't know which of those tablets, you know, caused

13   the residue.

14                 So I really am having trouble answering

15   that because it may depend upon what the evidence

16   looks like.

17       Q.        Does NMS Labs have a website?

18       A.        Yes, it does.

19       Q.        Does NMS Labs' website have shipping

20   instructions for specimens?

21       A.        I believe it does.

22       Q.        Does the NMS instructions for shipping

23   specimens include cinnamon Altoid containers?

24       A.        I don't think that's on our website.

25       Q.        And certainly if it did, you'd probably

1  counsel that it be packed with tissue to cushion the

2  blow; correct?

3       A.     Absolutely.

4              MR. MORIARTY:  Okay.  I'm sorry, Miss, I

5  took that from you.

6  BY MR. MORIARTY:

7       Q.     So getting back to something you were

8  talking about quite some time ago on whether you were

9  going to offer opinions, I assume that -- well, I'll

10  just ask you:  Are you going to testify that the

11  tablets Mr. McCornack ingested prior to his death

12  contained anything other than the labeled amount of

13  digoxin?

14       A.     I have no basis for testifying to that,

15  so, no, I would not.

16       Q.     Okay.  Are you going to render any

17  opinions about whether Mr. McCornack had digoxin

18  toxicity or whether digoxin played any role in his

19  death?

20              MR. ERNST:  I'm going to object and I --

21              THE WITNESS:  I'm not going to testify

22  to that.

23              MR. MORIARTY:  I'm going to mark this as

24  Dr. Barbieri Exhibit 8.  It was formerly marked as

25  McMullin Exhibit 3.

PLAINTIFFS' EXHIBITS 012945

Page 48

1              (Exhibit Barbieri-8 was marked for

2     identification.)

3     BY MR. MORIARTY:

4         Q.      Okay.  Is that the blood analysis for

5     the McCornack specimen?

6         A.      Yes.  This is the second report,

7     toxicology report, that I authored on this case.

8         Q.      All right.  And for lack of a better

9     term, you were what is known as the -- I'm sorry --

10    supervising toxicologist; is that right?

11        A.      At which time?  When I did this case?

12        Q.      Yes.

13        A.      Well, I was the toxicologist who did the

14    report for this case.

15        Q.      Okay.  So what is your title with

16    respect to this case?

17        A.      I'm the person who reviewed the data and

18    signed the report.

19        Q.      Who actually ran the blood through

20    whatever tests are done?

21        A.      We have a whole lab staff, and there are

22    people in the lab in different departments that would

23    have done different pieces of this analysis.  And some

24    of the screen data as well.

25        Q.      So your role is then what?

1      A.      My role would be to take the data, some

2   of it original data, some of it through the computer,

3   review that data, make sure it makes sense in terms of

4   what I see in the case, generate a report listing the

5   specimens, what was requested, the factual results

6   that we obtained, and to publish that in a signed

7   report with certain reference comments that the report

8   could be modified by me.

9              And then at the end, to list everything

10   that we did in terms of testing.

11      Q.      Got it.

12              MR. ERNST:  And this is Number 8?

13              MR. MORIARTY:  8.

14              THE WITNESS:  Yes.

15   BY MR. MORIARTY:

16      Q.      And I assume you have not read

17   Dr. McMullin's testimony regarding this document?

18      A.      I have not.

19      Q.      Did you talk to him about it?

20      A.      After the first phone call that I

21   received from Mr. Ernst and he mentioned Matt

22   McMullin's name, that he was deposed on the case, and

23   then, of course, as we pulled up the records I found

24   that out, I went to Matt McMullin and I said to him,

25   Do you remember being deposed on the McCornack case?

PLAINTIFFS' EXHIBITS 012947

1           And he says he remembers being deposed

2   on two cases that involved tablet testing and there

3   was one of them with biologicals.

4           And I said, Can you tell me anything

5   about -- because I don't know why I'm being deposed

6   again.

7           And he said, no.  There was a lot of

8   discussion, there were a lot of people in the room.

9   But he said they -- his memory was that the focus was

10  on the tablets.

11          So that was the extent of our

12  conversation.  And I just assumed that I was going to

13  talk about the biologicals.

14      Q.      Okey-doke.

15          Now, if you look at the -- I'm sorry,

16  let me take a step back.

17          Have you ever seen lab tests that are

18  done for clinical purposes?

