Page 68

1      A.      I heard a figure but I don't want to

2  state it because it's not documented, so I would say I

3  don't know for sure.

4      Q.      Well, if I told you it was over 75

5  hours, does that ring true to what you were told?

6      A.      I heard it was about three days.

7      Q.      Okay.  That's pretty long, isn't it?

8      A.      It is.

9      Q.      Is it one of the longest you've ever

10 heard of?

11     A.      No.  There are -- autopsies are done a

12 week later.

13     Q.      Okay.  But certainly in a true

14 peripheral site like a femoral vein, you would expect

15 there to be postmortem redistribution of digoxin at 70

16 hours; right?

17     A.      I would.

18     Q.      And would you expect there to be

19 postmortem redistribution of digoxin in an axillary

20 vein at 70 hours?

21     A.      I think it would be in any site.

22     Q.      Okay.  Is digoxin lipophilic or

23 lipophobic?

24     A.      It's more lipophilic, but it does have

25 water-soluble characteristics.

PLAINTIFFS' EXHIBITS 012966

1      Q.      Are lipophilic compounds more likely to

2  undergo PMR than lipophobic?

3      A.      Yes.

4      Q.      Are you a member of the AAFS?

5      A.      Yes.  American Academy of Forensic

6  Sciences.

7      Q.      Yes.

8              What is Dr. Middleberg's role at NMS

9  vis-a-vis your own?

10     A.      Well, right now he is the vice president

11 of quality assurance.  He still functions as a

12 forensic toxicologist.

13             Before -- before Dr. Logan came on

14 board, he was in charge of the toxicological services

15 group.

16             And then when Barry Logan joined us, Rob

17 moved into the QA department, though he still does a

18 lot of forensic tox, and Barry headed up the

19 toxicological services group.

20     Q.      Okay.  So I assume in this case you

21 don't know anything about when Mr. McCornack took his

22 last digoxin dose before death?

23     A.      I do not.

24     Q.      Did you help draft the AutoText portions

25 that appear on Page 2 of Exhibit 8?

PLAINTIFFS' EXHIBITS 012967

1     A.     Some of these I was involved in in not

2  directly writing but certainly I had input into the

3  text itself.

4     Q.     Okay.  Do you have any --

5     A.     The digoxin, I know I did not work with

6  the digoxin.

7            But quinidine, atropine, ethyl alcohol,

8  and diltiazem are all part things that I did work over

9  the years.

10    Q.     Is there any one source in the medical

11 literature that is the definitive statement on the

12 quantity by which digoxin will redistribute postmortem

13 at various times?

14    A.     I don't know the answer to that.  I

15 haven't seen any specific papers that I know of that

16 would answer that question.

17    Q.     Are --

18    A.     I'm sure there are studies in a limited

19 number of patients that, you know, we can glean

20 information from, but I don't know if it's definitive.

21    Q.     Okay.  But you're aware that there's

22 literature that talks about quantity of

23 redistribution; right?

24    A.     Well, certainly.

25    Q.     Or magnitude of redistribution?

PLAINTIFFS' EXHIBITS 012968

1      A.      Well, based on ratios between heart

2  blood, peripheral blood, yes.

3      Q.      Is excess dose the only reason for

4  digoxin toxicity or an elevated serum level?

5      A.      No.

6      Q.      Would you expect there to be more

7  postmortem redistribution at 24 hours than 5 hours?

8      A.      I would expect so.

9      Q.      More at 44 hours than 24 hours?

10     A.      I expect so.

11     Q.      And more at 75 than 44?

12     A.      Unless -- unless we've gotten to a point

13  where, you know, things have stabilized and all the

14  concentrations in the body are the same.

15     Q.      I assume in this case you're not going

16  to render any opinions to a reasonable probability as

17  to what the dose of Mr. McCornack's digoxin was in the

18  days leading to his death.

19     A.      I will not.

20     Q.      You're not going to render any opinions

21  to a probability about the -- what his serum digoxin

22  level would have been had it been drawn prior to his

23  death.

24     A.      No, I would not.

25             MR. ERNST:  I'm going to object to that.

PLAINTIFFS' EXHIBITS 012969

1    It's incomplete.

2    BY MR. MORIARTY:

3        Q.      Are you even going to render any

4    opinions to a probability as to the likely range of

5    his serum level prior to death?

6        A.      Well, if I was given a hypothetical

7    question based on his weight and normal body functions

8    in terms of kidney function, et cetera, I could use

9    literature values to give you a ballpark estimate of

10   his antemortem level.

11       Q.      Would that require to use -- you to

12   select some random magnitude of postmortem

13   redistribution?

14       A.      Well, if we're talking about antemortem,

15   there would not be any postmortem redistribution.

16       Q.      I'm sorry, maybe my question was bad.

17               Would doing such a ballpark estimate

18   require you to assume a magnitude of the postmortem

19   redistribution?

20       A.      No.  No.  I'm not taking -- I'm not

21   taking a level that we took postmortem and trying to

22   calculate back to antemortem.

23               What I'm saying is, to be clear, what I

24   would do is if you -- somebody were to give me the --

25   as much information as you could about the situation

PLAINTIFFS' EXHIBITS 012970

1    at the time, his body weight, his typical dose, his

2    kidney function being normal, et cetera, things like

3    that, and then based on the literature of volunteers

4    taking digoxin over a certain period of time, I would

5    say the typical range would be from X to Y.

6         Q.    Okay.

7         A.    Okay?

8         Q.    But extrapolating back from postmortem

9    to anti -- antemortem -- a-n-t-e -- mortem, is

10   typically not recommended; correct?

11        A.    It's not recommended.  It's fraught with

12   all kind of perils.

13        Q.    And you've even said in other settings

14   that you can make estimates but they are not

15   necessarily accurate estimates; correct?

16        A.    That's correct.

17        Q.    And you can attempt correlations like

18   that, but you realize that the accuracy is not great;

19   correct?

20        A.    Yes.

21        Q.    And just so we're clear, this -- in

22   Exhibit 8 this diltiazem level of 630 nanograms per

23   milliliter, that is not a measurement of what Dan

24   McCornack's diltiazem level was just prior to his

25   death.

---

PLAINTIFFS' EXHIBITS 012971

1        A.        It is not.

2        Q.        And the digoxin level of 3.6 is not a

3   measurement of what Dan's digoxin level was just prior

4   to his death.

5        A.        I would be surprised if it was.

6        Q.        More likely than not, both of those, had

7   they been measured prior to death, would be

8   substantially lower; correct?

9                  MR. ERNST:  Objection.

10                 THE WITNESS:  I don't know that for a

11  fact, but I'm assuming that's what would be the case.

12  BY MR. MORIARTY:

13       Q.        More likely than not that's true?

14       A.        More -- I'm sorry.  More likely than

15  not, that's true.

16       Q.        But you can't quantify that; correct?

17       A.        Correct.

18       Q.        Is there any peer-reviewed scientific

19  literature, to your knowledge, that gives a formula

20  for any reliable back calculating from postmortem

21  levels to antemortem levels of digoxin?

22       A.        I don't know if it is a reliable

23  estimate, but what is normally done is you take some

24  of the pharmacokinetic parameters in antemortem

25  livers, such as volume distribution, and then measure

PLAINTIFFS' EXHIBITS 012972

1   half life and dose and do a calculation starting with

2   the postmortem level, trying to get an antemortem

3   level or a dose that is given.

4           The problem there is that the -- the

5   volume of distribution has a range to it.  The volumes

6   of distribution have a significant range to it.  And,

7   therefore, that's where the error comes in.

8           Because you end up with very low levels

9   to very high levels, and that's why it's not very

10  accurate.

11      Q.    Okay.  And if I remember what you told

12  me before, you haven't published any article which

13  contains any sort of calculations or anything like

14  that on this subject.

15      A.    That's correct.

16      Q.    Have you ever told a coroner to base a

17  cause of death solely on a postmortem blood tox screen

18  for digoxin?

19           MR. ERNST:  Objection.

20           THE WITNESS:  Not that I'm aware of, no.

21  BY MR. MORIARTY:

22      Q.    If you had, hypothetically, one sample,

23  so blood drawn from one site, and no other tissue

24  tested, and you knew that the specimen was drawn over

25  70 hours after death from an axillary vein, would you

1    counsel a coroner to base a cause of death on a

2    postmortem blood result from that sort of draw?

3                MR. ERNST:  Objection.

4                THE WITNESS:  With having one sample, I

5    would not.  Unless -- unless the number was just so

6    outrageously large.