19      A.      Yes.

20      Q.      And typically in a lab test done for

21  clinical purposes, there is the result; correct?

22      A.      Yes.

23      Q.      And then near it somewhere, above it or

24  to the side, is typically the lab's reference range

25  for that -- whatever that test may be; correct?

Page 51

1       A.      Yes.

2       Q.      So if they're doing a red blood cell

3   count, it will say RBC, then it will have that

4   patient's red blood cell count; correct?

5       A.      Yes.

6       Q.      And then typically in parentheses off to

7   the side it will say what the normal red blood cell

8   count in that lab should be; right?

9       A.      Yes.

10      Q.      All right.  And that information in

11  parentheses, do you call that the reference range?

12      A.      Generally.

13      Q.      Now, on Exhibit 8, whether it's for

14  alcohol, diltiazem, digoxin, there is no reference

15  range next to those figures, is there?

16      A.      Right.

17              On a forensic report, we don't put that

18  on the -- on the front under the Findings.  Many times

19  if we know what it is, we would put it in the Comments

20  section on the back.

21      Q.      Okay.  So --

22      A.      Can I add to that?

23      Q.      Sure.

24      A.      If this was a clinical case with a

25  clinical format report -- we have those for our

PLAINTIFFS' EXHIBITS 012949

1   clinical clients -- what you described would be on the

2   report.

3          Q.      And the reason it is not on the report

4   is because this is not a clinical case, this is a

5   forensic case; right?

6          A.      Yes.

7          Q.      And there is no reference range for dead

8   people; right?

9                  MR. ERNST:  Objection.

10                 THE WITNESS:  That's true.

11   BY MR. MORIARTY:

12         Q.      Okay.  So, for example, for diltiazem,

13   there is no known figure for what the diltiazem level

14   should be, if any, in somebody who died.

15         A.      Well, in terms of therapeutic.  I mean,

16   we have reference ranges that we add in terms of

17   people taking a certain dose and finding postmortem

18   blood levels of X to Y.

19         Q.      Right.

20         A.      But they're not therapeutic ranges, per

21   se, like antemortem would be.

22         Q.      Got it.

23                 So if you go to Page 2, Paragraph 2,

24   this is talking about diltiazem; right?

25         A.      Yes.

PLAINTIFFS' EXHIBITS 012950

1      Q.      And at the end of the first paragraph --

2   at the beginning of the second paragraph it says,

3   Therapeutic blood levels of diltiazem appear to be in

4   the range of 50 to 200 nanograms per milliliter;

5   correct?

6      A.      That's correct.

7      Q.      And what that is referring to is that in

8   the living, from your review of the literature, this

9   is what you would expect to see in a patient who was

10  being monitored for diltiazem; yes?

11     A.      Yes.

12             MR. MORIARTY:  We have two minutes left

13  on the first tape.  How time flies.  So we might as

14  well take a five-minute break.

15             THE WITNESS:  Okay.

16             VIDEO OPERATOR:  We're going off the

17  record at 11:46.

18             (A recess was taken from 11:46 to

19  11:51 a.m.)

20             VIDEO OPERATOR:  We're back on the

21  record at 11:51.

22             You may proceed.

23  BY MR. MORIARTY:

24     Q.      All right.  Dr. Barbieri, I want to ask

25  you some questions about the blood sample.

Page 54

1           And just to cut straight through it, I

2    want you to assume that Dr. Mason, the coroner, has

3    testified that he drew the specimen from an axillary

4    vein.  Okay?

5        A.      Okay.

6        Q.      Do you know where the axillary vein is?

7        A.      It's up here (indicating) in your arm.

8        Q.      Are you pointing to the arm, the

9    shoulder --

10       A.      Well, it's right in this area

11   (indicating).  It's near the subclavian.  And the

12   axilla -- this is the axilla (indicating), so it would

13   be right in the junction between the arm and the

14   shoulder area.

15       Q.      Okay.  From your understanding of the

16   literature, is the axillary vein even referred to

17   often as a draw site for postmortem blood analysis?

18       A.      Well, it's been referred to.  It's not a

19   common one.

20       Q.      And would you agree with me that it is

21   not a true peripheral specimen?

22               MR. ERNST:  Objection.

23               THE WITNESS:  In terms of certain

24   pathologists, they consider it a peripheral site.

25               In terms of a toxicologist, myself, I do

Page 55

1    not consider it a peripheral site.