7    BY MR. MORIARTY:

8        Q.     So, hypothetically, if Dr. Mason had

9    called you and said I'm looking at this diltiazem

10   result of 630 nanograms per milliliter, you know, it's

11   an axillary draw, non-ligated, over 70 hours after

12   death.

13               Dr. Barbieri, do you think that I should

14   say that this man died of diltiazem toxicity?

15               What would you say?

16       A.     I would tell him probably not.

17       Q.     Okay.

18       A.     And I would say to him that the -- the

19   blood serum ratio of diltiazem after -- you know, a

20   study is around two and a half, and these levels are

21   typical -- or that level is typical of what we see in

22   postmortem cases and non-death cases related to

23   diltiazem.

24               And it's certainly nowhere near the

25   range in the literature of death cases caused by

PLAINTIFFS' EXHIBITS 012974

1  diltiazem.

2       Q.      Okay.

3       A.      So I would say that the diltiazem could

4  be contributory to some degree based on the history,

5  but by itself, no way.

6       Q.      And you'd agree with me that a digoxin

7  level of 3.6 even in a living person who had given a

8  serum sample is not necessarily fatal; correct?

9       A.      Correct.

10              MR. ERNST:  Object.

11  BY MR. MORIARTY:

12      Q.      And so if Dr. Mason had called you and

13  said, You know, Dr. Barbieri, I see your result of 3.6

14  nanograms per milliliter based on this specimen, would

15  you advise him to say that Dan McCornack died of

16  digoxin toxicity?

17              MR. ERNST:  Objection.

18              THE WITNESS:  I probably would not have

19  done that.

20              Can I add to that answer?

21  BY MR. MORIARTY:

22      Q.      Sure.

23      A.      I think it's important for everybody to

24  understand that people have died from digoxin at

25  levels that were well within therapeutic range as

PLAINTIFFS' EXHIBITS 012975

1    well.

2            So if he has no other pathology, you

3    could say that certainly a level like that of digoxin

4    could be a cause of death because people die at

5    therapeutic levels as well.

6       Q.      Okay.

7       A.      Just based on that number, again, I

8    would not definitively say that digoxin caused the

9    death.

10           MR. MORIARTY:  How are we doing on time?

11           VIDEO OPERATOR:  Good.  Thirty-one

12    minutes left.

13    BY MR. MORIARTY:

14       Q.      Do you still read the Journal of

15    Analytical Toxicology?

16       A.      Yes.

17       Q.      Are you still a reviewer for the Journal

18    of Analytical Toxicology?

19       A.      Yes.

20           MR. MORIARTY:  Why do I keep doing that?

21           (Exhibit Barbieri-9 was marked for

22    identification.)

23    BY MR. MORIARTY:

24       Q.      I'm handing you Dr. Barbieri Exhibit 9.

25           This is a letter to the editor in the

PLAINTIFFS' EXHIBITS 012976

1    Journal of Analytical Toxicology in the July/August

2    issue of this year; correct?

3        A.      Yes.

4        Q.      2011; right?

5        A.      Yes.

6        Q.      Do you know Fred Apple?

7        A.      Yes, I do.

8        Q.      Is he a reliable coroner?

9                MR. ERNST:  I'm going to object.  That's

10   --

11   BY MR. MORIARTY:

12       Q.      To your knowledge.

13               MR. ERNST:  Object.

14               MR. MORIARTY:  Okay.  I'll withdraw the

15   question.

16   BY MR. MORIARTY:

17       Q.      What is Fred Apple's reputation in the

18   scientific community, if you know?

19       A.      Well, he has a -- he has a following,

20   and he has done some very good work over the years.

21   There are things that he has written that I completely

22   disagree with as well.

23       Q.      Okay.

24       A.      But he certainly has a decent reputation

25   as a -- as a medical toxicologist.

PLAINTIFFS' EXHIBITS 012977

1     Q.     Now, when the editors of the Journal put

2  a letter to the editor in, do any of the reviewers,

3  like you, get to look it over before it's published?

4     A.     No, generally not.  This is usually

5  handled by the editorial staff.

6     Q.     All right.  Have you read this before

7  today?

8     A.     No.  No.  This is a -- this is a recent

9  one.  I have not read this -- I have not seen this one

10  yet.  I haven't opened up that July/August issue.

11     Q.     Behind an issue or two, are you?

12     A.     I am.

13     Q.     Okay.  Let me just ask you about a

14  couple passages in this.

15     Right here in -- partway through the

16  second paragraph it says, The scientific fact is that

17  PMR occurs in both central (heart) blood as well as in

18  peripheral (femoral) blood, as shown for numerous

19  drugs in Table I.

20     Did I read that correctly?

21     A.     Yes, you did.

22     Q.     Do you agree with that?

23     A.     Yes --

24     MR. ERNST:  I'm going to --

25     THE WITNESS:  I'm sorry.

PLAINTIFFS' EXHIBITS 012978

Page 81

1          MR. ERNST:  -- object to this line of

2    questioning.

3    BY MR. MORIARTY:

4        Q.     Is digoxin in Table I?

5               MR. ERNST:  Can I have a continuing

6    objection?

7               MR. MORIARTY:  Yes.

8               MR. ERNST:  Thank you.

9    BY MR. MORIARTY:

10       Q.     Is digoxin in Table I?

11       A.     Yes, digoxin is listed in Table I.

12       Q.     For both heart and peripheral?

13       A.     That's what it says.

14       Q.     On the second page, at the end of this

15   paragraph that continues on from the preceding page,

16   it says, When heart or peripheral blood is drawn --

17   are you with me?

18       A.     I have it.

19       Q.     -- it more likely than not does not

20   reflect the blood concentration at the time of death,

21   but reflects the combination of tissue-bound drug that

22   has been released into the blood/fluid that is drawn

23   at autopsy hours after death.

24              Did I read it correctly?

25       A.     Yes.

PLAINTIFFS' EXHIBITS 012979

1      Q.      Do you agree with that?

2              MR. ERNST:  Objection.

3              THE WITNESS:  That is a -- that is a

4   general statement for many drugs, not specific to

5   digoxin.  And so, yes, I do agree with that.

6   BY MR. MORIARTY:

7      Q.      And it goes on to say, I opine that this

8   needs to be carefully considered in cause of death

9   determinations when interpretation of PM drug

10  concentrations is backed by literature in support of

11  PMR.

12             Did I read it correctly?

13     A.      Yes.

14     Q.      And do you agree with it?

15             MR. ERNST:  Objection.

16             THE WITNESS:  I think it's a fair

17  statement, so I would agree with it.

18  BY MR. MORIARTY:

19     Q.      It goes on to say, This is especially

20  true in death cases in which blood concentrations may

21  be overinterpreted as the cause of death based on the

22  assumption that the peripheral PM blood concentration

23  is an accurate record of the perimortem blood

24  concentration at the time of death.

25             Did I read it correctly?

PLAINTIFFS' EXHIBITS 012980

1         A.        Yes.

2         Q.        Do you agree with that?

3                   MR. ERNST:  Objection.

4                   THE WITNESS:  Yes, I do.

5    BY MR. MORIARTY:

6         Q.        Do you know anything about whether

7    Dr. Mason and his staff have the ability and skill to

8    draw vitreous samples?

9         A.        I don't know for sure, but I'm assuming

10   that they do.

11                  (Exhibit Barbieri-10 was marked for

12   identification.)

13   BY MR. MORIARTY:

14        Q.        I have marked this International Journal

15   of Legal Medicine, year 2000, I think it's Exhibit 10,

16   isn't it?

17        A.        Yes.

18        Q.        Have you ever read this before?

19        A.        This article, no, I have not.

20        Q.        Well, basically what they're trying to

21   do is figure out if -- because postmortem blood is

22   unreliable, they're questioning whether vitreous is

23   any better.

24                  Is that a gross description of what this

25   is about?

PLAINTIFFS' EXHIBITS 012981

Page 84

1      A.      It looks that way.

2      Q.      Okay.  And it says here, Postmortem MDMA

3   concentrations in vitreous humor were closer to the

4   antemortem blood levels when compared to cardiac blood

5   samples.

6              Do you see that?

7      A.      Yes, I see that.

8      Q.      And MDMA is basically methamphetamine;

9   right?

10     A.      Well, it's a derivative of

11   methamphetamine.

12     Q.      Okay.

13     A.      It's Ecstasy, the other name.

14     Q.      So in the second column in the first

15   paragraph do you see where they're footnoting 5?