2    BY MR. MORIARTY:

3        Q.      Why?

4        A.      It's too close to the chest cavity.

5        Q.      What was the total sample size between

6    the two vials of blood?

7        A.      The way we have them listed on the

8    report, per our quick measurement, the total sample

9    size was 24 mL's of blood.

10       Q.      Do you have any knowledge or opinion as

11   to the blood volume of an axillary vein?

12       A.      No, I wouldn't know.

13       Q.      Do you know anything about whether a

14   specimen should be -- I'm sorry -- a -- let me start

15   over.

16               Do you know anything from your own

17   toxicological experience about whether it is advisable

18   to ligate a vessel before drawing a postmortem blood

19   specimen?

20       A.      It's the preferred way of taking a

21   specimen.

22       Q.      Why?

23       A.      Because it prevents a back flow from

24   upstream so that you don't get contamination from

25   sites away from the draw site.

Page 56

1      Q.      Okay.  So what would the danger of -- be

2   of drawing 24 milliliters of blood from a non-ligated

3   axillary vein?

4              MR. ERNST:  Objection.

5              THE WITNESS:  Well, the only danger is

6   it's not a pure axillary vein sample.

7   BY MR. MORIARTY:

8      Q.      Okay.

9      A.      You may have -- you may have blood

10  that's being pulled from closer to the chest as it's

11  being drawn.  I'm assuming that the -- the draw is

12  going up toward the chest and not downward.

13     Q.      Okay.  So the danger is that the draw

14  would get subclavian blood?

15     A.      Subclavian blood comes off -- yes, that

16  would be the site of contamination, again, if it's

17  being pulled in this direction.

18     Q.      And obviously you don't know anything

19  about the volume of an axillary.  You probably don't

20  know about the volume of a subclavian vein either, do

21  you?

22     A.      It's -- it's bigger.

23     Q.      Okay.  But, in general, the overall

24  danger -- and when I say "danger," I mean to the

25  integrity of the specimen or the quality of the

PLAINTIFFS' EXHIBITS 012954

1    specimen -- is that you're drawing blood from closer

2    to the heart than you want to.

3         A.    Yes.

4         Q.    Does NMS's website have a collection

5    procedure on it?

6         A.    There are submission procedures.  I

7    don't believe that we give collection procedures in

8    terms of how to draw samples.

9         Q.    Is -- whatever procedures are out there,

10   are they designed to lower the risk of analytical

11   error?

12        A.    Yes.

13        Q.    Does NMS say on its website that it

14   prefers femoral samples?

15        A.    Yes.

16        Q.    Does NMS on its website say that it

17   prefers more than one location of sample?

18        A.    Yes.

19        Q.    Does the NMS website say that it prefers

20   samples from the heart and the femoral vein?

21        A.    Yes.

22        Q.    In this case, did Dr. Mason do either?

23              MR. ERNST:  Objection.

24   BY MR. MORIARTY:

25        Q.    To your knowledge?

PLAINTIFFS' EXHIBITS 012955

1      A.      Well, to my knowledge, I don't know

2   that.  He did not submit the heart and peripheral

3   blood as two different sample sites.

4      Q.      Okay.

5      A.      The two peripheral samples could have

6   come from two sites.  I don't know that.

7      Q.      All right.  But -- okay.

8              Does the NMS website also list various

9   other types of specimens such as vitreous and liver?

10     A.      It does.

11     Q.      Are those options available so that you

12  can cross-check your results and do the best you can

13  to give accurate results?

14     A.      Yes.  If a problem comes up and we have

15  an additional sample that saves the client in terms of

16  shipping costs and delays in testing an alternate

17  specimen, such as the liver or vitreous.

18     Q.      Well, what is the risk, if you will,

19  from a forensic toxicological standpoint of just

20  having one blood specimen as the only matrix that

21  you're analyzing?

22     A.      Well, one risk would be that the sample

23  could have been contaminated at the site, at the

24  autopsy site.

25              Another risk is that the draw site could

PLAINTIFFS' EXHIBITS 012956

Page 59

1   have -- does not represent really what's happening

2   with the individual.

3              Let me give you a case in point.  You

4   have an individual who has an i.v. morphine drip into

5   the arm, the left arm, per se, and that's all

6   disconnected after the person dies.

7              And at autopsy, they take a sample from

8   the left arm.  Well, the concentration of morphine in

9   that left arm is going to be significantly greater

10  than it would be in the femoral blood, for example.