16     A.      Yes.

17             Under -- after femoral vein?

18     Q.      Yes.

19     A.      It says 5.

20     Q.      After --

21             MR. MORIARTY:  Do you see where I am,

22   Don?

23             MR. ERNST:  No.

24             MR. MORIARTY:  Above where your pen is.

25             MR. ERNST:  Thank you.

1   BY MR. MORIARTY:

2       Q.      However, bearing in mind this general

3   recommendation, a single blood sample is often

4   insufficient to draw appropriate conclusions.

5              Another sample, tissue or fluid, should

6   not only be used as an analytical control for the

7   blood level determined but could also provide

8   information on the pharmacokinetic phase and as a

9   result the time of drug intake.

10             Do you agree with that?

11             MR. ERNST:  Objection.

12             THE WITNESS:  I don't know.  I'd have to

13  read through to understand what they're saying here --

14  BY MR. MORIARTY:

15      Q.      All right.

16      A.      -- without taking a snapshot of it.

17      Q.      Well, the bottom line is that even your

18  company advocates more than one type of sample for

19  cross-checking purposes.

20      A.      Well, that I -- that I agree with, yes.

21      Q.      Okay.

22             (Exhibit Barbieri-11 was marked for

23  identification.)

24  BY MR. MORIARTY:

25      Q.      I'm handing you Dr. Barbieri Number 11.

1          MR. MORIARTY:  Sorry, Don.

2    BY MR. MORIARTY:

3        Q.      Have you ever seen this article before?

4        A.      Yes, I have.

5        Q.      Is it in your own archive of materials

6    about this subject?

7        A.      Yes, it is.

8        Q.      So let's go to Page 237.  It says

9    Examples of drugs known to undergo PMR.

10          Do you see that section?

11       A.      Yes.

12       Q.      Digoxin is the second one listed;

13   correct?

14       A.      Yes.  Uh-huh.

15       Q.      And if you go to Page 238, the second

16   column -- I'm sorry.  Oh, I'm sorry.  It got buried

17   there.

18          VIDEO OPERATOR:  Yeah, it's making a

19   noise.

20   BY MR. MORIARTY:

21       Q.      Okay.  Let's go back.

22          I'm at Page 238 on the bottom of the

23   left column where it says Practical implications for

24   the medical toxicologist?

25       A.      Uh-huh.

1            MR. ERNST:  Uh-huh.

2   BY MR. MORIARTY:

3        Q.      It says, Peripheral blood is less likely

4   to be subject to the postmortem elevations in drug

5   concentrations seen in central blood sources such as

6   the heart.

7                Do you agree with that?

8        A.      Yes.

9        Q.      Further down in that same paragraph,

10  Heart blood is probably one of the least informative

11  areas for sampling because the redistribution of drug

12  from the lung, liver, or myocardium affects the

13  resulting drug concentration and, therefore, should

14  not be used without a corresponding peripheral blood

15  sample.

16               Do you see that?

17       A.      I do.

18       Q.      Do you agree?

19       A.      Yeah, let me just clarify.

20               They're talking about concentrations

21  found in heart blood.  And that I certainly agree

22  with.

23       Q.      Okay.

24       A.      Heart blood can be very informative in

25  terms of screening a compound.

1      Q.      Okay.  In the next section, it's

2   Alternative to blood, and they're talking about other

3   tissues.  It says, Of these, the vitreous, because of

4   its isolation, appears to be less susceptible than

5   blood to postmortem changes.

6               It is also a more simple environment

7   than putrefied blood containing 98 to 99 percent

8   water.

9               Do you agree with that?

10      A.      Yes, I do.

11              (Exhibit Barbieri-12 was marked for

12   identification.)

13   BY MR. MORIARTY:

14      Q.      Dr. Barbieri, I asked this Keith Gibson

15   a number of questions about medical literature.

16              Did Mr. Ernst forward to you any of the

17   medical literature that I asked Keith Gibson about?

18      A.      No, he did not.

19      Q.      Have you seen this Ferner article from

20   the British Journal of Clinical Pharmacology?

21      A.      I don't remember this one.

22      Q.      Okay.  Well, I only want to ask you

23   about one paragraph.

24              MR. ERNST:  I'm going to object.  He

25   hasn't read it.

PLAINTIFFS' EXHIBITS 012986

1          MR. MORIARTY:  Okay.  Your objection is

2     duly noted.

3     BY MR. MORIARTY:

4          Q.     Go to the last page.  I mean the last

5     page of the article, not the bibliography.

6          A.     With a figure on the top?

7          Q.     Yes, sir.

8          A.     Okay.

9          Q.     And when I ask you this question, I'm

10    asking -- I want to ask you specifically in regard to

11    a postmortem axillary vein, non-ligated specimen drawn

12    70 hours after death regarding digoxin.  Okay?

13         A.     Okay.

14         Q.     Keep that in mind as I ask about it.

15         A.     Okay.

16         Q.     It says, There is no reliable or obvious

17    connection between concentrations measured in life and

18    subsequent to death.

19                Consequently, concentrations measured

20    after death cannot generally be interpreted to yield

21    concentrations present before death.

22                MR. ERNST:  Objection.

23    BY MR. MORIARTY:

24         Q.     Did I read that correctly?

25         A.     You did.

PLAINTIFFS' EXHIBITS 012987

1      Q.      All right.  Would you agree with me that

2    that is true regarding the type of specimen that I

3    just described?

4                MR. ERNST:  Objection.

5                THE WITNESS:  I would have to agree with

6    you.

7                (Exhibit Barbieri-13 was marked for

8    identification.)

9    BY MR. MORIARTY:

10     Q.      I believe this is Number 13.

11             This is Clarke's lab manual, isn't it?

12     A.      Uh-huh.  Yes.

13     Q.      Part of it.

14     A.      Yes.

15     Q.      Volume 1.

16             You've seen this before.

17     A.      Well, I know the -- I know the volume.

18     Q.      You use this?

19     A.      Yes.

20     Q.      So let's go to Page 96.

21             And, again, I was asking you earlier

22    about whether various -- that's Page 96; right?

23     A.      96.

24     Q.      Okay.  I was asking you earlier about

25    whether other matrices are good for cross-checking

PLAINTIFFS' EXHIBITS 012988

1   your results as opposed to one sample.  And I want to

2   ask you about this vitreous paragraph.  Okay?

3       A.      Okay.

4       Q.      About halfway through that section it

5   says, Vitreous humor has also been used increasingly

6   for the measurement of drugs.

7               Do you agree with that?

8       A.      Yes.

9       Q.      For example, digoxin concentrations

10  increase markedly in postmortem cardiac blood but do

11  not increase significantly in vitreous humor.

12              Do you see that statement?

13      A.      Yes.

14      Q.      Did I read it correctly?

15      A.      You did.

16      Q.      Does it come from that Vorpahl and Coe

17  article, to the best of your knowledge?

18      A.      Yes, it does.

19              MR. ERNST:  Objection.  Objection.

20              THE WITNESS:  I'm sorry.

21              MR. ERNST:  Unless there's a foundation.

22              THE WITNESS:  Yes, it does, and I know

23  that article.

24  BY MR. MORIARTY:

25      Q.      You've read it.

PLAINTIFFS' EXHIBITS 012989

Page 92

1      A.      Yes.

2      Q.      Do you agree with the statement?

3      A.      Yes.

4      Q.      Therefore, vitreous digoxin

5   concentrations give a better indication of perimortem

6   concentrations than does heart blood.

7              Do you agree?

8      A.      There's a weight of evidence that

9   suggests that that is true.

10     Q.      All right.  And when you say --

11     A.      Whether I -- whether I specifically

12  agree, I'm still on the fence there.  But I know that

13  the weight of evidence is that vitreous digoxin does

14  give a better indication of the concentrations.

15     Q.      And when you say "the weight of

16  evidence," you're talking about the scientific

17  evidence.

18     A.      Yes, I am.

19     Q.      Let's go to Page 105, second column.

20              In the middle of the paragraph under

21  Blood and/or tissue distribution.

22              Are you in the general area?

23     A.      Yes, I have it.

24     Q.      It says, While concentrations of some

25  drugs can increase by as much as two to tenfold after

Page 93

1    death in postmortem blood, concentrations in tissues

2    such as liver remain relatively stable.

3              Do you agree with that?

4       A.    Well, the first part of the sentence I

5    do agree with.  I mean, tricyclic antidepressants, for

6    example, can go up to 15 times.

7              Concentrations in liver being relatively

8    stable, I don't know the answer to that, whether I

9    agree or not.

10      Q.    All right.

11      A.    I think it largely depends upon where

12   the section of the liver is taken from --

13      Q.    Okay.

14      A.    -- which can definitely lead to

15   concentrations.