11             So that -- if we had two different

12  samples, we would say, These results make no sense

13  based on the history you're giving us.  Let's test

14  something else.  Let's test the liver or femoral blood

15  sample or the vitreous.

16     Q.     Okay.

17     A.     Okay?

18     Q.     Do you know whether NMS measured the

19  digoxin concentration in -- I'm sorry, withdraw that

20  question.

21             This is a whole blood sample, not a

22  serum sample; correct?

23     A.     This is -- yes.  It's postmortem blood

24  we consider as whole blood, though it's not really

25  whole blood as we think about it in a living person.

PLAINTIFFS' EXHIBITS 012957

1      Q.      Is there an analytical difference

2   between whole blood and serum?

3      A.      Very much so.

4      Q.      What's the difference?

5      A.      Serum does not contain deformed

6   elements.  It's just the liquid portion of a clotted

7   sample.

8      Q.      My question was poor.

9              If you were somehow able to draw a

10  sample at the same time and analyze it from a whole

11  blood standpoint and a serum standpoint, would the

12  numbers come out different?

13     A.      They may.

14     Q.      All right.  And how would they be

15  different?

16     A.      Well, certain drugs distribute

17  differently into the formed elements of whole blood

18  than they do into the liquid portion.  Ethyl alcohol

19  would be a perfect example.

20     Q.      What about digoxin?

21     A.      Digoxin, the ratio that's been in the

22  literature is whole blood versus serum -- plasma that

23  they used is 1 to 1.1, so it's close.  A little bit

24  higher in blood than in plasma or serum.

25     Q.      Okay.  And do you have to take that into

PLAINTIFFS' EXHIBITS 012958

1    account in interpreting postmortem whole blood

2    analysis?

3         A.      Yes.  It's very important to take that

4    into account.  Especially if there's a big difference

5    between the two.

6         Q.      You've heard the term "error rates"?

7         A.      Yes.

8         Q.      What's the error rate of the whole blood

9    postmortem digoxin analysis in this type of case?

10        A.      Well, what we would do in this case if

11   we had to answer that question is replicate samples

12   would have to agree within plus or minus 20 percent of

13   each other.  That would be the error rate for the

14   analysis -- for the total analysis.

15               That doesn't mean that any one sample is

16   off by 20 percent.  It just means corresponding

17   between two replicate analyses.

18        Q.      If you had two.

19        A.      If we had two.

20        Q.      In your experience as a forensic

21   toxicologist, how reliable is a liver specimen for

22   quantifying digoxin postmortem?

23        A.      Not that reliable.

24        Q.      Did you have a liver sample available to

25   you in this case?

1        A.       There was a liver submitted, yes.

2        Q.       Was it ever run?

3        A.       No, it wasn't.

4        Q.       Why?

5        A.       It wasn't asked to be run.

6        Q.       Who does the asking?  Is it Mr. Ernst's

7   office or Dr. Mason's office?

8        A.       Well, in this case, the original sample

9   came in from the Santa Cruz County coroner, so they're

10  our client.  They would have to do the asking.

11             We're -- we're different than a state

12  lab or a government lab who may look at results and

13  want to do every sample tested.  Everything we do we

14  charge for and that would be unethical for us to do

15  work like that.

16       Q.       Sure.

17             Tell us the sort of things that happen

18  to tissue and blood, even in a properly preserved

19  body, when you get out to 70 to 78 hours postmortem.

20             MR. ERNST:  Objection.

21             But you can go ahead and answer the

22  question.

23             THE WITNESS:  Well, in terms of blood,

24  the cells are breaking down.  The red cells are

25  hemolyzing.  The white cells are hemolyzing.

PLAINTIFFS' EXHIBITS 012960

1          That's why the sample, we call it whole

2     blood, but it really has no relationship to real whole

3     blood anymore.

4          You could have tissue products that are

5     going into the blood and it becomes contaminated with

6     tissue fluids as the walls of the arteries or the

7     veins break down as well.

8          The same thing happens in the liver or

9     any other tissue.  Tissue necrosis occurs.  Postmortem

10    artifacts occur.

11         And so, you know, you do the best you

12    can with what you have, but it's not representative,

13    necessarily, of what was there immediately after the

14    person died.

15    BY MR. MORIARTY:

16         Q.     Are there things called proteolysis and

17    tissue autolysis that occur?