16      Q.    Have you read articles about digoxin in

17   which they talk about that drug undergoing PMR by two

18   to tenfold after death?

19      A.    No.

20      Q.    At Page 106 in the second column, the

21   last sentence in that carryover paragraph --

22      A.    Here (indicating), okay.

23      Q.    Right there.

24            It says, In most instances,

25   pharmacokinetic calculations using postmortem blood

PLAINTIFFS' EXHIBITS 012991

1  measurements are rarely defensible forensically.

2           Do you agree with that?

3           MR. ERNST:  Objection.

4           THE WITNESS:  Well, this is -- this is

5  pretty clear to say that you can't really defend it.

6  You can defend with the calculations that one makes

7  and with all the caveats associated with them, as I

8  tried to explain before.

9           So I would say that I'm not going to,

10 you know, say that this is not true because I think

11 you can defend what you've done, but the calculations

12 are suspect.

13 BY MR. MORIARTY:

14     Q.    Are you telling me that you can defend

15 what you've done, but the results aren't necessarily

16 accurate?

17     A.    That's true.

18           MR. ERNST:  Objection.

19           THE WITNESS:  Yes.

20           (Exhibit Barbieri-14 was marked for

21 identification.)

22 BY MR. MORIARTY:

23     Q.    Okay.  Let's look at Exhibit 14, which

24 is Volume -- from Volume 2 of Clarke's.

25           This is the monograph on digoxin, is it

PLAINTIFFS' EXHIBITS 012992

1    not?

2         A.       Yes.

3         Q.       And if you go to Page 918, under

4    Disposition in the body, it says, Digoxin is rapidly

5    distributed throughout the body and less than 20

6    percent of the total digoxin in the body is located in

7    the blood.

8              Do you see that?

9         A.       Yes.

10        Q.       Do you agree?

11        A.       Yes.

12        Q.       Is that similar to what Baselt is saying

13   in his book?

14        A.       Yes.

15        Q.       And then it says, High concentrations

16   are found in the heart, brain, and kidneys, but the

17   skeletal muscles form the largest digoxin store.

18              Did I read that correctly?

19        A.       Yes.

20        Q.       Do you agree?

21        A.       Again, we talked about this, and that's

22   true not on a concentration basis but on a total body

23   load.

24        Q.       All right.  And is it consistent with

25   Baselt's text?

1        A.      Yes.

2        Q.      Now, under Therapeutic Concentration it

3   says, In serum usually in the range of 1 to 2.5.

4                Now, that's micrograms per liter;

5   correct?

6        A.      Yes.

7        Q.      Okay.

8                (Exhibit Barbieri-15 was marked for

9   identification.)

10  BY MR. MORIARTY:

11       Q.      Here is Exhibit 15, the Cook and

12  Braithwaite article from the Journal of Clinical

13  Pathology.

14                Have you ever seen this before?

15       A.      Yes, I have.

16       Q.      Is it in your archive of scientific

17  materials regarding digoxin?

18       A.      I don't know if I saved this one.  This

19  goes back, you know, many years.

20       Q.      But you've read it.

21       A.      But I have read it.

22       Q.      Okay.  All I want to ask you about is

23  the last paragraph of the article.  It begins by

24  saying, Our study shows that a high degree of error

25  can arise from attempting to predict antemortem

PLAINTIFFS' EXHIBITS 012994

```
 1   concentrations from postmortem concentrations --
 2               MR. ERNST:  I'm going to object.
 3               MR. MORIARTY:  What's the matter?
 4               It's the last paragraph of the
 5   article --
 6               MR. ERNST:  I object.  It's -- you're
 7   talking about a whole range of drugs.  I object.
 8               MR. MORIARTY:  Okay.  I just -- I didn't
 9   know if you were in the right place.
10               Let me start over --
11               MR. ERNST:  Yeah, I'm in the right
12   place.  I just -- it's an improper cross-exam.  I
13   object.
14   BY MR. MORIARTY:
15       Q.     Okay.  Let me ask you about this last
16   paragraph.
17               It says, Our study shows that a high
18   degree of error can arise from attempting to predict
19   antemortem concentrations from postmortem
20   concentrations and emphasizes the need for continued
21   research into this area of pathology practice.
22               In the absence of such data, estimates
23   of circulating drug concentrations during life should
24   not be made.
25               First, did I read it correctly?
```

PLAINTIFFS' EXHIBITS 012995

1     A.     You did.

2     Q.     Second, so far as digoxin is concerned,

3  do you agree with that?

4           MR. ERNST:  Objection.

5           THE WITNESS:  Well, certainly the

6  beginning in terms of the high degree of error can

7  arise, and I've stated that before today.  So I

8  certainly agree there.

9           And they're saying definitely the

10  circulating concentrations should not be made.  There

11  may be some utility in calculating a concentration,

12  especially if their levels are significantly greater

13  than what one would expect.

14           So I don't know if I agree with that

15  second sentence because I think there may be some

16  utility at least getting ballpark numbers to look at

17  -- and what -- what we have.

18           Again, realizing all the caveats that

19  I've talked about.

20  BY MR. MORIARTY:

21     Q.     Sure.

22           You wouldn't do it as a forensic

23  toxicologist based on a 3.6 postmortem Dig level drawn

24  under these circumstances, would you?

25     A.     No --

PLAINTIFFS' EXHIBITS 012996

1            MR. ERNST:  I'm just -- objection.

2            What was the -- I didn't -- it was an

3   incomplete question.

4            MR. MORIARTY:  Can you read my question

5   back.

6            (The court reporter read back the

7   following:

8            "Q.  Sure.

9            "You wouldn't do it as a forensic

10  toxicologist based on a 3.6 postmortem Dig level drawn

11  under these circumstances, would you?")

12           MR. MORIARTY:  And what was his answer?

13           (The court reporter read back the

14  following:

15           "A.  No --")

16           THE WITNESS:  No, I didn't answer.

17           COURT REPORTER:  I'm sorry.  There was

18  an objection, and he was interrupted by the objection.

19  BY MR. MORIARTY:

20      Q.    Did you answer my question?

21      A.    No, I started but I didn't answer.

22            COURT REPORTER:  Right.

23  BY MR. MORIARTY:

24      Q.    Answer my question.

25      A.    Okay.

PLAINTIFFS' EXHIBITS 012997

Page 100

1            MR. ERNST:  My objection stands.

2            THE WITNESS:  Okay.  As I said before, I

3    would not do it with digoxin in this case.

4            MR. MORIARTY:  Okay.

5            (Exhibit Barbieri-16 was marked for

6    identification.)

7    BY MR. MORIARTY:

8       Q.    I'm handing you Dr. Barbieri Number 16.

9    I'm going to try to get this question in before the

10   break.

11           Go to Page 541.

12           Have you seen this article, by the way?

13      A.    Yes, I have.

14      Q.    Read it?

15      A.    Read it.  Saved it.

16      Q.    Under Practical Consequences in Forensic

17   Toxicology, it says, From practical -- From a

18   practical point of view, the respect of some

19   precautionary measures can limit misinterpretations.

20           Do you agree with that?

21      A.    Yes.

22      Q.    It is very important in postmortem

23   testing to be able to compare concentrations in

24   several blood and tissue samples even if reference

25   values for drug concentrations in tissues are often

1    missing.

2              MR. ERNST:  Objection.

3    BY MR. MORIARTY:

4         Q.    Do you agree?

5         A.    I do.

6         Q.    Okay.  That's all I want to ask you

7    about this.

8              We have to take a five-minute break.

9    When we come back, I will be able to wrap this up

10   within 15 minutes or so.

11             VIDEO OPERATOR:  Going off the record at

12   12:50.

13             (A recess was taken from 12:50 to

14   12:59 p.m.)

15             VIDEO OPERATOR:  We're back on the

16   record at 12:59.

17             You may proceed.

18   BY MR. MORIARTY:

19        Q.    Dr. Barbieri, do you use Flanagan's

20   toxicology book in your practice at all?

21        A.    No, I don't.

22        Q.    I'm just trying to get through these

23   articles and see if I need to ask you about them.

24             Are you familiar with Graham Jones?

25        A.    Yes.

PLAINTIFFS' EXHIBITS 012999

1      Q.      What's his reputation in the

2  toxicological community?

3      A.      Excellent.

4      Q.      Have you read any of his books or

5  articles?

6      A.      Yes, I've read several -- several of his

7  articles.

8              (Exhibit Barbieri-17 was marked for

9  identification.)