18         A.     Yes, that does occur.

19         Q.     I forgot to ask you this up front.

20         Have you and I ever talked about this

21    case before we went on the record today?

22         A.     No, we have not.

23         Q.     How much time have you spent talking to

24    Mr. Ernst before we went on the record today?

25         A.     The first phone call was I guess about

PLAINTIFFS' EXHIBITS 012961

1   40 -- 40 to 45 minutes.

2            There was a subsequent phone call that

3   occurred with Mr. Kilpatrick that was maybe five or

4   ten minutes.

5            And then there was a follow-up phone

6   call which did not have anything to do specifically

7   with the case, it was more my misunderstanding of what

8   was written in one of those documents that I objected

9   to, and he -- Mr. Ernst contacted me and tried to

10  explain the purpose of what was written there.

11       Q.    Okay.

12       A.    So that was another maybe five to ten

13  minutes.

14            I think that's the total conversations

15  that we've had.

16       Q.    All right.  When you say a

17  misunderstanding about something written in the

18  document, are you talking about Exhibit 4?

19       A.    Yes.  This was Pages 9 and 10 that we

20  talked about before.

21       Q.    Okay.  Now, Drs. Middleberg, Logan, you,

22  McMullin, are all available, theoretically, to give

23  testimony about postmortem blood analysis for

24  specimens run at NMS; correct?

25       A.    Yes.

1      Q.      Do you gentlemen have meetings to

2   discuss this scientific principle in order to assure

3   that you are on the same page?

4      A.      Not necessarily.  I mean, we -- we have

5   toxicology meetings and we have meetings to discuss

6   casework.  We don't specifically talk about topics

7   like this.

8              We may bring up a case where a paper is

9   written about postmortem redistribution, and we want

10  -- everybody reads it and we talk about it.  Kind of a

11  journal club type of thing.  So those topics have come

12  up.

13     Q.      Okay.

14     A.      But it's not a formal meeting to do

15  that.

16     Q.      Well, how would you know, for example,

17  whether you are saying something under oath that is

18  consistent with what your colleagues in the same

19  practice are saying under oath in a different case?

20     A.      Well, we -- we talk about cases that

21  have come up and how the testimony went and what the

22  questions are and what the issues are.  Especially if

23  there are unusual circumstances.

24     Q.      Okay.  And then do you keep an archive

25  or try to keep an archive of the pieces of medical

1   literature that lawyers ask you about?

2        A.      Well, we all have our own reference

3   files, you know, paper copies of references.

4              We also have a sentry on our -- we have

5   a computer drive that has nothing but reference

6   articles, they're all stored electronically.

7              So if something comes up like an out --

8   broken out by drug, by events like postmortem

9   redistribution or distribution of bioavailability.

10             So we all have access to those files.

11  We all share our own files as well so that we

12  distribute information among the group.

13       Q.     Does NMS keep a record of all the

14  postmortem digoxin specimens that it has run?

15       A.     Our IT department can get that

16  information.  We can -- we can start a list from --

17  you know, giving a certain date range of all the

18  digoxin values and then we can list it by forensic

19  cases versus clinical cases, for example.

20             Now, in those forensics cases, there may

21  be cases that are not postmortem.  We wouldn't know

22  that.  We'd have to search back into the

23  documentation.

24             So it's limited, but we can get some of

25  that information.

PLAINTIFFS' EXHIBITS 012964

1      Q.      So, sitting here today, you wouldn't

2   know where this digoxin result of 3.6 stands in

3   relation to other postmortem levels that your lab has

4   done.

5              MR. ERNST:  Object --

6              THE WITNESS:  No, I wouldn't know that

7   as I sit here today.

8              MR. ERNST:  Objection.

9   BY MR. MORIARTY:

10     Q.      Does digoxin undergo postmortem

11  redistribution at multiple locations in the body?

12     A.      Yes.

13     Q.      Does it happen at peripheral sites?

14     A.      It would happen at peripheral sites

15  through diffusion from skeletal muscle into the

16  bloodstream, yes.

17     Q.      So even in a true peripheral sample,

18  like a femoral sample, you would expect there to be

19  some postmortem redistribution of digoxin, depending

20  on the timing of the postmortem draw; correct?

21     A.      I would expect that there would be

22  some.  It would be certainly much less than it would

23  be from a blood sample taken from the chest.

24     Q.      All right.  Do you know how long after

25  death the postmortem draw was in this case?

PLAINTIFFS' EXHIBITS 012965