10  BY MR. MORIARTY:

11      Q.      Well, let me ask you about Barbieri

12  Exhibit 17, which is a chapter from a book called the

13  Postmortem Toxicology of Abused Drugs by Karch.

14              Do you have that book?

15      A.      It's on -- it's on -- it's not my book,

16  but it's on our shelves, yes.

17      Q.      Do you ever refer to it?

18      A.      Once in a while.

19      Q.      Is it considered pretty reliable?

20      A.      There's good things and bad things about

21  it.

22      Q.      All right.  Let me ask you about Graham

23  Jones' chapter in particular called the Interpretation

24  of Postmortem Drug Levels.  All right?

25      A.      Uh-huh.

PLAINTIFFS' EXHIBITS 013000

Page 103

1          MR. ERNST:  I will object.  There's no
2   foundation.
3   BY MR. MORIARTY:
4       Q.     All right.  So let's go to Page 115.
5              Do you see that section called
6   Postmortem Specimens?
7       A.     Yes.
8       Q.     It says, Relying on a toxicology result
9   from a single specimen can be misleading because of
10  the postmortem changes that can occur.
11             Do you agree with that?
12      A.     Yes.
13             MR. ERNST:  Objection.
14  BY MR. MORIARTY:
15      Q.     The last sentence in that section, it
16  says, It is good forensic practice to have multiple
17  specimens available or at least blood specimens from
18  different sites in the body because of the potential
19  difficulties in interpreting postmortem toxicology
20  results.
21             Do you agree with that?
22             MR. ERNST:  I will object.
23             THE WITNESS:  Yes, I do.
24  BY MR. MORIARTY:
25      Q.     So on the next page, at the end of that

PLAINTIFFS' EXHIBITS 013001

1    -- at the end of the section before Vitreous, it says,

2    Since blood concentrations of some drugs have the

3    potential for marked postmortem change, it is good

4    practice to analyze blood obtained from more than one

5    site, plus tissue or other specimens where this may be

6    useful.

7              MR. ERNST:  Objection.

8    BY MR. MORIARTY:

9        Q.    Do you agree?

10       A.    Yes.  In general, yes.

11       Q.    And in the section on Vitreous, which is

12   one of these alternative specimens that they're

13   talking about, the second sentence says, However,

14   vitreous humor has also been useful for a number of

15   drugs.

16              For example, it is well known that

17   digoxin concentrations will rise after death in

18   cardiac blood, due to postmortem redistribution from

19   myocardial tissue, and possibly other organs.

20              Consequently, vitreous digoxin

21   concentrations are more likely to reflect those in

22   antemortem plasma.

23              Did I read it correctly?

24       A.    You did.

25       Q.    Do you agree?

PLAINTIFFS' EXHIBITS 013002

1        A.       I do.  And that -- that references again

2    to Vorpahl and Coe.

3        Q.       Okay.  So if we go back to Page 123,

4    there is a section called Estimation of Amount

5    Ingested from Blood Levels.

6                 Do you see that?

7        A.       I have it.

8                 MR. ERNST:  I'm going to object.

9    Objection.

10   BY MR. MORIARTY:

11       Q.       The first sentence --

12                MR. ERNST:  Can I have a continuing

13   objection to this entire article?

14                MR. MORIARTY:  Yes.

15                MR. ERNST:  Thank you.

16   BY MR. MORIARTY:

17       Q.       Given the foregoing discussion, it

18   should go without saying that using pharmacokinetic

19   calculations to try to estimate dosage given a

20   postmortem blood concentration is of virtually no

21   value and can be extremely misleading.

22                Do you agree?

23       A.       No.

24       Q.       Okay.

25       A.       I don't.

PLAINTIFFS' EXHIBITS 013003

1      Q.      Why?

2      A.      Well, it can be misleading, and, as I

3  stated before, I think there may be some benefit to

4  knowing ballpark numbers and ballpark estimates.  So

5  to say it's no value I think is very strong.

6      Q.      Yeah, but here they're talking about

7  dose ingested, not the antemortem level.

8      A.      Well, I know that.  But you can do the

9  calculation -- you can reverse the calculations and

10  get the dose back.

11              Again, the -- based on the caveats it

12  talked about before, there can be a wide range between

13  those.

14      Q.      Okay.

15      A.      And though, in some respects, at least

16  in his respect, he says it's of no value, I think

17  there is some value to at least get a ballpark

18  estimate of where you are.

19      Q.      All right.  But you wouldn't do it in

20  this case.

21      A.      In this particular case --

22              MR. ERNST:  Objection.

23              THE WITNESS:  I'm sorry.

24              In this particular case I think we're

25  dealing with a drug that should not be estimated

PLAINTIFFS' EXHIBITS 013004

```
 1    levels.

 2                    MR. MORIARTY:  All right.  Okay.

 3                    (Exhibit Barbieri-18 was marked for

 4    identification.)

 5    BY MR. MORIARTY:

 6         Q.      Okay.  Let's ask you about Dr. Barbieri

 7    Number 18.

 8                    Have you read any of Gideon Koren's work

 9    on postmortem redistribution of digoxin?

10         A.      No, I haven't.

11         Q.      Are you sure?

12         A.      I'm pretty sure.

13         Q.      Okay.

14         A.      I know Dr. Koren's work from his work on

15    alcohol and cocaine, but I don't remember reading

16    anything on digoxin.

17         Q.      All right.  What is his general

18    reputation in the scientific community?

19         A.      It's very good.

20         Q.      So as you can see from the abstract,

21    they actually had some patients in whom they had --

22    did some studies; correct?

23         A.      Yes.  It states here 47 children.

24         Q.      Okay.  So let's go to the left column of

25    the first page of this, which is Page 1210.
```

Page 108

1              It says, However, excessive serum

2    concentrations of the cardiac glycoside should not

3    automatically be interpreted as reflecting toxicity.

4              Do you agree?

5    A.      I do.

6    Q.      Let's go back to Page 1212.

7              MR. ERNST:  Just a minute.

8              There's no foundation for this.

9    Continued objection.

10             Is that agreed, Counsel?

11             MR. MORIARTY:  Yes, you can have a

12   continuing objection.

13             MR. ERNST:  Thank you.

14   BY MR. MORIARTY:

15   Q.      Let's go to the last sentence on the

16   page.

17             An attempt to prove digoxin intoxication

18   as a cause of death may be hampered by the fact that

19   postmortem levels may be 1.5 to ten times higher than

20   antemortem levels.

21             Do you see that?

22   A.      I do.

23   Q.      Do you agree?

24   A.      Well, I certainly agree that trying to

25   produce -- to prove digoxin intoxication as a cause of

PLAINTIFFS' EXHIBITS 013006

1    death may be hampered.

2         Q.      Okay.

3         A.      That postmortem levels are this range, I

4    don't have any basis for that, so I can't agree to the

5    numbers.

6         Q.      Are you --

7         A.      But in terms of the general statement,

8    yes, I agree.

9         Q.      Are you saying you have no basis because

10   you haven't done the experiments?

11        A.      I don't have enough data to make a

12   determination that it's going to be 1.5 to ten times

13   higher than antemortem.

14        Q.      Okay.  And have you read enough

15   literature to know whether this is contained in the

16   greater body of literature on this subject?

17        A.      To go up to ten times higher?  I don't

18   believe so.

19        Q.      All right.

20        A.      In the lower range I would say we're

21   probably closer to it.

22        Q.      Okay.

23               MR. MORIARTY:  Okay, everybody, we have

24   to take a time-out.

25               VIDEO OPERATOR:  Let's go off the record

PLAINTIFFS' EXHIBITS 013007

Page 110

1    at 1:09.

2               (A recess was taken from 1:09 to

3    1:11 p.m.)

4               VIDEO OPERATOR:  We're back on the

5    record at 1:11.

6               You may proceed.

7               MR. MORIARTY:  Thank you.

8               (Exhibit Barbieri-19 was marked for

9    identification.)

10   BY MR. MORIARTY:

11       Q.    Okay.  Let me ask you about Dr. Barbieri

12   Number 19.

13               Do you know who Derrick Pounder is?

14       A.    Yes.

15       Q.    What is his reputation in the scientific

16   community?

17       A.    It's very good.

18       Q.    And this is from I think Cyril Wecht's

19   pathology text.

20               Yes.  Legal Medicine, 1993, Cyril Wecht,

21   M.D., J.D.  He's a coroner from Pittsburgh --

22       A.    I know him.

23       Q.    -- for many years.

24       A.    I know Dr. Wecht.

25       Q.    Is he still practicing?

PLAINTIFFS' EXHIBITS 013008

1      A.      Yes.

2      Q.      Amazing.

3              Have you ever seen this book?

4      A.      No, I haven't.

5              MR. ERNST:  May I have a continuing

6   objection?

7              MR. MORIARTY:  Yes, you can.

8   BY MR. MORIARTY:

9      Q.      Have you ever used it?

10     A.      No.

11     Q.      Let me ask you just a few questions from

12  it.

13             In the beginning they're talking about

14  the purpose of postmortem analysis for drugs; is that

15  right?

16     A.      Yes.

17     Q.      And then a couple sentences down it

18  says, In all of this there is an underlying

19  presumption that drug concentrations in blood and

20  other biological fluids and tissues remain constant in

21  a corpse, whatever the delay between death and the

22  collection of samples.

23             In recent years it has become

24  increasingly clear that for most drugs, this

25  presumption is false.

PLAINTIFFS' EXHIBITS 013009

1                    Do you agree with that?

2         A.       I do.

3         Q.       Turn, please, to Page 175.

4                    It's -- Page 175, it's the second full

5    paragraph.

6         A.       Okay.

7         Q.       And it talks about diltiazem and

8    digoxin.

9                    Do you see that?

10        A.       Yes.

11        Q.       Can you just read that paragraph to

12   yourself.  It starts with Drug concentrations in

13   cardiac blood, and ends with is the likely mechanism.

14        A.       (Witness reviews document.)  Okay, I've

15   read it.

16        Q.       Do you agree with it?

17        A.       Well, again, I have to -- I have to take

18   him at his word that -- the last thing about 30 times

19   that of blood.  But it wouldn't be unusual coming from

20   cardiac blood -- I'm sorry -- coming from myocardium,

21   the cardiac blood to be that high.

22        Q.       Okay.

23        A.       So in general, yes, I do agree with the

24   paragraph.

25        Q.       Got it.

PLAINTIFFS' EXHIBITS 013010

1            And then if you go to the next page,

2    176, the first full paragraph begins with One approach

3    to the problem of postmortem drug changes in blood has

4    been to look for alternative or corroborating tissues

5    for analysis.

6            You agree with that, don't you?

7    A.    Yes.

8    Q.    And, lastly, please go to Page 187.

9            The last paragraph, In conclusion.

10   A.    Okay.

11   Q.    Do you see that?

12   A.    Uh-huh.

13   Q.    The second sentence says, For

14   interpretive purposes, the ideal toxicological sample

15   is a peripheral blood specimen obtained from a ligated

16   vessel immediately after death.

17            Do you agree with that so far?

18   A.    Yes.

19   Q.    Then it goes on to say, All autopsy

20   samples fall short of this ideal, but the more they do

21   so, the more contentious will be the interpretation of

22   the analytical results.

23            Do you agree with that?

24   A.    I do.

25            MR. MORIARTY:  Do you want to break and

1    talk or just go?

2              MS. DONAHUE:  Just go.

3              MR. MORIARTY:  Okay.  I am going to pass

4    the witness.

5              Did I give you a copy of this?

6              MS. DONAHUE:  No.

7              Thank you.

8              I think I need your microphone.

9              VIDEO OPERATOR:  Yes.

10             MS. DONAHUE:  Thank you.

11                  EXAMINATION

12   BY MS. DONAHUE:

13       Q.    I guess it's afternoon now, so good

14   afternoon, Dr. Barbieri.

15       A.    Good afternoon.

16       Q.    I just have a few short follow-up

17   questions for you.

18             I introduced myself off the record, but

19   my name is Alicia Donahue and I represent the Mylan

20   defendants in this case.

21       A.    Okay, Alicia, thank you.

22       Q.    Thanks.

23             Let's see.  You talked a little bit

24   about the various conversations you had with Mr. Ernst

25   and his partner on the case.

PLAINTIFFS' EXHIBITS 013012

1            How much time in total have you spent

2    working on this case, preparing for deposition?

3        A.      Not a lot at all.  I spent about an hour

4    -- other than the phone calls, which in total was

5    about an hour or so.

6        Q.      Uh-huh.

7        A.      I spent about an hour yesterday going

8    through the litigation package.  I had reviewed it

9    very briefly after our first conversation when I

10   obtained the records, just to get a feel for the

11   case.  So that's about it.

12       Q.      Okay.  And what is your -- what are you

13   charging Mr. Ernst per hour for doing that work?

14       A.      I believe it's 400 an hour.  But I don't

15   -- I don't handle that, so I'm just guessing on that.

16       Q.      So as you sit here today, do you have

17   any idea in your mind about how much has been billed

18   for your time spent on this case to date?

19       A.      Nothing has been billed so far.

20       Q.      Do you have an estimate as to how much

21   that bill would be based on the time you've spent to

22   date?

23       A.      It's probably going to be somewhere

24   around four hours' worth of time.  Assuming we're here

25   for a couple hours now, so we're already three-plus

PLAINTIFFS' EXHIBITS 013013

1    hours into it.

2         Q.      Okay.

3         A.      It depends how long it goes obviously.

4                 MR. ERNST:  That includes this

5    deposition?

6                 THE WITNESS:  It includes that, yeah.

7    BY MS. DONAHUE:

8         Q.      All right.  In regard to what has been

9    marked as Exhibit 4, which is the expert disclosure in

10   this case, and that you were asked questions about

11   that earlier, you mentioned -- and I'm just

12   paraphrasing -- but you mentioned talking to Mr. Ernst

13   and telling him that you objected to one of the

14   statements in Exhibit 4?

15        A.      Well, I -- it wasn't just one --

16        Q.      I hand that to you.

17        A.      -- it wasn't just one of the

18   statements.  It was the -- the whole tenure of the

19   statement of what I would testify to.

20        Q.      And that's my question.  Can you tell --

21   can you elaborate for me what exactly your objections

22   were to Exhibit 4?

23                And first let's start by telling --

24   telling me, when did you tell Mr. Ernst you had

25   objections to Exhibit 4?

PLAINTIFFS' EXHIBITS 013014

1        A.        It was a couple weeks after the first

2    conversation that we had.

3        Q.        And can you give me a time frame of when

4    that occurred?

5        A.        I probably have a specific date.

6        Q.        If you refer to the phone log --

7        A.        I don't have the --

8        Q.        -- would that be helpful?

9                  I'll give you back the exhibits.  I

10   think the phone log is in there.

11       A.        No, it would not be in here.  Let's see.

12                 (Witness reviews documents.)  Well, this

13   isn't -- this isn't specific as to when we spoke.  But

14   it was certainly in the range of June the 8th to the

15   16th, somewhere in that area.

16       Q.        Thanks.

17                 All right.  So then getting --

18       A.        And my objection was that -- well, how

19   this came about -- again, as I think I tried to

20   explain before -- I was very confused after our first

21   initial conversations about why I was being deposed

22   because I knew that this package had been done before

23   by Matt McMullin.

24                 And so I -- we contacted Mr. Moriarty's

25   office to get a clarification of did he really want me

PLAINTIFFS' EXHIBITS 013015

1  to testify on this case because I didn't know if I

2  could really add to what was presented previously.

3           And then he sent me back a deposition --

4  the beginning of the deposition notice with just Pages

5  9 and 10 of this document.

6           And I read through this and basically I

7  took it as the Ernst law firm made a decision that I

8  would be talking about causation and all these things

9  and distribution and toxicity and et cetera.

10          And I -- I had no knowledge of this

11  specific case, as I tried to explain.  And so I got

12  quite upset because this is not normally what I see.

13          Usually people will contact me ahead of

14  time and say, Here's what we want to talk about.

15  Here's what I'm going to write out.  I'm going to send

16  you a copy of this and we'll go over it.

17          This was brand new to me.  And so I

18  basically hit the ceiling.

19     Q.    And?

20     A.    And so I contacted his office and let

21  him know that I was very unhappy about what

22  happened -- what transpired.

23          He then -- through missing some phone

24  calls back and forth, we eventually hooked up and he

25  was very, very cordial and very apologetic and tried

PLAINTIFFS' EXHIBITS 013016

1    to explain to me what this was about and that this was

2    their best attempt prior to contacting me as to what I

3    may be testifying to.

4              And so I took him at his word and I

5    accepted his apology and I said, We're just going to

6    move forward on that.

7         Q.    You talked about what you're used to and

8    what normally happens in situations like this, and

9    that would be that you would have been contacted prior

10   to the disclosure being served.

11        A.    Yes.

12        Q.    That's been your experience in the

13   past.

14        A.    Yes.

15        Q.    And that did not occur in this case.

16        A.    No, it did not.

17        Q.    And you never discussed with Mr. Ernst

18   or anyone in his office prior to May 15th -- or May

19   16th of 2011 any of the opinions that are reflected in

20   the disclosure as those that you would provide in this

21   case.

22        A.    That's correct.  I had no -- no contact

23   with his office at all.

24        Q.    And the fact of the matter is, I believe

25   your testimony today is that you do not intend to

PLAINTIFFS' EXHIBITS 013017

1    render any opinions, any expert opinions, in regard to

2    this case, other than the methodology that your lab

3    uses and the findings of your lab in regard to the

4    blood tests performed on the sample.

5                 MR. ERNST:  Objection.  He already has.

6                 THE WITNESS:  Well, I've rendered some

7    opinions based upon digoxin in general.  And I tried

8    not to be specific with the case, but obviously the

9    question was focused on the level.

10                And so I didn't want to.  And -- but

11   circumstances, I tried to answer honestly.

12   BY MS. DONAHUE:

13        Q.     You do not intend to render any opinions

14   in this case in regard to the cause of Mr. McCornack's

15   death; is that correct?

16        A.     No, I do not.

17        Q.     Nor any opinions in regard to the

18   liability of any of the defendants for that death.

19        A.     That's correct, I will not.

20        Q.     When you had your conversation with

21   Mr. Ernst where you said you were pretty upset after

22   reviewing the disclosure that's been marked as Exhibit

23   4, did he tell you why he didn't contact you prior to

24   serving the disclosure and discuss your testimony with

25   you?

1      A.      I don't know the exact words he used,

2   but the -- what I got out of it was they were moving

3   forward with this case, they wanted me eventually to

4   testify, and whether it was an oversight on their

5   part -- I don't know the specifics of it -- but they

6   did their best in terms of putting down what they

7   thought I would testify to.

8           That's what I got out of it.

9      Q.      Did any -- is there any reflection in

10   your records, Doctor, that anyone from Mr. Ernst's

11   office attempted to contact you and discuss the

12   opinions and testimony that's referenced in Exhibit 4

13   as testimony that you will provide, prior to serving

14   it on May 16th, 2011?

15      A.      No.

16           MS. DONAHUE:  That's all the questions I

17   have.  Thank you very much.

18                   EXAMINATION

19   BY MR. ERNST:

20      Q.      Good morning, Doctor.

21      A.      Good morning.

22      Q.      We should clarify a number of things

23   here.

24           Doctor, looking at what has been

25   previously marked as Exhibit Number 8, would you look

PLAINTIFFS' EXHIBITS 013019

Page 122

1    at that document for me, please.

2         A.       Yes.

3         Q.       And what is it, please?

4         A.       This is the second report that I

5    generated based on the blood testing for Daniel

6    McCornack to the Santa Cruz County coroner.

7         Q.       And did you sign that document?

8         A.       I did.

9         Q.       Are you the person that is mentioned as

10   the individual that supervised the test for the

11   digoxin on the blood sample taken from Mr. McCornack

12   after his death?

13        A.       No.  I did not supervise the testing for

14   digoxin.

15        Q.       Did you sign Exhibit 8?

16        A.       I did.

17        Q.       And your purpose in signing it was what?

18        A.       My purpose in signing it is that I

19   reviewed all the data.

20        Q.       I see.  I'm sorry.

21        A.       I reviewed all the data.  As I said

22   before, some of it original, some of it not.

23                 The digoxin level I did not review the

24   original data, but it was on the computer, and I

25   published the results based upon what the laboratory

PLAINTIFFS' EXHIBITS 013020

Page 123

1   staff did and the review of that data.

2       Q.      How long have you worked for NMS?

3       A.      Almost 13 years.

4       Q.      Now, is your name on this -- is yours

5   the only name on this report as the -- having signed

6   the report with the digoxin level of 3.6?

7       A.      That's correct.

8       Q.      Circling back, looking at your CV, which

9   has been marked as Exhibit 1, I want to just take you

10  through a couple of things.

11      A.      Okay.  Certainly.

12      Q.      Doctor, do you have a Ph.D.?

13      A.      I do.

14      Q.      In what?

15      A.      Pharmacology.

16      Q.      And you received that from where?

17      A.      The Philadelphia College of Pharmacy and

18  Science.

19      Q.      And when was that?

20      A.      1976.

21      Q.      And you did your undergraduate study

22  where?

23      A.      My undergraduate was at the same

24  college.  I have three degrees from the same

25  institution.

PLAINTIFFS' EXHIBITS 013021

Page 124

1      Q.      And those three degrees are?

2      A.      Bachelor of Science in pharmacy, 1970; a

3   Master's in Science in pharmacology in 1972; and my

4   Ph.D. in 1976.

5      Q.      And you have testified as an expert in

6   toxicology many times, both in criminal cases and in

7   civil cases?

8      A.      Yes.

9      Q.      And Exhibit 8 was generated by NMS, your

10  employer, and you in this case; true?

11     A.      Yes.

12     Q.      Does it accurately reflect the testing

13  that was done by NMS?

14     A.      Yes, it does.

15     Q.      And was the testing by NMS done in a

16  scientifically appropriate fashion?

17     A.      Yes, it was.

18     Q.      And you can testify as the person who

19  signed the report that, in fact, that testing was done

20  in an appropriate scientific fashion?

21     A.      Yes.  Yes, I do.

22     Q.      And does Exhibit 8 accurately reflect

23  the findings of that -- of those tests?

24     A.      Yes, it does.

25     Q.      Now, looking back at the report, Doctor,

PLAINTIFFS' EXHIBITS 013022

1   you're aware that Mr. McCornack died on March 23rd,

2   2008?

3       A.      Yes.

4       Q.      And that --

5       A.      That's not from the report.  That's from

6   other documents in the folder.

7       Q.      In the file.

8               And when you were first contacted by me,

9   it was relayed to you that you were a non-retained

10  expert; true?

11      A.      Yes.

12      Q.      And, in fact, I told you that I just

13  wanted to have you testify about what you know, what

14  you knew, what you thought about the testing procedure

15  that was done and any ramifications about that; true?

16              MS. DONAHUE:  Objection.

17              MR. MORIARTY:  Objection.  Leading.  And

18  I'll take a continuing objection to leading your own

19  expert --

20              MS. DONAHUE:  Join.

21              MR. MORIARTY:  -- if you don't mind.

22              MS. DONAHUE:  Join.  Join.

23              MR. ERNST:  Actually, I might want to

24  use this deposition testimony, so I would appreciate

25  if you would ask -- or just make the objection so that

1    if there is a problem, I will be able to cure it.

2    Okay?

3              MR. MORIARTY:  Sure.

4    BY MR. ERNST:

5         Q.     Doctor, did we discuss that I wanted to

6    have you testify with having not reviewed any

7    particular documents of this case, just about what you

8    know or have observed and understood about the testing

9    procedures by NMS?

10        A.     You did.

11        Q.     And there was some confusion about when

12   you were designated as an expert.

13              But apparently you contacted

14   Mr. Moriarty's office and asked about why you were

15   being deposed?

16        A.     Yes.

17        Q.     And did you speak with Mr. Moriarty at

18   the time?

19        A.     No, I spoke with no one.

20        Q.     All right.  And thereafter you were sent

21   a disclosure.

22        A.     Yes.

23        Q.     And after the disclosure was sent, you

24   and I had a conversation where, if there was

25   miscommunication, we both sort of apologized and said,

Page 127

1    look, I just want to know what's in your mind as a

2    toxicologist when these tests were performed.

3          A.      Yes, that --

4                  MS. DONAHUE:  Objection.  Leading.

5                  THE WITNESS:  -- that is fair and

6    accurate.

7    BY MR. ERNST:

8          Q.      Did I ask you -- did I indicate to you

9    that during your deposition we would just be asking

10   you what you know and understood about the testing

11   procedures and any ramifications that you might have

12   from that?

13         A.      I think you phrased it as some

14   hypotheticals that may come up.  But, yes, we did.

15         Q.      Okay.  Now, one of the things that I

16   want to ask you about, and I have a hypothetical, but

17   before I get there, I want to ask about the testing of

18   digoxin.

19                 NMS regularly tests for digoxin if they

20   are asked to do so.

21         A.      Well, we will test for digoxin if we're

22   asked to do so.  It's not necessarily on a regular

23   basis.  We don't have a regular digoxin test we run

24   every day.  But we will test for digoxin as requested.

25         Q.      And in this particular case, what client

PLAINTIFFS' EXHIBITS 013025

Page 128

1    requested that you test for the digoxin?

2         A.      It came from the office of the Santa

3    Cruz County coroner.

4         Q.      Now, just in reviewing the document, do

5    you know why the request to review digoxin came at

6    this particular date?

7         A.      No, other than from the phone log notes,

8    there was a conversation from a Sergeant Burt, I

9    believe, who actually made the request.

10        Q.      I want you to -- I want to talk about

11   the 3.6 number.

12               Taken by itself with a digoxin level of

13   3.6 postmortem, does that mean anything to you as a

14   toxicologist?

15        A.      Well, 3.6 in the broad scope of things

16   for a postmortem blood sample is not exceedingly high.

17               If this were an antemortem serum or

18   plasma sample or even a whole blood sample that was

19   taken antemortem, this would -- as I explained to you,

20   this would be higher than the typical therapeutic

21   concentration that one may see.

22        Q.      It would give you concern as a

23   toxicologist.

24        A.      Well, it would certainly, you know,

25   raise a flag, again, depending on what the sample was,

PLAINTIFFS' EXHIBITS 013026

1   when it was taken, how it was taken, et cetera.  But

2   it's nothing to turn around and say, Ignore it.

3        Q.      Right.

4                You would want to do something with it

5   as a toxicologist.

6                MR. MORIARTY:  Objection.

7                MS. DONAHUE:  Objection.

8                THE WITNESS:  No, that I can't state I

9   won't do something with it.  We did something with

10  it.  We published the number.

11  BY MR. ERNST:

12       Q.      Now, I want to ask you -- I'm going to

13  ask you a hypothetical question, and I have some

14  things that I want you to assume.  And there's going

15  to be a list of them, so I want to make it clear.

16       A.      Okay.

17       Q.      I want you to assume that this blood

18  sample was taken from Dan McCornack who was 45 years

19  old at the time of his death.

20               I want you to assume that his kidney

21  function was normal.

22               I want you to assume that he weighed

23  approximately 220 pounds.

24               I want you to assume that he was taking

25  a 0.25 Digitek tablet twice per day, once in the

PLAINTIFFS' EXHIBITS 013027

1    morning and once in the evening with his evening meal,

2    and at breakfast.

3                I want you to assume that he was

4    regularly tested for digoxin levels by his treating

5    physician, that he had been taking digoxin for

6    approximately 15 to 20 years, and in the previous year

7    he'd been tested and his digoxin level was 1.6.

8                I want you to assume that he was

9    tested -- and the 1.6 was from May 15th of '07 and his

10   blood was 1.6 nanograms per milliliter.

11               I want you to assume that he was taking

12   his medication in an appropriate and compliant

13   fashion.

14               I want you to assume that a family

15   member saw him take his medication, digoxin, the

16   evening of March 22nd, 2008, at approximately 6:00 to

17   8:00 p.m.

18               I want you to assume that his digoxin

19   medication was in a pill dispenser for which he had

20   his pills segregated to take.

21               I want you to assume that he was with

22   four other families on a Easter trip camping in Big

23   Sur in a motor home.

24               I want you to assume that he had been

25   compliant in his medication, taking his medication,

PLAINTIFFS' EXHIBITS 013028

1    and the doctor, his treating doctor, had so testified.

2                    I want you to assume that his wife was

3    awakened by him at 12:30 a.m. on March 23rd, 2008, by

4    his snorting and inability to breathe.

5                    I want you to assume that his wife began

6    CPR, called 911, and that the rescue personnel arrived

7    and he was pronounced dead at 12:52 a.m. on March

8    23rd, 2008.

9                    I want you to assume that an autopsy was

10   done on March 26th, 2008, at 7:30 a.m.

11                   And I want you to assume that blood was

12   drawn from a peripheral limb, that means an axillary

13   vein of the arm.

14                   And I want you to assume that the

15   coroner that took the blood cut the axillary vein and

16   pressed the blood out from the wrist of the arm down

17   into the pooled area where he -- it was picked up.

18                   I want you to assume that at the time of

19   his autopsy, the doctor opined that the death was

20   cardiac arrest due to ventricular arrhythmia due to

21   atrial fibrillation due to hypertensive

22   arthrosclerotic cardiovascular disease.

23                   And I want you to assume that

24   thereafter, on or about May 2nd, 2008, a -- there was

25   a recall of the drug that Mr. McCornack was taking --

PLAINTIFFS' EXHIBITS 013029

1    taken, in Digitek, and that recall was dated early May

2    2008, some five weeks after he died.

3                    And thereafter, and only thereafter, did

4    Dr. Mason, the coroner, request digoxin test on the

5    blood of Mr. McCornack.

6                    That blood was in the custody and

7    control of NMS, and that test that was performed on

8    the digoxin was the test that you have in front of

9    you, Exhibit 8.

10                   Thereafter, the coroner reviewed the

11   medical records of Mr. McCornack from his treating

12   physician as well as his cardiologist and only after

13   review of all that material the coroner changed the

14   death certificate listing the cause of death to be

15   cardiac arrest due to ventricular arrhythmia due to

16   digoxin toxicity due to digoxin poisoning.

17                   If all of these facts that I have given

18   you are accurate, would the blood level of 3.6 be

19   consistent with digoxin toxicity, digoxin poisoning

20   that could lead to cardiac arrest due to ventricular

21   arrhythmia?

22                   MS. DONAHUE:  Objection.

23                   MR. MORIARTY:  Objection.  Form and

24   otherwise.

25                   Go ahead.

PLAINTIFFS' EXHIBITS 013030

Page 133

1          THE WITNESS:  Possibly.  Though I can't

2     state that with any kind of scientific certainty.

3     BY MR. ERNST:

4          Q.     Right.

5                 I am asking you as a forensic

6     toxicologist to go back to Exhibit 5.

7                 And on Exhibit 5, which you indicated

8     you were familiar with, which is the AHFS Drug

9     Information, there's a statement that reads, on Page

10    1729, Serum concentrations of digoxin should be

11    interpreted in the overall clinical context.

12                All right.  That's what it says.  But

13    the language that is also present is, In adults,

14    toxicity is usually, but not always, associated with

15    steady-state plasma digoxin concentrations greater

16    than 2.0 nanograms per milliliter.

17                Is that true?

18         A.     Yes, what page are you on, just to --

19         Q.     1729.

20                A better question is, Doctor, it's true

21    that steady-state plasma concentrations greater than

22    2.0 nanograms per milliliter are generally considered

23    toxic; true?

24                MR. MORIARTY:  Objection.

25                THE WITNESS:  Well, again, not

PLAINTIFFS' EXHIBITS 013031

1   necessarily.  I mean, this statement is true as it's

2   written.

3                Again, it says toxicity is usually, but

4   not always, associated with Dig concentrations greater

5   than 2.0 nanograms per mL.  That is a true statement.

6   Okay?

7                Now, again, there are -- there are

8   individuals who have levels of -- these are --

9   antemortem therapeutic levels of digoxin above 2.0

10  nanograms per mL that are surviving as we sit here

11  today.

12               There are also individuals who have

13  levels below 2.0 nanograms per mL of digoxin in their

14  serum that have died from digoxin.

15               So the therapeutic index of digoxin,

16  which means the ratio between the toxicity and the --

17  the therapeutic level of digoxin, is very low.

18               And it is a dangerous drug.  And in an

19  individual who has cardiac problems, it can be a

20  lifesaving drug and at the same time it can be a drug

21  that can cause problems.

22               So in answer to the hypothetical that

23  you gave me, I'll restate that, yes, it is certainly

24  possible that digoxin was involved in his death.

25               And it's also likely or it's possible

PLAINTIFFS' EXHIBITS 013032

1    that digoxin had no role in his death, that his

2    pathology caused that.

3    BY MR. ERNST:

4         Q.    Just -- but you don't have an opinion on

5    that.  You just have -- I'm asking about the 3.6

6    level.

7         A.    I understand that.

8         Q.    So the 3.6 level is what you've termed a

9    starting point.

10        A.    Yes.

11        Q.    Now, I want to go back and talk about

12   the test for a moment.  And this is Exhibit 8.

13        A.    Yes, it is.

14        Q.    And everything in Exhibit 8 is true and

15   accurate according to what you are testifying here

16   today and what you know; true?

17        A.    Yes, it is.

18             MR. ERNST:  Counsel, I would move

19   Exhibit 8 into evidence.

20             Do you have any objection?

21             MR. MORIARTY:  Yes.

22             MS. DONAHUE:  Yes.

23             MR. ERNST:  And would you state your

24   objection for the record.

25             VIDEO OPERATOR:  Could you put the mic