# EXHIBIT 2

**In Re:**

*Digitek*

---

*Misbah Sherwani*

*March 18, 2010*

*Confidential – Subject to Further Confidentiality Review*

---

*GOLKOW TECHNOLOGIES, INC.*

*Excellence In Court Reporting For Over 20 Years*

*877.370.3377*

*deps@golkow.com*

Original File ms031810.txt

**Min-U-Script®**

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

- - -

IN RE:  DIGITEK PRODUCTS  :  MDL NO.
LIABILITY LITIGATION      :  1968


(This document relates to all cases.)

- - -

CONFIDENTIAL - SUBJECT TO FURTHER

CONFIDENTIALITY REVIEW

- - -

New York, New York
Thursday, March 18, 2010

- - -


Videotaped Deposition of MISBAH

SHERWANI, held at Harris Beach PLLC, 100 Wall

Street, 24th Floor, on the above date,

beginning at 9:06 a.m., before Kimberly A.

Overwise, a Certified Realtime Reporter and

Notary Public.

- - -


GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

2

1    APPEARANCES:

2

3        MOTLEY RICE LLC
         BY:  FRED THOMPSON III, ESQ.
4             MEGHAN JOHNSON CARTER, ESQ.
         28 Bridgeside Boulevard
5        Mt. Pleasant, SC  29464
         843-216-9118
6        fthompson@motleyrice.com
         mjohnson@motleyrice.com
7        Counsel for Plaintiffs

8

9        THE MILLER FIRM LLC
         BY:  PETER A. MILLER, ESQ.
10       The Sherman Building
         108 Railroad Avenue
11       Orange, VA  22960
         540-672-4224
12       pmiller@doctoratlaw.com
         Counsel for Plaintiffs

13

14       TUCKER ELLIS & WEST LLP
         BY:  MICHAEL ANDERTON, ESQ.
15            SETH H. WAMELINK, ESQ.
         1150 Huntington Building
16       925 Euclid Avenue
         Cleveland, OH  44115-1414
17       216-696-2276
         michael.anderton@tuckerellis.com
18       seth.wamelink@tuckerellis.com
         Counsel for Actavis Defendants

19

20

21

22

23

24

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

3

1    APPEARANCES:  (Continued)

2

          SHOOK, HARDY & BACON, LLP
3         BY:  SEAN LEE, ESQ.
          1155 F Street, NW, Suite 200
4         Washington, D.C.  20004-1305
          202-783-8400
5         slee@shb.com
          Counsel for Mylan Defendants
6

7

8    ALSO PRESENT:

9    Robert McDonald, videographer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

4

1                          I N D E X

2     WITNESS:                                Page

3     MISBAH SHERWANI

4         By Mr. Miller                    8, 215

5         By Mr. Thompson                     184

6         By Mr. Anderton                     204

7

8

9

10                       E X H I B I T S

11                       (Attached.)

12    Plaintiff's No.  Description            Page

13    215       E-mail, 1/14/08, with          56
                attachments, from Ponzo,
14              Bates Nos.
                ACTAV001425411-22
15
      216       E-mail chain, Bates No.        77
16              ACTAV001420273; with
                attachments, Bates Nos.
17              ACTAV001580756-76

18    217       E-mail chain, with            107
                attachments, Bates Nos.
19              ACTAV000299883-89

20    218       E-mail chain, Bates No.       119
                ACTAV001265670
21
      219       E-mail, 4/24/08, to Benson    126
22              from Sherwani, Bates Nos.
                ACTAV000140080-82
23

24

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3377

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

5

1              E X H I B I T S  (Continued)

2                    (Attached.)

3     Plaintiff's No.  Description              Page

4     220      Letter, 8/25/08, to Thapar      136
              from Licata, Bates No.
5             ACTAV000006560; with
              attachment, Bates Nos.
6             ACTAV000006579-80

7     221      Digitek Recall Package          144
              2008, Bates Nos.
8             ACTAV000028178-222

9     222      Product Complaint Form,         159
              Bates Nos.
10            ACTAV001831802-11

11    223      E-mail, 9/16/08, from           174
              Castellazzo, Bates Nos.
12            ACTAV000098099-100

13    224      Documents re:  Quality          175
              System, Bates Nos.
14            ACTAV000098101-121

15    225      E-mail chain, Bates Nos.        179
              ACTAV000419719-20
16

17

18

19

20

21

22

23

24

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

6

```
 1              DEPOSITION SUPPORT INDEX

 2                     -  -  -

 3

 4     Direction to Witness Not to Answer

 5     Page  Line

 6     135   12

 7


 8
       Request for Production of Documents
 9
       Page  Line
10
       NONE
11

12

13     Question Marked

14     Page  Line

15     NONE

16

17

18

19

20

21

22

23

24
```

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

7

1              THE VIDEOGRAPHER:  We are now

2      on the record.  My name is Robert

3      McDonald, and I am the videographer for

4      Golkow Technologies.  Today's date is

5      March 18th, 2010, and the time is

6      approximately 9:06 a.m.  This video

7      deposition is being held in New York, New

8      York, and In Re:  Digitek Product

9      Liability Litigation.  The deponent is

10     Misbah Sherwani.

11             Would counsel introduce

12     yourselves for the record, please.

13             MR. MILLER:  My name is Pete

14     Miller from The Miller Firm representing

15     the plaintiffs.

16             MS. CARTER:  Meghan Carter from

17     Motley Rice representing the plaintiffs.

18             MR. THOMPSON:  Fred Thompson

19     representing the plaintiffs.

20             MR. LEE:  Sean Lee from Shook,

21     Hardy & Bacon representing the Mylan

22     defendants.

23             MR. WAMELINK:  Seth Wamelink

24     from Tucker Ellis & West representing the

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

8

1      Actavis defendants.

2                 MR. ANDERTON:  Michael

3      Anderton, also from Tucker Ellis & West,

4      also representing the Actavis defendants.

5                 THE VIDEOGRAPHER:  Thank you.

6                 The court reporter is Kim

7      Overwise, and she will now swear in the

8      witness.

9                      - - -

10                ...MISBAH SHERWANI, after

11     having been duly sworn, was examined and

12     testified as follows:

13  BY MR. MILLER:

14      Q    Good morning, ma'am.

15      A    How are you?

16      Q    Excellent.  Thank you.

17           We met earlier.  My name is Pete

18  Miller.  For the record, I'd ask you to state

19  your full name, please.

20      A    My name is Misbah Sherwani.

21      Q    Yes, ma'am.  And where are you

22  currently employed?

23      A    I'm currently employed at Halo

24  Pharmaceutical.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

9

1        Q    Halo Pharmaceutical?  And what is

2    your title at Halo?

3        A    I'm the director of quality

4    assurance.

5        Q    And when did you begin your

6    employment at Halo?

7        A    November 2009.

8        Q    And were you hired as a director of

9    quality assurance in November 2009?

10        A    Yes.

11        Q    Then I'd like to back up before

12    November of 2009.  Where were you employed?

13        A    I was employed at Actavis.

14        Q    And what month did you leave

15    Actavis?

16        A    I left Actavis in October of 2009.

17        Q    October of 2009.  Okay.  And when

18    were you hired by Actavis?

19        A    I was hired by Actavis in January of

20    2008.

21        Q    What was your title when you were

22    first hired by Actavis in January of 2008?

23        A    I was a senior manager of quality

24    assurance investigations group.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

10

1      Q     Senior manager of quality assurance
2    investigation group?
3      A     Correct.
4      Q     Did your title change over time from
5    January 2008 through October of 2009?
6      A     Yes.
7      Q     And what was the first change in
8    your title?
9      A     I was made director of quality
10   assurance investigations group.
11     Q     So you went from senior manager to
12   director of the same group?
13     A     Correct.
14     Q     And when did that happen?
15     A     In December of 2008.
16     Q     December of 2008.  Did your title
17   change again from December 2008 until you left
18   in 2009?
19     A     No.
20     Q     Have you ever been deposed before,
21   ma'am?
22     A     No.
23     Q     I'd like to go through employment
24   history prior to Actavis.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

                                                              11

```
 1              Who were you employed with in 2007?
 2         A    I was employed by Pliva.
 3         Q    Could you spell that, please?
 4         A    P, as in Peter, L-I-V, as in Victor,
 5    A.
 6         Q    Pliva Pharmaceuticals?
 7         A    It was just called Pliva,
 8    Incorporated.
 9         Q    Okay.  Was it a pharmaceutical
10    company?
11         A    Yes, it was.
12         Q    Was it a pharmaceutical
13    manufacturing company?
14         A    Yes.
15         Q    And what was your title there?
16         A    I was the manager of quality
17    information.
18         Q    And how long were you employed at
19    Pliva?
20         A    Approximately two and a half years.
21         Q    So we're going back roughly to 2005?
22         A    (Witness shakes head.)
23         Q    And what were you doing prior to
24    2005?
```

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

12

1          A     Prior to July of 2005, I was at

2     Roche, Hoffmann-LaRoche.

3          Q     And what was your job title at

4     Roche?

5          A     When I left, I was a compliance

6     coordinator.

7          Q     When you say "compliance

8     coordinator," does that entail or is that GMP

9     compliance?

10         A     Yes.

11         Q     And when were you hired by Roche?

12         A     I was hired by Roche in 2003,

13    September 2003.

14         Q     Okay.  And we don't have to get

15    exact on the month and date from here on out,

16    but who were you employed by prior to Roche?

17         A     I was employed by Halsey Drug

18    Company.

19         Q     You must have started when you were

20    12.  All right.  Halsey Drug, what years did

21    you work for Halsey?

22         A     I worked at Halsey from 2002 to

23    2003.

24         Q     And what was your title there?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

13

```
 1            A    I was a quality auditor.
 2            Q    And as quality auditor at Halsey
 3      Drug, did that involve CGMP compliance?
 4            A    Yes.
 5            Q    Who did you work for before Halsey
 6      Drug?
 7            A    Who did I work for prior to Halsey
 8      Drug?
 9            Q    Yes.
10            A    I worked for Penwest
11      Pharmaceuticals.
12            Q    What years did you work for Penwest?
13            A    Actually, I think I'm getting my
14      titles confused.  At Halsey Drug Company, I
15      was a compliance associate.  Sorry.
16            Q    That's okay.
17            A    And at Penwest Pharmaceuticals, I
18      was a quality auditor.
19            Q    Okay.  And when would you have
20      started at Pensey?
21            A    Penwest.
22            Q    Penwest.  I'm sorry.
23            A    I started in 2002.
24            Q    Did you work for any pharmaceuticals
```

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

14

1    prior to Penwest?

2         A    Yes.  Barr Laboratories.

3         Q    Okay.  What was your job title

4    there?

5         A    I was a chemist.

6         Q    And as a chemist, you were certainly

7    concerned with or adhered to CGMP compliance?

8         A    Yes.

9         Q    Okay.  I'd like to just do a couple

10   quick questions about your education.

11             Where did you go to college?

12        A    I went to New York University.

13        Q    Okay.  And what did you study at

14   New York?

15        A    I studied sciences.

16        Q    Okay.  And what's your degree?

17        A    I have a Bachelor of Arts in biology

18   and history.

19        Q    What year did you graduate?

20        A    I graduated in 1998.

21        Q    Any education beyond NYU?

22        A    Yes.

23        Q    What was that, ma'am?

24        A    I have a Master's of Industrial

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

15

1    Pharmacy from Long Island University.

2         Q    And what year did you receive that?

3         A    In 2002.

4         Q    Being that you haven't been deposed

5    before, I'd like to just go over a couple of

6    quick rules.  It's important that you

7    understand my questions.  So as we go

8    throughout the deposition, if I ask a question

9    and you don't understand it, I'm going to ask

10   that you ask me to rephrase the question.  Is

11   that fair?

12        A    Yes.

13        Q    And make sure we don't step on each

14   other when we're talking, so sometimes it

15   takes me a second to get my question out.  So

16   let me get my full question out before you

17   answer it so she can type it up.

18             Is that fair?

19        A    Yes.

20        Q    Okay.  Fantastic.  How did it come

21   to be that -- or I guess my question is this:

22   Is it "Pliva" or "Pliva"?

23        A    "Pliva."

24        Q    You left Pliva in December of 2007,

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

16

1    started with Actavis January 2008.  Why was it

2    you left Pliva in search for employment?

3         A    It was just a better opportunity.

4         Q    Okay.  And how did you hear about

5    that opportunity with Actavis in January of

6    2008?

7         A    There -- well, actually there were a

8    few job postings on a couple of search sites,

9    job search sites, for Actavis.  And I had a

10   couple of internal individuals who worked

11   there who had apprised me of an opportunity.

12        Q    There were individuals at Actavis

13   that you knew prior to being employed there?

14        A    Yes.

15        Q    And who would that be?

16        A    I knew Phyllis Lambridis.

17        Q    Okay.  Anyone else?

18        A    Yes.  Elisabeth Guarch.

19        Q    Would you spell that for me?

20        A    E-L-I-S-A --

21        Q    Oh, Elisabeth I got.  The last name.

22        A    Guarch is G-U-A-R-C-H.

23        Q    Was there anyone else?

24        A    There were quite a few --

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

17

 1          Q     Okay.

 2          A     -- that I have met prior.

 3          Q     That you met prior?

 4          A     Right.

 5          Q     How did you know Mrs. Lambridis

 6     prior to your employment?

 7          A     I have actually worked with her at

 8     prior companies.

 9          Q     Okay.  Which companies?

10          A     I worked with her at Halsey Drug

11     Company and at Pliva.

12          Q     Who did you interview with in order

13     to be employed at Actavis?  Or did you have --

14     I guess I should start out with saying:  Did

15     you have an interview before you were hired?

16          A     Yes.

17          Q     And who did you interview with?

18          A     I interviewed with Scott Talbot,

19     Tony Delicato.  I interviewed with Bill

20     Washington, Chris Young, Brian Nizio, Scott

21     Allen, Rick Dowling, and Swapan Roychowdhury.

22          Q     Quite the interview process.  Did

23     this take place everyone in one room at one

24     time or did you interview with all these

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

18

1    people individually?

2        A    I interviewed with them

3    individually.

4        Q    During this interview process when

5    you sat with all these individuals, was it --

6    was there ever a time when any one of those

7    individuals shared with you the current

8    compliance status of the company?

9        A    I don't recall.

10       Q    What did you know about Actavis

11   going into your employment in January 2008

12   specifically regarding their compliance

13   history?

14       A    What I knew was they had a few

15   warning letters that had been issued to them

16   for their Little Falls Totowa facility.  And I

17   knew that they had done extensive remediation

18   at their Elizabeth site for prior 483s that

19   they had received.

20       Q    Okay.  So you were familiar with

21   483s at Elizabeth and familiar with

22   remediation that was done there; is that

23   correct?

24       A    Familiar in the sense that I had

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

19

1    read whatever was on the Internet on the FDA

2    website.

3         Q     Okay.  And then you did that

4    research prior to your employment?

5         A     Yes.

6         Q     Was that in preparation of the

7    interview process?

8         A     Yes.

9         Q     And what opinion, if any, did you

10   form regarding Actavis' prior CGMP compliance

11   when you read the warning letters --

12                    MR. ANDERTON:  Objection.

13   BY MR. MILLER:

14        Q     -- off the Internet?

15                    MR. ANDERTON:  Objection.

16                    You may answer.

17                    THE WITNESS:  Can you just ask

18        the question again?

19   BY MR. MILLER:

20        Q     Certainly.  When you read the

21   warning letters off the Internet that regarded

22   Actavis' CGMP compliance, what opinion did you

23   form regarding their past history on the same

24   topic?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

20

1              MR. ANDERTON:  Objection.

2              You may answer.

3              THE WITNESS:  There was really

4        no opinion that I formed.  Like I said,

5        it was just to prepare myself for the

6        interview.

7    BY MR. MILLER:

8        Q    FDA is charged with ensuring

9    pharmaceutical manufacturing companies are

10   within CGMP compliance; do you agree with that

11   statement?

12       A    Yes.

13       Q    And do you agree that an inspection

14   of the facilities for a pharmaceutical

15   manufacturing company is the process by which

16   the FDA ensures that there's CGMP compliance?

17   Do you agree with that?

18       A    Among other things.

19       Q    Among other things?

20       A    Correct.

21       Q    And I like to use the term "483

22   inspection," but I'm learning that perhaps

23   that's not the right term.

24              What term do you use for the

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

21

1    inspection the FDA conducts of a

2    pharmaceutical manufacturing company.

3         A    It honestly depends on what type of

4    inspection they're conducting.

5         Q    Okay.  Are you familiar with the

6    inspections that were conducted that resulted

7    in the warning letters that you read on the

8    Internet?

9         A    Yes.  Those would be, if I recall

10   correctly, I believe they would be GMP, CGMP

11   inspections.

12        Q    CGMP inspections, that's the term

13   you want -- okay.  We'll use that term.  Did

14   you, prior to employment in preparing for the

15   interview or at any time during your

16   employment, have an opportunity to go back and

17   read what I'll call the FDA 483s or the CGMP

18   inspection report that were conducted on

19   Actavis?  And there were multiple, so I'm

20   asking about any of them.

21        A    You're asking afterwards if I had a

22   chance --

23        Q    At any time.

24        A    As I indicated to you, I briefly

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

22

1      reviewed what was on the FDA website.

2           Q    You indicated to me that's what you

3      did in preparation for potential employment.

4      And my question is much broader.  It's at any

5      time, as we sit here right now, yesterday,

6      going all the way back to your review in

7      preparation for employment, have you had an

8      opportunity to sit down and read the CGMP

9      inspection write-up from the FDA regarding the

10     Actavis Little Falls?

11          A    For what -- for which inspection?

12          Q    Any inspection.

13          A    Yes.

14          Q    Okay.  And did that take place after

15     you were employed?

16          A    No.

17          Q    When did it take place?

18          A    While I was employed at Actavis.

19          Q    Okay.  So you did it as part of your

20     work title?

21          A    Again, I just want to clarify if I'm

22     understanding correctly.  You asked me if I

23     had an opportunity to review any of the CGMP

24     inspection reports --

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

23

1      Q     Right.

2      A     -- that were conducted at the

3   facility.

4      Q     Yes.

5      A     I did, yes.

6      Q     Okay.  Great.  Explain to me what

7   duties and responsibilities go with the title

8   of senior manager of the QA investigation

9   group.

10     A     I was responsible for overseeing the

11  investigations, the corrective actions and

12  preventive actions.  I was responsible for the

13  complaints.  I was responsible for issuing

14  field alerts.

15     Q     And when you say responsible for

16  investigations, is that laboratory

17  investigations such as out-of-specification

18  findings?

19     A     Those are one type.

20     Q     What other types of investigations

21  other than out-of-specification

22  investigations?

23     A     Any process-related investigations.

24     Q     You don't have to do an exhaustive

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

24

1     list, but can you give me a few examples?

2          A     Anything that pertains to

3     manufacturing, packaging.

4          Q     And when you say you're responsible

5     or that falls under your job title, how

6     exactly does that work?  If the lab finds an

7     out-of-specification while doing lab testing,

8     is it the laboratory that would initiate the

9     investigation and then you maintain the file

10    or do you monitor it to make sure it's

11    completed?  I need kind of your words on how

12    you follow the investigations.

13         A     Okay.  My responsibility is

14    basically to review and -- review, approve,

15    and bring to closure any investigations that

16    were initiated.

17               So in the example that you cited, if

18    there was an out-of-specification that was

19    observed by the laboratory, they would

20    initiate the deviation; we would track it,

21    trend it, and basically, as I indicated to

22    you, review; and I would approve the

23    investigation.

24         Q     "Track it" means to keep a file of

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

25

```
 1      that type of investigation?

 2           A     Correct.

 3           Q     And "trend" means that if it happens

 4      more than once, you want to know if the same

 5      thing is happening over and over again?

 6           A     Correct.

 7           Q     Okay.  And "approve it," you approve

 8      the procedures that the QA department is

 9      taking regarding the inspection?

10           A     I'm sorry?

11           Q     Well, what do you mean by "approve"?

12           A     Approve in the sense that when the

13      investigation report is written, I would

14      review it, ensure that it was accurate, it was

15      thorough, it met all of the criteria

16      regarding, you know, as far as internal

17      requirements, any sort of regulatory

18      requirements.  And once those aspects were

19      met, I would approve.

20           Q     And then "bring to closure," how

21      does an investigation receive closure?

22           A     Well, first of all, the

23      investigation report, like I indicated to you,

24      is approved.  So that aspect of it is -- that
```

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

26

1    report is closed.  However, if there are any

2    further actions, whether they be corrective

3    actions or preventive actions, that are

4    associated with that report, you have to

5    ensure that those actions are completed.

6            Once those are completed and

7    everything pertaining to the actions related

8    to the investigation are completed, then

9    that's what "bring to closure" means.

10        Q    Okay.  And when you say "preventive

11    action," if the company determines that

12    there's something that can be done to not

13    allow this out-of-specification to happen

14    again, then you would ensure that the company

15    takes those steps?

16        A    To prevent recurrence.

17        Q    Yes.  Okay.  Whose spot did you

18    replace -- that's not a great way to put it.

19    But who was in the -- who held that title as

20    senior manager of QA investigations group

21    prior to your being hired in January of 2008?

22        A    I don't know.

23        Q    Did you receive any kind of

24    pass-down?  Did somebody sit down with you and

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

27

1    say, "This is the status of our investigations

2    to date; we want you to take over"?  Or did

3    you just sit down and start from then on and

4    not have a pass-down?

5         A    No.  I mean, there's a certain

6    amount of pass-down that does occur.  It's a

7    rolling list.  So obviously there was that

8    information that was passed that here is the

9    current status of investigations that I would

10   be responsible for.

11        Q    Who did that pass-down with you?

12        A    Who did that?  For the Elizabeth

13   site, it was Tony Delicato.  And for the

14   Little Falls site, it was a combination of

15   Scott Talbot and Dan Bitler.

16        Q    And for Elizabeth, did that

17   primarily pertain to adverse drug event

18   reporting?  Is that correct?

19        A    I'm sorry?

20        Q    What do you -- what term do you use

21   for complaints received from customers

22   regarding the products?

23        A    There are a few types.

24        Q    Okay.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

28

1        A     There are product complaints, which

2    is what I was responsible for.  And that

3    entails any customer complaints that we

4    received regarding the quality of the product.

5    So, for example, if they saw broken tablets or

6    if they saw a burnt induction seal or if they

7    saw a damaged bottle that they received, those

8    are product quality complaints.

9        Q     Okay.

10        A     There are adverse events.  Those are

11    the responsibility of the medical affairs

12    group.  And that would entail any sort of

13    obviously adverse event related to the

14    product.

15        Q     And who was your counterpart that

16    was responsible for the adverse events?

17        A     Sarita Thapar.

18        Q     My question is:  Were those product

19    complaints and adverse events, were they all

20    maintained at Elizabeth?

21        A     What do you mean by "all"?  Like --

22        Q     What do I mean by "all"?  You said

23    that your pass-down at Elizabeth was from

24    Delicato.  Was the pass-down for Elizabeth,

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

29

1    was it regarding how you're going to handle

2    and pass complaints for the product?  Were the

3    product complaints, was that an issue that was

4    dealt with at Elizabeth or Little Falls?

5          A    They're two different facilities.

6          Q    Right.

7          A    Each facility had a different

8    product listing.  So dependent on what site

9    manufactured or packaged or processed what

10   product, the product complaint would reside at

11   that facility.

12         Q    Oh, okay.  So the product -- you

13   understand that today we're here to speak

14   about the product Digitek?

15         A    Yes.

16         Q    Okay.  And what's the active

17   ingredient in Digitek?

18         A    Digoxin.

19         Q    Okay.  And which plant was Digitek

20   manufactured?

21         A    In the Little Falls and Totowa

22   facilities.

23         Q    And does that mean that Little Falls

24   would have maintained the file on the product

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

30

1   complaints and the adverse events?

2       A    They would have maintained the files

3   for the product complaints.

4       Q    Would the adverse events have been

5   maintained at Elizabeth?

6       A    Yes.

7       Q    Thank you.  Who did you report to?

8   Who was the director of the quality assurance

9   investigations group when you were hired in

10  January of 2008?

11      A    There was no director of quality

12  assurance investigations group.

13      Q    Okay.  Then do you have an

14  understanding as to why at the end of the

15  year, December of 2008, a billet or job title

16  of director was created?

17      A    There was a reorganization at the

18  company.  That was a position that was newly

19  created.

20      Q    I am going to hand you what was

21  previously marked as Plaintiff's Exhibit 91.

22  Ma'am, if you'll take a look at that document,

23  and I'll represent to you that that is an

24  establishment inspection report from the FDA.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

31

1    Are you familiar with what that is?

2         A    With what an establishment

3    inspection report is?

4         Q    Yes, ma'am.

5         A    Yes.

6         Q    Those previous companies that you

7    worked for, were you ever involved with the

8    CGMP inspections, if any, that were conducted?

9         A    Yes.

10         Q    Okay.  And have you had experience

11   in the past to actually work with the FDA

12   inspectors?

13         A    Yes.

14         Q    And have you in the past prior to

15   Actavis been involved in a warning letter that

16   was the result of a CGMP inspection?

17         A    No.

18         Q    Have you had an opportunity to

19   review establishment inspection reports in the

20   past?

21         A    Yes.

22         Q    So you're familiar with what one is?

23         A    Correct.

24         Q    Okay.  Turn to -- this is an

32

1    establishment inspection report from an

2    inspection that took place in May of 2008.

3    And you were employed at Actavis at that time?

4          A    Correct.

5          Q    Are you familiar with that

6    particular inspection?

7          A    Yes.

8          Q    Have you seen this document before?

9          A    No.

10         Q    All right.  Well, take a look at it.

11   And we're going to go to Page 12.  And in this

12   establishment inspection report written by the

13   FDA, they identify the individuals that were

14   employed at Actavis that were important

15   regarding this CGMP inspection.

16              And I would like to ask you about

17   the paragraph at the bottom of Page 12 that

18   identifies you.  Do you see where it starts

19   out with your name, ma'am?

20         A    Correct.

21         Q    And it says:  "Misbah Sherwani,

22   Senior Manager Quality Assurance

23   Investigations Group, joined the company" --

24   and it's redacted but you agree that should

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

33

1     say January of 2008?

2          A     Correct.

3          Q     "She currently oversees Quality

4     Assurance investigations and complaints for

5     multiple sites, including Totowa, Little

6     Falls, and Elizabeth, New Jersey.  She

7     explained the efforts to correct the backlog

8     of incomplete QA investigations and stated

9     that she hoped to hire additional resources."

10               My question, ma'am:  Do you recall

11    sitting and having conversations with the FDA

12    inspector on this inspection?

13         A     Yes.

14         Q     And which inspector do you remember

15    sitting and talking with?

16         A     I spoke to Erin McCaffery.

17         Q     And do you recall the conversation

18    with Erin regarding the backlog of incomplete

19    QA investigations?

20         A     To an extent.

21         Q     Okay.  And what was it that you

22    explained to Erin regarding the backlog of

23    incomplete QA investigations?

24         A     In what regard?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

34

1          Q     In any regard.  What conversation do

2     you recall having with her regarding the

3     incomplete QA investigations?

4          A     I think it was exactly that, how

5     many incomplete investigations there were,

6     what the status of them were.  I think that

7     was the general conversation.

8          Q     According to Actavis' investigations

9     SOP, do you know how many days an

10    investigation is supposed to be wrapped up or

11    completed?

12         A     Which SOP are you referring --

13         Q     SOP 33, the one regarding

14    out-of-specification investigations.

15         A     There --

16               MR. ANDERTON:  Objection.

17               You may answer.

18               THE WITNESS:  There were quite

19         a few revisions, so I'd actually have to

20         see which revision.

21    BY MR. MILLER:

22         Q     And it's your memory that in the

23    revisions, the number of days that you have to

24    complete the investigation changed?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

35

1              MR. ANDERTON:  Objection.  If

2        you want to ask her about a document, can

3        we put it in front of her?

4              MR. MILLER:  No.  I don't have

5        it right now.

6   BY MR. MILLER:

7        Q    I'm asking about your memory.  Do

8   you have a memory of the number of days that

9   an investigation was to be completed changed

10  in a revision?

11       A    Yes.

12       Q    Do you remember what the number of

13  days changed to?

14       A    It changed from 30 business days to

15  30 calendar days.

16       Q    And from 30 business days to

17  calendar days.  So 30 business days, you'd

18  agree with me that's counting Monday through

19  Friday?

20       A    Correct.

21       Q    And calendar days, day one is when

22  the investigation started.  You've got 30

23  days.  So it actually shortened; do you agree

24  with that?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

36

1          A      Correct.

2          Q      Do you remember roughly when that

3     change took place?

4          A      I believe that took place in June of

5     2008.

6          Q      Do CGMPs -- have you had an

7     opportunity to read the good manufacturing

8     practices, or do you keep a copy of them with

9     you at work?

10         A      Yes.

11         Q      I guess that was bad because I asked

12    two questions.  Have you read the good

13    manufacturing practices?

14         A      Have I read?  Certain portions of

15    it, yes.

16         Q      Okay, great.  And you do keep a copy

17    at work?

18         A      Yes.

19         Q      And do you agree that part of

20    compliance with good manufacturing practices

21    is that a company follows its own standard

22    operating procedures?

23         A      Yes.

24         Q      The second half of that sentence

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

37

1    that we read that says "she hoped to hire

2    additional resources," do you recall the

3    requirement or the desire to hire additional

4    resources back when you spoke with this

5    investigator between March and May of 2008?

6         A    I'm sorry.  Ask that again.

7         Q    Certainly.  I'll read the whole

8    sentence:  "She explained the efforts to

9    correct the backlog of incomplete QA

10   investigations and stated that she hoped to

11   hire additional resources."

12              Did you hope to hire additional

13   resources back in the time frame of May of

14   2008?

15        A    Yes.

16        Q    What was -- what positions needed to

17   be filled?

18        A    It wasn't a -- I don't believe that

19   there were any open positions that needed to

20   be filled.  However, given the workload, I had

21   requested additional resources.

22        Q    Given the workload, and is that

23   workload the incomplete or the backlog of

24   incomplete QA investigations?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

38

1      A    That was one of the items.

2      Q    It goes on to say:  "She explained

3  the limitations of the current paper based

4  system to document the QA investigations.  She

5  described plans to implement the electronic

6  Trackwise system, which is already in use at

7  the Actavis Elizabeth, New Jersey, site."

8           Now, ma'am, my question is:  Explain

9  to me what you believe the limitations of the

10  paper-based system to be.

11      A    There were limitations in regards to

12  how quickly and efficiently you would be able

13  to search, track, and monitor information.

14      Q    So as we discussed, one of your job

15  titles was to track out-of-specification

16  investigations.  And it's my understanding

17  that with a paper-based system, it was

18  difficult to go back and review and see what

19  other out-of-specifications were related to

20  the one you were currently working on?

21           MR. ANDERTON:  Objection;

22       mischaracterizes her testimony.

23           You may answer.

24           THE WITNESS:  I'm sorry?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

39

1            MR. ANDERTON:  You may answer.

2            THE WITNESS:  I didn't say it

3       couldn't be done.  It was more of an

4       efficient manner.  So sometimes it would

5       be a bit more time consuming.

6   BY MR. MILLER:

7       Q    I understand.  And the TrackWise

8   system, that was an electronic system so that

9   you could go back and track

10  out-of-specification issues much faster?

11      A    Yes.

12      Q    Do you know how long it had been in

13  place at Actavis Elizabeth?

14      A    No.

15      Q    It goes on to say:  "Ms. Sherwani

16  was also responsible for providing the

17  voluntary recall information to New Jersey

18  District Office."

19            Was that a part of your job

20  description when you were hired in January of

21  2008, or did someone come to you during the

22  decision to recall and inform you that that

23  was going to be part of your job title?

24      A    No, it wasn't part of my job

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

40

1    description when I was hired.  However, given

2    my prior experience with recalls, I was

3    requested to help.

4         Q    What prior experience with recalls

5    did you have, ma'am?

6         A    I performed recalls for

7    Hoffmann-LaRoche and for Pliva.

8         Q    And were those voluntary recalls, or

9    were they directed by the FDA?

10        A    All recalls are voluntary.

11        Q    All recalls are voluntary?

12        A    They should be.  It's really at the

13   company -- the FDA really can't force a

14   recall.  It's more of a company directive.

15        Q    And you're familiar with the fact

16   that the CGMP is a federal code, 210 and 211?

17        A    Yes.

18        Q    Yes?

19        A    Uh-huh.

20        Q    Have you read the section on

21   recalls?

22        A    Yes.

23        Q    You have?  Okay.  Are you familiar

24   with recalls being either voluntary, totally a

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

41

1    decision on the part of the company and -- or

2    the other option being that the FDA recommends

3    the recall and then the company does a

4    voluntary recall based on the recommendation

5    of the FDA?  Are you familiar with that split?

6                    MR. ANDERTON:  Objection.

7                    You may answer.

8                    THE WITNESS:  I'm sorry.  Ask

9        that again.

10   BY MR. MILLER:

11       Q    Certainly.  Would you agree that

12   there are voluntary recalls without any input

13   whatsoever from the FDA and there are recalls

14   in which the FDA recommends that the company

15   recall and, therefore, the company does a

16   voluntary recall?

17       A    In my experience, it has always been

18   the company that performs a voluntary recall.

19       Q    What recalls were you involved with

20   with Actavis?

21       A    Quite a few.

22       Q    And would you agree with the

23   statement that these recalls are a result of

24   the CGMP inspection that took place at Actavis

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

42

1    in May of 2008?

2                     MR. ANDERTON:  Objection.

3                     You may answer.

4                     THE WITNESS:  Are these recalls

5         a result of the inspection?

6    BY MR. MILLER:

7         Q    Yes.

8         A    To an extent.

9         Q    Do you know what a Class I recall

10   is?

11        A    Yes.

12        Q    What's a Class I recall?

13        A    A Class 1 recall is a recall down to

14   the consumer level.

15        Q    And you agree it's more serious than

16   the other classes of recall?

17        A    It's -- yes.

18        Q    Did you have experience with a

19   Class I recall prior to Actavis, the recalls

20   from Hoffmann-LaRoche and Pliva?

21        A    Yes.

22        Q    Which one?

23        A    At Hoffmann-LaRoche.

24        Q    Was it a particular lot, or was it

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

43

1    all lots back at Hoffmann-LaRoche?

2         A    It was one particular lot.

3         Q    So you agree with me that -- well,

4    Digitek was one of the recalls you were

5    involved with at Actavis; correct?

6         A    Yes.

7         Q    And you agree that it was a Class 1?

8         A    Yes.

9         Q    And you agree that it was all lots?

10        A    Yes.

11        Q    Why was Digitek recalled?

12        A    Why was Digitek -- in what regard?

13   To one particular lot or all lots?

14        Q    I'm asking, ma'am.  I don't know.

15   Why was Digitek recalled?

16        A    I don't know.

17        Q    You don't know?

18        A    (Witness shakes head.)

19        Q    Do you agree with this last

20   statement that I read from the FDA EIR report

21   that states that Ms. Sherwani was also

22   responsible for providing the recall

23   information to New Jersey district office?  Is

24   that a true statement?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

44

1          A     For certain recalls, yes.

2          Q     Is the Digitek recall one of the

3     recalls?

4          A     Yes.

5          Q     Did you feel like it was important

6     that you determine why Digitek was recalled if

7     you're going to communicate to the FDA

8     regarding providing the voluntary recall

9     information to their district office?

10                    MR. ANDERTON:  Objection.

11     BY MR. MILLER:

12          Q     It's okay to answer.

13                    MR. ANDERTON:  You may answer.

14                    THE WITNESS:  I was only

15          carrying out what I was told to do.

16     BY MR. MILLER:

17          Q     The next statement says:  "She

18     reports to Phyllis Lambridis, Vice President

19     US Quality and Compliance."

20               Was Phyllis Lambridis the one

21     telling you what to do when it came to the

22     recall?

23          A     She was one of the individuals,

24     except that is incorrect.  I didn't report to

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

45

1       Phyllis Lambridis.

2            Q     Who did you report to?

3            A     I reported to Tony Delicato.

4            Q     Okay.  Although you reported to Tony

5       Delicato, you agree that Phyllis Lambridis was

6       giving you input as far as the recall goes?

7            A     She was one of the individuals, yes.

8            Q     Anyone else besides Phyllis

9       Lambridis and Delicato?

10           A     There were other management.

11           Q     Any names come to mind?

12                 MR. ANDERTON:  You can identify

13           the people.

14                 THE WITNESS:  Okay.

15                 MR. ANDERTON:  You can tell

16           them -- to the extent that you're

17           concerned about privileged

18           communications, you can tell them

19           in-house counsel or outside counsel that

20           gave you.  Just don't reveal any of the

21           information they gave you.  You can

22           identify them, not the substance of the

23           communications.

24                 THE WITNESS:  Okay.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

46

1          MR. ANDERTON:  Okay?

2          THE WITNESS:  I worked with a

3      group of individuals:  Phyllis Lambridis,

4      Tony Delicato, John LaRocca, Hjordis

5      Arnadottir.  I don't know if I'm not --

6      I'm not pronouncing her name correctly.

7      But they were a few of the individuals

8      that I interacted with.

9  BY MR. MILLER:

10      Q    Thank you.  How many times during

11  the CGMP compliance investigation, the 483,

12  did you actually sit and talk with the

13  investigator?

14      A    You're asking for this particular

15  inspection --

16      Q    Yes.

17      A    -- how many times?  I sat with her,

18  I believe, just once.

19      Q    And did the investigator you sat

20  with, did she seem satisfied with your

21  responses regarding the backlog of incomplete

22  QA investigations?

23          MR. ANDERTON:  Objection.

24          You may answer.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

47

1          THE WITNESS:  I wouldn't know.

2     You'd have to ask her.

3  BY MR. MILLER:

4     Q    No.  Did she seem satisfied to you?

5  I'm asking what your opinion of the

6  conversation was.

7          MR. ANDERTON:  Objection; asked

8     and answered.

9  BY MR. MILLER:

10    Q    It's okay to answer.

11    A    Again, I --

12    Q    I'd have to ask her what your

13 opinion of the conversation was?  I'm not so

14 sure she'd have that answer.

15    A    No, I don't know.  I mean, as far as

16 you're asking me if she seemed satisfied?

17    Q    Yes.

18    A    I don't know.  I never asked her if

19 she was satisfied.

20    Q    One of the duties or descriptions of

21 your job were to handle complaints.  And tell

22 me if there is any connection there between

23 investigations such as out-of-specifications

24 and complaints.  They seem like two totally

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

48

1    separate jobs.  Am I correct in thinking that?

2         A    It's actually -- it depends.  There

3    may be some correlation.

4         Q    During January 2008 up and to the

5    completion of this inspection in the end of

6    May of 2008, how much time would you spend on

7    those two tasks, either complaints or

8    investigations?  How was your day, your

9    typical day split up?

10        A    The majority of my day was spent

11   with investigations from that time frame, from

12   January 2008 to May 2008.

13        Q    And then you said also you dealt

14   with field alerts.  What are field alerts?

15        A    Field alerts are communications from

16   the company to the FDA to alert them of

17   significant quality issues.

18        Q    Did you generate the field alerts

19   and make sure they were sent to the FDA or

20   someone else generated them and you tracked

21   them?

22        A    Initially I was not doing that.

23   That's a responsibility that came to me

24   probably sometime in June of 2008.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

49

1          Q      Prior to June of 2008, would you
2    have been involved in any way in field alerts?
3          A      There were a few that I had been
4    reviewing.
5          Q      Were you reviewing any field alerts
6    that dealt with Digitek in 2008?
7          A      I don't recall.
8          Q      Do you recall any field alerts being
9    issued to the FDA regarding Digitek while you
10   were employed at Actavis?
11         A      I don't recall.
12         Q      Do you have a memory of generating
13   any field reports to the FDA since you've been
14   employed at Actavis?
15         A      Yes.
16         Q      Okay.  I don't want to know the name
17   of the drug.  It's not important.  But what
18   was the issue with the drug if you can give me
19   an example of a field report that you've
20   submitted to the FDA?
21                MR. ANDERTON:  Objection.  I'm
22         not going to let you get around PTO 27
23         like that.  You can ask her issues for
24         field alerts about digoxin.  But to the

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

50

1          extent you're explicitly asking about

2          issues, even though you're not

3          identifying the specific drug, that's

4          asking about an issue relating to a drug

5          other than digoxin, just not naming the

6          drug.

7                    So I'm going to instruct the

8          witness to answer only with respect to

9          Digitek.

10    BY MR. MILLER:

11         Q    Are you being represented by counsel

12    today?

13         A    The company -- he is not my lawyer.

14    He is a company-provided --

15         Q    Do you have a lawyer here at all

16    today?

17         A    No.

18                    MR. ANDERTON:  The rule clearly

19         allows me to instruct a witness or

20         deponent to not answer a question to the

21         extent necessary to enforce the terms of

22         a court order.  It's not limited to

23         whether I represent her or not.  The rule

24         is very clear on that.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

51

1            MR. THOMPSON:  What rule are

2      you talking about?

3            MR. ANDERTON:  30(b)(2), I

4      believe, is the rule -- 30(c)(2), I

5      misspoke, clearly allows me to instruct a

6      witness to not answer, whether I

7      represent that person or not.

8            MR. THOMPSON:  I'm going to

9      have to look that up, but I think that's

10     relating to privilege.  You are asserting

11     relevance.

12            MR. ANDERTON:  I'm not

13     asserting relevance.  I'm enforcing the

14     terms of a court order.

15            MR. THOMPSON:  We disagree on

16     PTO 27.  So my suggestion would be for

17     Mr. Miller to ask the questions and you

18     to assert the objection and direction so

19     we'll have a record.

20            MR. ANDERTON:  Which is fine.

21            Give me one second.

22            MR. MILLER:  Let's go off the

23     record for a second.

24            THE VIDEOGRAPHER:  Off the

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

52

1         record at 9:59 a.m.

2                  (Short recess.)

3                  THE VIDEOGRAPHER:  Back on the

4         record at 10:03.

5    BY MR. MILLER:

6         Q    Ma'am, did you have any

7    conversations with any of the attorneys while

8    we took that break?

9         A    Yes.

10        Q    And what did you discuss while you

11   were on the break?

12                  MR. ANDERTON:  You can answer.

13                  THE WITNESS:  Oh, he was just

14        asking me if I recalled specifics of any

15        field alerts that I issued.

16   BY MR. MILLER:

17        Q    Okay.  And your answer?

18        A    Yes.

19        Q    Okay.  I want to ask you, did any of

20   the field alerts that you submitted during

21   your employment at Actavis, did they regard

22   CGMP compliance issues?

23                  MR. ANDERTON:  I'm going to

24        object.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

53

1              But you may answer.

2                    THE WITNESS:  What do you mean

3         by "issues"?

4    BY MR. MILLER:

5         Q    Did they regard CGMP compliance?

6         A    In what regards?

7         Q    Any regard.

8                    MR. ANDERTON:  I'm going to

9         object and ask you, Pete, to form your

10        questions so as to make clear any

11        distinction between Actavis Totowa and

12        Actavis Elizabeth.

13              I think the testimony has shown

14        that Ms. Sherwani had responsibility --

15        responsibilities both for Actavis Totowa

16        and Actavis Elizabeth operations.

17              And I think it's important for

18        the record to properly reflect, rather

19        than just a general Actavis denomination,

20        whether we're talking about Elizabeth or

21        Totowa.

22    BY MR. MILLER:

23        Q    Did any of the field reports that

24    you generated while at Actavis, did they

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

54

1    involve CGMP compliance?  And I'm only asking

2    about field alerts at Actavis Little Falls or

3    Actavis Elizabeth if they involved adverse

4    events.

5                    MR. ANDERTON:  I object to the

6         form.  That's at least two questions,

7         maybe more.

8                    You can answer if you

9         understand.

10                   THE WITNESS:  No.  Can you

11        restate your question?

12                   MR. ANDERTON:  Pete, just one

13        question at a time would be much easier

14        for all concerned.

15                   MR. MILLER:  Sounds nice.

16   BY MR. MILLER:

17        Q    Did you write any field alerts that

18   concerned CGMP compliance while you were

19   employed at Actavis?

20        A    Did I write any field alerts?  Yes.

21        Q    Did you have a feeling that this had

22   something to do with safety?

23                   MR. ANDERTON:  Objection.

24                   You may answer.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

55

```
 1                    THE WITNESS:  I wouldn't know.
 2          That's not my area.  I was only -- as I
 3          indicated to you before, field alert
 4          reports are communications between the
 5          FDA and the company for any potential
 6          significant quality issues.
 7     BY MR. MILLER:
 8          Q    Is safety your area in any of your
 9     job titles?
10                    MR. ANDERTON:  Objection.
11                    You may answer.
12                    THE WITNESS:  One of the
13          aspects of quality to ensure a quality
14          product is to ensure safety, but that's
15          a -- that's a requirement for the entire
16          company.  It's...
17     BY MR. MILLER:
18          Q    It's a requirement for you too;
19     right, ma'am?
20          A    Correct.
21          Q    If no one investigated
22     out-of-specification findings and a product
23     was just made whether or not there were
24     out-of-specification tests or not, would it
```

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

56

1    still be a safe product?

2         A    I'm sorry.  Say that again.

3         Q    Certainly.  If a pharmaceutical

4    manufacturing company didn't have someone such

5    as yourself or an investigation group to

6    determine that out-of-specification findings

7    were tracked and dealt with, would the product

8    still be safe?

9                    MR. ANDERTON:  Objection.

10                   You may answer.

11                   THE WITNESS:  I wouldn't know.

12          It's not part of my job to determine the

13          safety of a product or what medical

14          impact it has.

15                   MR. MILLER:  I'm going to hand

16          you what I'm going to mark as

17          Exhibit 215.

18                   (Plaintiff's Exhibit No. 215

19          was marked for identification.)

20    BY MR. MILLER:

21         Q    For the record, this is

22    Actavis 01425411.  Ma'am, I'll represent to

23    you that this is an e-mail from a Michael

24    Ponzo dated Monday, January 14th, 2008.  And

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

57

1    you can go through that long list of who it's

2    to.  And I don't believe I saw you on here

3    anywhere.  Have you ever seen this e-mail

4    before?

5         A    (Witness shakes head.)

6         Q    My question is this:  Are you

7    familiar with --

8              MR. ANDERTON:  Did she answer

9         that question?

10             MR. MILLER:  Well, with a head

11        nod.

12   BY MR. MILLER:

13        Q    I guess we need to make sure you

14   actually answer it instead shaking your head.

15        A    Oh, no, I haven't seen this e-mail.

16        Q    You were the senior manager of QA

17   investigations starting on January 1 of 2008?

18        A    No.

19        Q    No?

20        A    (Witness shakes head.)

21        Q    When did you start?

22        A    Sometime late January 2008.

23        Q    Late January 2008?

24        A    Yeah.  I don't recall the specific

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

58

1     date.

2          Q     Okay.  Did you realize or was there

3     such a thing as a team for open investigation

4     and performance reports when you took over in

5     late January of 2008?

6          A     What do you mean by "team"?

7          Q     What does "team" mean to you?

8          A     There are different -- I mean, team

9     is an organized -- an organized body of, you

10    know -- basically an organization of people

11    or, you know, that, you know -- what is a

12    team?

13              They sit.  They, you know -- they're

14    involved in investigations.  And for me, team,

15    I'm thinking more -- I don't know how you mean

16    it, whether they're designated, whether

17    they're, you know, required.  There are

18    different --

19         Q     Of all the multiple definitions of

20    the word "team," I like the one you picked.

21    Let's use it.  Was there a team of open

22    investigations that you know of in January of

23    2008?

24         A     In January of 2008, I did not know

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

59

1    there was a team at the Little Falls site.

2        Q    When you took over in late January

3    of 2008, did anyone sit down with you and go

4    over how many deviations or how many

5    investigations were open at that time?

6                    MR. ANDERTON:  Objection; asked

7        and answered.

8                    You may answer.

9                    THE WITNESS:  No one sat with

10       me in January of 2008 from the Little

11       Falls site.

12   BY MR. MILLER:

13       Q    Do you think it was important, as

14   the senior director of quality investigations

15   group, to know how many investigations were

16   open at the time that you started your

17   employment --

18                    MR. ANDERTON:  Objection.

19   BY MR. MILLER:

20       Q    -- at Actavis?

21                    MR. ANDERTON:  Objection.

22                    You may answer.

23                    THE WITNESS:  I started off in

24       the Actavis Elizabeth site.  So for the

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

60

1          first few weeks, I was being brought up

2          to speed for only the Actavis Elizabeth

3          site.

4     BY MR. MILLER:

5          Q    Okay.  Then --

6          A    Then later on in February is when I

7     started getting the information for the Little

8     Falls Totowa site.

9          Q    In February of 2008 -- take a look

10    at the attachment.  And it appears to be an

11    Excel spreadsheet of open investigations.  Is

12    this something that you would have

13    familiarized with or given in February when

14    you were asked to become aware of open

15    investigations at Actavis at Little Falls?

16         A    Yes.

17         Q    So you recall this document,

18    although it's heavily redacted?

19              MR. ANDERTON:  Objection;

20         mischaracterizes her testimony.

21              THE WITNESS:  No.

22              MR. ANDERTON:  You may answer.

23              THE WITNESS:  I don't know this

24         particular document.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

61

1   BY MR. MILLER:

2        Q    Well, if we go to Page 3 of 11,

3   Actavis 01425414, and you see where at the top

4   it says Open Investigations, are open

5   investigations something you would have been

6   concerned with in your job as senior director

7   of the investigations group?

8        A    Senior manager.

9        Q    Senior manager.  I'm sorry.  Senior

10  manager without a director of the QA

11  investigations group in February of 2008, is

12  this a document that you would have been

13  concerned with?

14                MR. ANDERTON:  Objection.

15                You may answer.

16                THE WITNESS:  I don't know what

17      you mean by "concerned," but --

18  BY MR. MILLER:

19       Q    I'll stay away from the tough words.

20            But looking at Line 11 here, if you

21  go down, it says 07-093 with an asterisk.

22            Do you see that, ma'am?

23       A    Yes.

24       Q    Okay.  Is that a number for an

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

62

1    investigation?

2         A    Yes.

3         Q    Okay.  And you're familiar with it?

4    And how does that system work?  What does

5    07-093 mean to you?

6                   MR. ANDERTON:  Objection.  You

7         just asked a question and didn't let her

8         answer and then moved on to the next

9         question.  So I object to the form.  You

10        said, "Are you familiar with it?" and

11        then you immediately moved on to the next

12        question.

13                  MR. MILLER:  She said "yes."

14                  MR. ANDERTON:  She didn't

15        respond.  You didn't give her even a

16        remote chance to respond.

17                  MR. MILLER:  You might want to

18        sit over here because you're missing a

19        lot.  She shook her head once and we

20        fixed that, and a minute ago she just

21        said "yes."

22                  Would you repeat back the

23        answer  and tell me if she said "yes."

24                  MR. ANDERTON:  She said she --

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

63

1          you asked her if that was a number of an

2          investigation.  She said "yes."

3                    MR. MILLER:  Yes.

4                    MR. ANDERTON:  Then you said,

5          "Are you familiar with it?" and then

6          immediately launched into the next

7          question without allowing her to respond

8          to whether she was familiar with it.

9                    MR. MILLER:  It was kind of a

10         rephrasing of the question.  All right.

11                   Well, he's already -- I'm not

12         sure what that was all about.  Let's go

13         back.

14                   MR. ANDERTON:  What it's about,

15         Pete, is your dedication and devotion to

16         asking imprecise questions and not

17         allowing her to answer and creating a

18         misrepresentative record as a result of

19         that.

20                   MR. MILLER:  Very well.  Let's

21         get back to it.

22     BY MR. MILLER:

23         Q    Explain to me, ma'am, what does

24     07-093 asterisk indicate to you?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

64

1          A      I don't recall what the asterisk

2     represents, but 07 is the year.   It represents

3     the year.   And "dash 093" is the sequential

4     number of the investigation.

5          Q      Okay.   So is it fair to say that

6     that's the 93rd investigation from 2007?

7          A      Correct.

8          Q      Okay.   Thank you.

9                 And the next column titled Product,

10    you agree with me that reads Digoxin Tablets

11    .125-milligram?

12         A      Correct.

13         Q      Would you have an understanding of

14    what the OOSN is at the top of the next

15    column?

16         A      Yes.

17         Q      What is OOSN?

18         A      It's out-of-specification number.

19         Q      Okay.   If we go down to the entry in

20    that field, it says "NA."  Do you have an

21    understanding as to why this particular

22    inspection would not have an OOSN?

23         A      Yes.

24         Q      Why?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

65

1          A     Because the investigation wasn't for

2     an out-of-specification and it didn't result

3     as a result of an out-of-specification.

4          Q     If we go to the product number,

5     you're familiar with the product number being

6     145 of this product?

7          A     If that's what it says.

8          Q     Okay.  And you're familiar with the

9     batch and lot numbering system used at

10    Actavis; is that a fair statement?

11         A     Yes.

12         Q     Okay.  Do you have any specific

13    memory of Lot or Batch No. 70924A1 of Digitek?

14         A     No.

15         Q     If we go to Deviation Description

16    and it states:  Two tablets of digoxin -- I'm

17    sorry.  My eyes are getting bad.

18              Two tablets of digoxin tablets

19    .125-milligram were found with approximately

20    double the thickness from counter channels

21    during packaging/filling operation.

22              Did I read that correctly, ma'am?

23         A     Yes.

24         Q     You've had an extensive work history

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

66

1      in CGMP compliance, and you understand the

2      meaning of "out of specification"; correct?

3          A    Yes.

4          Q    Would a tablet that is double the

5      thickness of what it was supposed to be, is

6      that out of specification?

7          A    It did not meet the requirements.  I

8      think what you need to understand is the way

9      the out-of-specification number system here at

10     Actavis Totowa works was this

11     out-of-specification number were for any

12     laboratory-generated investigations.

13         Q    Should a laboratory-generated

14     investigation have taken place on this

15     deviation description?

16         A    No.

17         Q    Why not?

18         A    Because it was an issue that

19     occurred during the processing of the product.

20         Q    Is there a specification for the

21     proper thickness of a tablet?

22         A    I don't know.

23         Q    You don't know if a tablet's

24     supposed to be within a certain range of

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

67

1    thickness?

2         A    It depends on what the batch record

3    says.

4         Q    And it says, next column, Initiated

5    By.  And it has D. Joshi?

6         A    "Joshi."

7         Q    Joshi.  What's his title?

8         A    I don't know what his title is now.

9    What it was back then?

10        Q    If you know it, sure.

11        A    I believe he was the packaging

12   manager.

13        Q    Okay.  It says Date Initiated in the

14   next column.  Do you see that?  And it's

15   December 5 of 2007.

16             My question is -- well, actually

17   let's go on.

18             The next column is Days Open and it

19   says 40.  Now, that 40, you agree with me, is

20   beyond the required SOP of 30 days?

21             MR. ANDERTON:  Objection;

22        mischaracterizes her testimony and the

23        document you're referring to.

24             You may answer.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

68

1              THE WITNESS:  The SOP says 30

2          business days.  So I don't know whether

3          it was 30 business days or...

4     BY MR. MILLER:

5          Q    So at the time of this e-mail back

6     in -- let's see.  It's dated January 14th of

7     2008.  It may or may not have been inside the

8     30 days?

9          A    Correct.

10         Q    Having read this deviation

11    description, do you hold any opinion that this

12    was a part of the reason that Digitek was

13    recalled?

14              MR. ANDERTON:  Objection; asked

15          and answered.

16              You may answer.

17              THE WITNESS:  I indicated to

18          you I don't know specifically the reason

19          it was recalled.  I was just acting out

20          on what I was told to do.

21    BY MR. MILLER:

22         Q    Very well.  I'm going to hand you

23    what was previously marked Exhibit 130.

24    Ma'am, I'll represent to you this is an

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

69

1    e-mail.  It appears to be from you.  The "to"

2    line, for whatever reason, did not print.  And

3    the subject is "Help," dated Tuesday,

4    February 5th of 2008.

5              Do you recall generating this

6    e-mail, ma'am?

7         A    Yes.

8         Q    And down at the bottom, the bottom

9    half of this e-mail appears to be an e-mail to

10   you.  And, again, I believe it's from Phyllis

11   Lambridis, but I can't verify that from what's

12   typed here.

13             And the subject is "Help."  And I'll

14   read that bottom portion.

15             It says:  Issue with digoxin in

16   Riverview.  Oil got on tablets during

17   compression.  Needs inspection.  Dan doesn't

18   think an investigation is required.  Tony C.

19   called me because he disagrees.  Can you

20   contact him and open an investigation?

21   Castellazzo -- am I saying that right?

22        A    Yes.

23        Q    And that's Anthony; is that right?

24        A    Correct.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

70

1      Q    Okay.  And then your response --
2   actually, let's back up.
3           Whose decision is it to determine if
4   an inspection is opened up on something such
5   as oil was on the tablets during compression?
6      A    Whose -- it could be anyone in
7   quality.
8      Q    Okay.  Well, if such an e-mail --
9   well, such a decision is out there where two
10  people are trying to determine if an
11  inspection needs to be done or not, did you
12  have the authority, as the senior manager, to
13  open an investigation yourself?
14     A    You're asking -- there are two
15  different words.  What is it?  Is it an
16  inspection that you're asking about --
17     Q    Yes.
18     A    -- or the investigation?
19     Q    All right.  What's the difference
20  between the two as far as you're concerned?
21     A    Well, an inspection is an activity
22  that you can basically inspect the tablets.
23  An investigation is something where it's the
24  form in how you document the occurrence.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

71

1          Q     Okay.  My question is:  Do you have

2     the authority, as a senior manager of QA

3     investigations group, to open an investigation

4     yourself?

5          A     Do I have?  Yes.

6          Q     Okay.  And then this is your reply,

7     Tuesday, February 5th.  And you would agree

8     with me that this is within like the first

9     week that you've taken over, correct, as the

10     senior manager QA investigation group at

11     Little Falls?

12          A     Okay.

13          Q     Okay?  I mean, do you agree?

14          A     Yes.

15          Q     And you replied back.  And your

16     reply is:  Right on it.  Sent him an e-mail

17     requesting details and told Mike to place

18     product on hold immediately as well as

19     affected equipment until oil cups are changed

20     and cleaning is performed.  Wow.  Looks like

21     I'm going to ruffle some feathers today.

22     Excellent.

23                Did I read that correctly, ma'am?

24          A     Yes.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

72

1          Q     Okay.  And whose feathers did you

2     think you were going to ruffle with this

3     reply?

4          A     Dan.  I believe it was Dan.

5          Q     Dan who?

6          A     Bitler.

7          Q     And did your actions, your requested

8     actions, take place?  Did you place the

9     product on hold?

10         A     I did not.  I asked an individual to

11    place it on hold.

12         Q     And do you know for a fact that it

13    was or was not placed on hold?

14         A     I don't recall.

15         Q     Did you have the authority, as the

16    senior manager of quality assurance

17    investigation group, to put a lot on hold?

18         A     Yes.

19         Q     Were there other occasions where you

20    exercised your ability to place a lot on hold?

21         A     Yes.

22         Q     What were some of the other

23    occasions in which you had a product lot put

24    on hold?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

73

1          A     For varying reasons.

2          Q     And was preventing an

3     out-of-specification -- well, strike that.

4                Was preventing a product that was

5     not within specifications from entering the

6     market, was that a reason for putting a

7     product on hold?

8          A     Yeah, as one of the measures,

9     correct.

10         Q     We discussed the last exhibit, the

11    Lot 70924A that had the tablets that were

12    approaching double thickness.

13               Do you recall that, ma'am?

14         A     Do I recall what?

15         Q     That exhibit that I put in front of

16    you --

17         A     Yes.

18         Q     -- that discussed that.

19               Did you ever consider putting that

20    lot on hold?

21                    MR. ANDERTON:  Objection.

22                    THE WITNESS:  I --

23                    MR. ANDERTON:  Objection;

24         mischaracterizes the facts in evidence.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

74

1              You may answer.

2              THE WITNESS:  This

3     investigation was initiated prior to my

4     employment at Actavis.

5  BY MR. MILLER:

6     Q    My question is:  Did you ever

7  consider putting that lot on hold?

8              MR. ANDERTON:  Objection.

9     She's already told you the investigation

10    was -- occurred before she arrived.

11 BY MR. MILLER:

12    Q    Do you know what the status of that

13 lot was -- did you ever look into the status

14 of that lot, where it was in the distributing

15 cycle, if that is such a thing, once you found

16 out about the thickness issue?

17              MR. ANDERTON:  Objection.

18              You may answer.

19              Same objection.

20              THE WITNESS:  I don't recall.

21    It occurred prior to me being there.

22 BY MR. MILLER:

23    Q    I'm going to hand you what was

24 previously marked as Exhibit 129.  You can

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

75

1   take the time to look at that.

2           Ma'am, if you'd had a chance to

3   review it, I'd like to ask you a couple of

4   questions.  And my question is relatively

5   simple, given the length of the document.

6           I'd like to go to the third page,

7   Actavis 00513871.  And it's about a third of

8   the way down that page.  Do you see where your

9   name starts off, it says Misbah?

10      A     Uh-huh.

11      Q     Am I saying that right?  Is it

12  "Misbah"?

13      A     Yes, Misbah.

14      Q     It states:  "The following are the

15  initial details regarding the oil introduction

16  onto Digoxin tablets during production.  Can

17  QA please provide an investigation number."

18          I don't want to take the time to

19  read through all that.  I'm kind of curious as

20  the process as to how an occurrence such as

21  this turns into an investigation and is given

22  an investigation number, if you know, if you

23  could walk me through that process.

24      A     Okay.  Basically, any sort of

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

76

1    departure or any sort of discrepancy that

2    occurs during the processing of a product,

3    something that is atypical is typically

4    documented as an investigation.

5              You want to document what occurred,

6    how it occurred, why it occurred, any sort of

7    actions that would be implemented to prevent

8    recurrence of the situation, and also a way to

9    document the disposition of the batch after

10   all of that information has been presented.

11        Q    And would your office, you or

12   someone that reported to you, initiate the

13   investigation and give it an investigation

14   number; or was that done prior to the

15   paperwork arriving at your department?

16        A    An investigation can be -- an

17   investigation number can be generated either

18   by the QA department or the individual that

19   was reporting to me, or they can just be

20   notified of an incident.  So once we were

21   alerted of an issue, we would generate a

22   number, yes.

23        Q    In the case of the lot with the

24   digoxin with oil spots, do you recall if your

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

77

1    office generated the inspection or was it done

2    prior to arriving at your office?

3        A    The inspection?

4        Q    Yes.

5        A    The inspection was requested for

6    this particular one -- I believe we requested

7    an inspection of the tablets the day we were

8    notified of the issue.

9                    (Plaintiff's Exhibit No. 216

10       was marked for identification.)

11   BY MR. MILLER:

12       Q    I'm going to hand you what I have

13   marked as Exhibit 216.  And this is

14   Actavis 01420273.  And I'll represent to you

15   it's an e-mail from Mike Ponzo dated Friday,

16   March 28th, 2008.

17                Do you recall this e-mail, ma'am?

18       A    I don't specifically recall it,

19   but...

20       Q    Okay.  The subject line is the

21   Investigation Review Board Meeting Rescheduled

22   Update.

23       A    Okay.

24       Q    Do you recall being sent an e-mail

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

78

1    regarding investigation review board meetings?

2         A    Yes.

3         Q    Okay.  Well, what was Michael

4    Ponzo's title?

5         A    I believe he was an investigator for

6    quality assurance.

7         Q    Oh, for quality assurance?  Okay.

8              And how does your -- how does that

9    work?  You're the senior manager of quality

10   assurance investigation group.  Did you work

11   side by side with Michael Ponzo or did you

12   report to him?

13        A    He reported to me.

14        Q    He reported to you.  Okay.

15             And how did a typical investigation

16   review board meeting take place?  Would he run

17   the meeting or did you?

18        A    Either he or I.

19        Q    And everyone -- you can take a

20   review of who this was to and courtesy-copied.

21   Would everyone show up at these meetings?

22        A    Not everyone.

23        Q    How many individuals would you

24   typically have at a meeting?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

79

1          A     It depends on the week.

2          Q     It varied from what to what?

3          A     It could vary from -- anywhere from

4     10 to 20.

5          Q     Okay.  And these meetings were being

6     held -- is this something that you generated,

7     or were they being held prior to your

8     employment?

9          A     They were generated prior to my

10    employment.

11         Q     Okay.  But you felt it was as part

12    of your job title to take over these meetings?

13    It was something that you were in charge of?

14         A     Correct.

15         Q     Have you seen these types of

16    meetings before in your employment in the

17    pharmaceutical industry?

18         A     Yes.

19         Q     Did the number of open

20    investigations at Actavis seem like an

21    unusually large number to you, or was it what

22    you were expecting?

23         A     What's the question?

24         Q     Did the number of open

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

80

```
1        investigations at Actavis -- I guess we can

2        take a look at the attachment.

3               But as you recall when you first

4        started in February 2008, did you think that

5        there was an unusually large number of open

6        investigations at Actavis?

7            A    As compared to?

8            Q    Your other employment.

9            A    Not necessarily.

10           Q    Was it one of your primary concerns?

11           A    Yes.

12           Q    And was both the number -- was the

13       number of open observations a concern?

14                      MR. ANDERTON:  Objection.

15                      You may answer.

16                      THE WITNESS:  In what regard?

17       Like a concern -- the number of what?

18       Observations?

19       BY MR. MILLER:

20           Q    Yes.  Were you -- was part of your

21       task, as the senior manager QA investigations

22       group, were you attempting to reduce the

23       number of open investigations?

24           A    Yes.
```

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

81

1          Q     Were you attempting to reduce the

2     amount of days it took to close an

3     investigation?

4          A     Yes, as part of continuous

5     improvement.

6          Q     If we go to -- we'll take a look at

7     the attachment titled "Open Investigations"

8     and go to Page 7 of 21.  And take a look at --

9     the first column has the numbers.  And go down

10    to No. 30.  And you see that that entry is

11    08-046?

12         A     Okay.

13         Q     Would you agree that that is the

14    46th investigation of 2008?

15         A     Correct.

16         Q     And it has, let's see, digoxin

17    tablets, .125.  Again, the OOSN is NA.  If we

18    go across to the column that's titled

19    "Deviation Description," it says:  "T zero

20    stability testing was not conducted when CRT

21    stability study was initiated."

22              And it has a responsible party.

23              How would you, as the senior manager

24    of QA investigations group, ensure that these

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

82

1     investigations were moved along and closed in

2     a timely fashion?

3            A     Well, part of it was having these

4     weekly meetings to discuss what the status of

5     the investigation was, what information was

6     required to try to bring it to closure.

7            Q     Other than the input you received

8     during the meetings, would you actively go out

9     and discuss with the different departments

10    what the status was?

11           A     Yes.

12           Q     Where was your physical office?

13           A     I had two.

14           Q     And they were where?

15           A     One was in Elizabeth.  The other one

16    was in Little Falls.

17           Q     How much time did you spend in --

18    how did you split your time amongst the two

19    offices?

20           A     For the majority, I spent three days

21    in Little Falls and two days in Elizabeth.

22           Q     Okay.

23           A     However, just -- there were points

24    where I think I spent most of the week in the

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

83

1     beginning in Little Falls.  I would do four to

2     five days.

3          Q    If we go to Page 9 of 21 of this

4     document titled "Open Investigations," and we

5     go down to Line 35, and it's -- this would be

6     08-051, the 51st investigation of 2008, and we

7     go across to Deviation Description, it says:

8     "Employees involved in the execution of

9     validation protocols were not trained."  And

10    responsible party is the tech services, and

11    then date initiated.

12              As the senior manager of quality

13    assurance investigations group, were you

14    responsible for initiating such an

15    investigation, or would a finding like this be

16    brought to your attention?

17         A    A finding like this would be brought

18    to my attention.

19         Q    And then what was your

20    responsibility to ensure that such training

21    took place?

22         A    I'm sorry?

23         Q    Were you responsible for ensuring

24    that the employees involved in the execution

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

84

1    of validation protocols were trained; or did

2    you tell the office that needed to do the

3    training, hey, these folks need to be trained?

4         A    Right; the department that was

5    responsible would have to train.

6         Q    I'm going to hand you what's been

7    marked Exhibit 141.  Ma'am, this document is

8    titled "Investigation No. 08-060."

9              Have you seen this document before?

10        A    I don't recall.  I'm sure I have.  I

11   just don't recall the specifics.

12        Q    I understand.  Is this the form that

13   a final investigation report takes?

14        A    No.

15        Q    Okay.  What would be the difference

16   between what I hold in my hand as

17   Investigation No. 08-06 and what the final

18   report would look like?

19        A    The final report would have a lot

20   more information.  It would discuss the event

21   in more detail.  It would indicate what

22   possible causes could have attributed to the

23   discrepancy, what actions were taken, any sort

24   of -- basically all of the investigational

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

85

1    activities that were performed to identify a

2    root cause, if possible.

3         Q    And then how would that final report

4    be maintained?

5         A    As -- what do you mean?

6         Q    Well, there's a final paper report.

7    You had a discussion we addressed during the

8    inspection regarding paper reports or

9    TrackWise.

10             And my question is:  If it's a paper

11   reporting system that was being utilized in

12   Little Falls at this time -- is that correct?

13        A    Correct.

14        Q    -- where was that paper report

15   actually maintained when it was finalized?

16        A    It was maintained in the files.

17        Q    In the files in?

18        A    In our area.

19        Q    In your office or an office that you

20   were in charge of?

21        A    An office that was designated for

22   investigations.

23        Q    And you were in control of that

24   office; correct?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

86

1        A     Yes.

2        Q     Were they scanned in so that you

3    could call them up electronically and kept in

4    a file?

5        A     Some of them were scanned just for

6    ease either because we needed to send the

7    report, a copy of the report to a department

8    that needed it or, you know, if someone

9    required a copy of it.

10       Q     Some were scanned -- I'm sorry.  I

11   didn't mean to step on you.

12             Some were scanned but not all?

13       A     Correct.

14       Q     This particular document that we're

15   looking at, Plaintiff's Document 141, would

16   this be -- would you categorize this as a

17   draft investigation report or preliminary

18   report?  How would such a document be --

19       A     I believe -- I believe this one is

20   the initial notification of a discrepancy that

21   occurred.  So it was basically something like

22   this would be sent to us to indicate, you

23   know, hey, this is an issue; it was observed

24   by this individual on this date; what was the

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

87

1    initial -- what the discrepancy was; how it

2    was discovered; the basics.

3         Q    And it was product digoxin tablets

4    .125 milligrams.  And then it has a control

5    number 80228A1.

6              Are you familiar with what a control

7    number would be on an investigation?

8         A    In this case, it would represent the

9    lot number.

10        Q    Okay.  Fill size, would that be the

11   size of the lot?  Are you familiar with what

12   the fill size is?

13        A    I believe the fill size is what it

14   was being packaged into, so the packaging

15   configuration.

16        Q    Okay.  And if we cut to the chase

17   here and talk about what discrepancy was

18   found, it states:  "He found 17 tablets with

19   higher weight out of 30 tablets."

20             Do you recall that particular issue

21   with digoxin in the time frame early April of

22   2008?

23        A    Not the specifics of it, but I

24   recall in general.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

88

1        Q    And this report of the incident,
2    would it be submitted to you to generate the
3    investigation?
4        A    Either to me or someone in my group.
5        Q    Okay.  Do you recall working on this
6    specific investigation?
7        A    I believe -- I believe I did.  I
8    think I might have reviewed it and approved
9    it.  I'm not quite sure.
10       Q    It says Preliminary Root Cause at
11   the bottom of the document, but it goes on to
12   say that the root cause, here at the last
13   sentence of this paragraph:  "Root cause of
14   this deviation is to be determined at
15   manufacturing stage."
16            Did I read that correct, ma'am?
17       A    Yes.
18       Q    Would you take any steps, as the
19   senior manager of quality assurance
20   investigation group, to have laboratory
21   testing of any type done on a lot in which
22   tablets were found to be higher weight than
23   they're supposed to be?
24       A    I'm sorry.  Ask that again.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

89

1        Q    Certainly.  Is there -- would you,

2    as part of the investigation, request or --

3    yeah, request that laboratory do testing on a

4    lot that has out-of-weight specification

5    tablets?

6        A    It depends on what the issue was.

7    I -- it has to come on an individual incident

8    basis.  I would need more information before I

9    commit to whether I would request that

10   information or not.

11       Q    Okay.  So based on the finding that

12   17 tablets were higher weight than they were

13   supposed to be, that's not enough information

14   to say we need to do some laboratory

15   testing --

16       A    No.

17       Q    -- on this lot?

18       A    No.

19       Q    Does 17 tablets that are higher

20   weight than what is specified, does that raise

21   to the level of a field alert?

22       A    No.

23       Q    Why?

24       A    A field alert is generated for

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

90

```
1      distributed product, product that is already

2      in the market.

3           Q    Product that's already been

4      distributed?

5           A    Correct.

6           Q    Well, when we looked at the open

7      investigation on the lot that had tablets

8      approaching double thickness that came out in

9      January, you indicated that one of the reasons

10     you didn't consider a field alert was because

11     it happened before you were there?

12               Do you recall that?

13               MR. ANDERTON:  Objection;

14          mischaracterizes her testimony.  She

15          didn't say she didn't consider a field

16          alert.  She said she wasn't involved

17          because it happened before she was there.

18     BY MR. MILLER:

19          Q    Being the senior manager in charge

20     of quality assurance investigation group, you

21     were aware that there were -- that there was a

22     lot in November of 2007 that had a thickness

23     issue; is that correct?

24          A    In November?
```

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

91

1          Q     Yes.

2          A     Which one are you speaking of?

3          Q     The 70924A.  If you go back to

4    Exhibit 216, the attachment of, and if you

5    look at Page 3 of 11 -- and I realize you

6    weren't there when the lot was manufactured.

7    I guess the investigation was initiated in

8    December of '07, a month prior to your arrival

9    at Actavis.  But once you were employed at

10   Actavis, you became aware of this lot; is that

11   correct?

12         A     Correct.

13         Q     And given that you -- and you were

14   aware that this was a thickness issue with

15   this lot; is that correct?

16         A     Okay.  Yes.

17         Q     Okay.  Did you ever become familiar

18   with what the root cause for that thickness

19   issue was?

20               MR. ANDERTON:  Objection; asked

21        and answered several times now.

22   BY MR. MILLER:

23         Q     It's okay to answer.

24               MR. ANDERTON:  You may answer.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

92

1              THE WITNESS:  For this

2        particular investigation, I don't recall.

3        It would -- I would have to look at the

4        investigation report to see what was

5        determined to be the cause.

6    BY MR. MILLER:

7        Q    But you agree that there was a

8    thickness issue just prior to your arrival at

9    Actavis?

10       A    Okay.  Yes.

11       Q    You agree with that?

12       A    Okay.  Yes.

13       Q    And then two months after you've

14   taken over this job, on April 1st of 2008, you

15   agree that there's another lot with a

16   thickness issue or a weight issue; is that

17   correct?

18       A    There's an -- yeah, there was a

19   notification of a weight issue, correct.

20       Q    And part of your job is to track out

21   of -- open investigations; is that correct?

22       A    Yes.

23       Q    And by tracking, to see if issues

24   are repeating; is that correct?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

93

1        A      Yes.

2        Q      And would these -- would you agree

3    that you have two out-of-specification lots

4    with Actavis; is this something that would

5    raise your level of concern regarding tracking

6    this product?

7        A      To a certain extent, it would.  We

8    would investigate the same way.  We would have

9    to try to determine what the root cause was to

10   further track it and make sure that it was

11   tracked properly.

12       Q      Would this be a reason for the

13   senior manager of QA investigation group to go

14   back and see if there were any other issues

15   with thickness or weight with this particular

16   product?

17       A      Yes.

18       Q      Do you recall doing such an

19   investigation?

20       A      An investigation specifically to

21   review historical?

22       Q      Historical information to see if

23   there were other lots that had issues with

24   out-of-specification weight and thickness for

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

94

1    Digitek.

2        A    I may have.  Again, I need to see

3    the actual report to determine what actions I

4    took for this specific case.

5        Q    But as you sit here today, you have

6    no memory of going back and doing a historical

7    report and to determine if there were any past

8    lots that had issues?

9        A    I don't recall what I did at that

10   point.  But, again, I don't know the

11   specifics.  I'd have to see the report to see

12   what I did.

13       Q    And when you say you'd have to see

14   the report, that would be the final

15   investigation --

16       A    Correct.

17       Q    -- of this?

18            And if you determined to do a

19   historical search on other lots, it would be

20   in that final investigation?

21       A    Yes.

22       Q    I'm going to hand you what was

23   previously marked as 142.

24            Ma'am, you have had time to review

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

95

1    that.  Do you agree that it's a conversation

2    regarding the lot we've discussed, that being

3    80202 alpha?

4                    MR. ANDERTON:  Objection.  When

5        was there a discussion of that lot?

6                    MR. MILLER:  Perhaps it's a

7        different lot.

8    BY MR. MILLER:

9        Q    Ma'am, if you go to Page -- these

10   numbers are all cut off.  It's the fourth from

11   the back that states:  Subject

12   Investigation 08-60.

13       A    I'm sorry.  Which one are we --

14       Q    It's about the third or fourth page

15   from the back.  And it starts -- has the cc on

16   the top of it.  Actually, it's exactly four

17   pages from the back, if you go to the last

18   page and count back four.

19       A    Okay.

20       Q    And if you recall, previously we

21   were discussing Plaintiff's Exhibit 141 that

22   discussed Investigation 08-060.

23                Do you recall that?

24       A    Yes.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

96

1        Q     And this subject line here is

2     Investigation 08-060.

3              Do you see that, ma'am --

4        A     Yes.

5        Q     -- on the exhibit?

6              And it discusses the same issue,

7     would you agree, and that is the

8     .125-milligram tablets were found above weight

9     specification?

10             Do you agree with that?

11       A     Yes.

12       Q     And if we go to the very first page,

13    we go back to the very first page of

14    Exhibit 142, and it's from Dan Bitler.  And

15    although the "to" line is not there,

16    intuitively it's to you because it starts out

17    "Misbah."

18             Do you agree with that?

19       A     Yes.

20       Q     And it's a response to your question

21    at the bottom, which says:  Has Batch 80202

22    alpha been released?

23             Am I reading that correctly?

24       A     Yes.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

97

1          Q     And the answer to you is:  Misbah,

2     yes, Batch 80202A was released and shipped to

3     Mylan Labs on Monday, March 31st, 2008.  I

4     have contacted Mylan, have discussed the

5     situation with them, and they are putting the

6     batch on hold.

7                Do you remember having this e-mail

8     exchange with Dan Bitler?

9          A     Obviously I had it.

10         Q     Fair enough.  Obviously you had it.

11    I'm just wondering if you remember.

12         A     Not specifically but...

13         Q     Okay.  Would this be -- do you

14    recall if that lot or batch was ever released?

15         A     Released by who?

16         Q     By Mylan.

17         A     I don't know.  I don't recall.

18         Q     Did you do any follow-up beyond this

19    on this lot whatsoever?

20         A     I don't recall.

21         Q     Do you recall out-of-specification

22    weight or thickness becoming an issue in early

23    April for Digitek?

24         A     I'm sorry.  Can you repeat the

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

98

1    question?

2         Q    Do you recall out-of-specification

3    weight or thickness becoming an issue with the

4    product Digitek in early April 2008?

5         A    What do you mean by "issue"?

6         Q    Was that one of the things that you

7    were focused on in your day-to-day routine as

8    senior manager of quality assurance

9    investigation group?

10        A    How -- I'm not sure how you mean

11   "focused on."  It was something that I had

12   oversight of.

13        Q    And what does "oversight" mean to

14   you?

15        A    It was under my radar.  I kept -- I

16   had an oversight in regards to I was assessing

17   the status of it, what -- you know, where we

18   were in trying to resolve the investigation

19   related to these particular cases.

20        Q    Potentially, could a field alert

21   come from any other office than yourself, or

22   would it typically come from you and your

23   department?

24        A    As I indicated to you, it was not my

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

99

1    responsibility when I was first hired.  So

2    there were cases when it would come from

3    individuals other than myself.

4         Q    When did it become your

5    responsibility?

6         A    Officially it became my

7    responsibility, I think, sometime in June.

8                   MR. MILLER:  Three minutes.

9         Let's take a break.

10                  MR. ANDERTON:  Okay.

11                  THE VIDEOGRAPHER:  This

12        completes Videotape 1.  Off the record at

13        11:07 a.m.

14                  (Short recess.)

15                  THE VIDEOGRAPHER:  This is

16        Videotape No. 2.  Back on the record at

17        11:16 a.m.

18    BY MR. MILLER:

19         Q    Ma'am, just prior to the break, we

20    were discussing Investigation 08-060.

21             Do you recall that?

22         A    Yes.

23         Q    For that topic, I'm going to hand

24    you what was previously marked Exhibit 145.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

100

1               Ready?

2          A    Yes.

3          Q    Take a look at the second-to-last

4     page, Actavis 0300112.  And about -- it's

5     difficult to read the format the way this came

6     out.  But going down about two thirds down the

7     page, it says:  Subject:  Regarding

8     Investigation 08-060, where it says "Please

9     consider."

10              Do you see that ma'am?

11         A    Yes.

12         Q    "Please consider what other batches

13    in campaign may be impacted so we can get

14    these on hold if applicable."

15              Who would Michael be?  Do you have

16    an understanding of who electronically signed

17    this?

18         A    What are you asking?  So we can

19    get --

20         Q    Yes.

21         A    It's not signed "Michael."  That's

22    the next e-mail exchange.

23         Q    Well, that's what I'm trying to

24    determine actually.  You don't think the word

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

101

1      "Michael" is the ending of that text?

2           A    No.  Because Michael is the next

3      e-mail, isn't it?  It's the start because it's

4      Michael Ponzo.  So isn't that the next e-mail

5      communication?

6           Q    I'll be quite honest; I'm not sure.

7      Would you agree with me this e-mail was

8      generated by Dilip M.?

9                     MR. ANDERTON:  Which e-mail?

10                    THE WITNESS:  Which e-mail?

11     BY MR. MILLER:

12          Q    The one I just read.

13          A    No.  It actually says from Tony

14     Delicato.

15          Q    Well, you got a better eye on this

16     than I do.  Okay.  I'll go with that.  From

17     Tony Delicato.

18               And you agree with me that the

19     subject of this e-mail is to determine if

20     other batches in the campaign may be impacted,

21     and you agree that that's regarding

22     Investigation 08-060?

23          A    Correct.

24          Q    And does Tony Delicato -- what's his

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

102

1     job title?

2          A    I believe at this time he was the

3     director of quality assurance.  I don't know

4     whether it was for all of New Jersey or

5     whether it was just specific to Elizabeth.

6          Q    As the senior manager of quality

7     insurance for investigation group, do you

8     report to him?

9          A    I did report to him, yes.

10         Q    Okay.  He is looking for information

11    regarding the campaign.  Do you understand

12    what it means by "campaign"?

13         A    Yes.

14         Q    And what does "campaign" mean?

15         A    "Campaign" means batches that are

16    produced together, that they're processed

17    subsequent to each other.

18         Q    Okay.  And looking into if an

19    out-of-specification issue affects a campaign,

20    is that something your department would do or

21    something that the manufacturing QA would take

22    care of?

23         A    There's no such thing as

24    manufacturing QA.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

103

1      Q     Then who is charged with determining

2   if the other batches in a campaign are

3   affected by such an issue that was outlined in

4   Investigation 08-060?

5      A     That would be quality assurance.

6      Q     Quality assurance investigation

7   group?

8      A     As well as overall quality

9   assurance.  Just so you know, quality

10  assurance, it's an overall department.  There

11  are groups within quality assurance.

12     Q     And I'm trying to determine which

13  group -- is it your group that is charged with

14  determining if other campaigns are impacted?

15     A     We can do that as well as quality

16  assurance in general.  It can be anyone in

17  quality assurance.

18     Q     But then there's another layer to

19  that, would you agree, that just not are the

20  batches in that campaign affected, but you

21  also want to see if it's an issue historically

22  to determine if that problem with that lot

23  that was identified in the investigation has

24  happened over time.  Do you agree?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

104

1      A      Again, for this particular -- it

2      depends.  It's almost a twofold step.  You

3      have to determine what the issue is and try to

4      assess what lots were impacted.  There may

5      have been changes so, you know, that limit

6      when whatever the cause of this impacted the

7      batches.  So...

8           Q      And an important step, would you

9      agree, would be determining the root cause?

10          A      If you can determine it, yes.

11          Q      You've had the opportunity to review

12     this e-mail.  And going to the second page,

13     300111, and it's an e-mail that appears to be

14     from Mike to you.  And what Mike would that

15     be?

16          A      I'm sorry?

17          Q      Do you know who the Mike is in the

18     very -- in the page you're on, it says

19     "Misbah" and then there's text and at the end

20     it's "Mike."  Do you know who Mike is?

21          A      It would appear to be Michael Ponzo.

22          Q      All right.  So Michael Ponzo states:

23     "Misbah, I'm sorry.  I have to get out of the

24     habit of getting into everything too.  My

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

105

1    problem is, here, that is what I'm used to.

2    No one went the extra yard when I started, so

3    I had to get into everything.  I understand

4    why you want ea department to start doing

5    their own work, they are the experts and they

6    should be held accountable.  I'll learn, and

7    keep reminding me when I go beyond my

8    boundaries.  Mike."

9            Did you understand what Mike was

10   trying to get across to you here?

11       A    At the time I'm sure I did.  Now I

12   don't recall.

13       Q    Was there a sense in early April of

14   2008 that there was finger-pointing, for lack

15   of a better term, at the different departments

16   when it came to investigations?

17                   MR. ANDERTON:  Objection.

18                   You may answer.

19                   THE WITNESS:  I don't believe

20       so.

21   BY MR. MILLER:

22       Q    Well, if we go to the next page, the

23   way I read this e-mail, it looks like an

24   e-mail from you at the very bottom to Kanesha

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

106

1    Jones?

2         A    Are we on the first page?

3         Q    Yes.

4         A    Yes.

5         Q    Is that an e-mail from you to

6    Kanesha Jones the second half or the bottom

7    half of the page that the text is just

8    "Shhhh"?

9         A    Yes.

10        Q    Do you recall why you had typed

11   that?

12        A    I don't recall.

13        Q    The next e-mail above that is to

14   you.  And I'm assuming it's from Kanesha

15   Jones.  Who was Kanesha Jones?

16        A    Kanesha was also an investigator

17   that worked for me.

18        Q    And what is LMAO?

19        A    What does it stand for?

20        Q    Yes.

21        A    I'm assuming it stands for "laughing

22   my ass off."

23        Q    It says:  "I guess it was evident

24   that you were pissed off."

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

107

1          Do you recall having an e-mail

2     conversation with Kanesha Jones about being

3     upset over this exchange?

4          A    Well, I mean, this is the e-mail,

5     but I don't recall what occurred.

6                    MR. MILLER:  Fair enough.

7                    I'm going to hand you what I'm

8          going to mark as Exhibit 217, if you

9          would take the opportunity to look at

10          that.

11                    (Plaintiff's Exhibit No. 217

12          was marked for identification.)

13     BY MR. MILLER:

14          Q    Have you had a chance to review

15     that, ma'am?

16          A    Yes.

17          Q    Okay.  My question to you is --

18     we'll take a look at this document.  You agree

19     this is an e-mail from you?

20          A    Yes.

21          Q    Dated Tuesday, April 15th, 2008.

22     The subject line is "List by Product."  And

23     there's an attachment that's dated

24     5 September 2007:  Present Investigations by

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

108

1   Product.xls.

2          Did I read that correctly?

3   A    Well, it's basically investigations

4   from September 5th, '07, to --

5   Q    Forward?

6   A    -- to that present time.

7   Q    All right, ma'am.  Do you recall --

8   well, actually I'll go through the contents

9   real quick.  It states:  She's gone through

10  both.  There should be no more surprises.

11         And it's forwarded by you.  Did you

12  recall generating this e-mail after you had an

13  opportunity to review it?

14  A    I don't -- I mean, I generated it;

15  but, again, I don't recall.

16  Q    Do you recall if it was generated

17  for the investigation that was going on with

18  the FDA during the month of April 2008?

19              MR. ANDERTON:  You mean the

20       inspection?

21              MR. MILLER:  Thank you.

22       Inspection.

23              THE WITNESS:  Was it?  Excuse

24       me.  Can you repeat the question?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

109

1    BY MR. MILLER:

2         Q    Was that list forwarded in response

3    to a request regarding the inspection that was

4    going on in 2008?

5         A    It appears to be.

6         Q    And if we take a look at the

7    attachment, you agree with me that this is a

8    document that lists the investigations by

9    product at Actavis, specifically Little Falls?

10        A    Correct.

11        Q    And if we go down to page in the

12   lower right corner Actavis 299886, and do you

13   see where the product identified is Digitek?

14        A    Yes.

15        Q    And these were investigations that

16   your department was handling at the time; is

17   that correct?

18        A    Monitoring?

19        Q    Yes.

20        A    Yes.

21        Q    It says:  Two tablets -- I'm going

22   to go with the first entry after Digitek and

23   the left side investigation number was 07-093.

24             And if we go to the reason for

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

110

1    investigation, it says:  Two tablets of

2    digoxin tablets, .125-milligram, were found

3    with approximately double the thickness from

4    counter channels during packaging/filing

5    operation.

6              Did I read that correctly?

7        A    "Filling operation."

8        Q    Thank you.  And here we have

9    Status:  Closed.

10             Were you involved in the closing of

11   that investigation?

12                  MR. ANDERTON:  Objection; asked

13        and answered several times.

14                  You may answer.

15                  THE WITNESS:  I don't think so

16        because I wasn't at the Little Falls site

17        during that time it was closed.

18   BY MR. MILLER:

19        Q    Who would have been responsible for

20   closing an investigation the date this was

21   closed?  And the date off of this is

22   1/25/2008.

23        A    I would think it would either be Dan

24   Bitler or Scott Talbot.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

111

1          Q    If we go on to the next Digitek open

2     investigation, that would be 08-11 --

3                    MR. ANDERTON:  Objection;

4          mischaracterizes the document.  I don't

5          know why you're calling these open

6          investigations.

7                    MR. MILLER:  Okay.  I think

8          you're correct.  Strike that.  I'll ask

9          the question again.

10    BY MR. MILLER:

11         Q    If we go back to the first page of

12    this exhibit, the attachment is:  Present

13    Investigations by product.

14              Is there a distinction with an

15    attachment titled "Present Investigations" if

16    they're open or closed?

17         A    I'm sorry?

18         Q    What do you mean by "Present

19    Investigations" in your title of your

20    attachment in your e-mail?

21         A    I don't believe I generated --

22    again, this is a forward.  So the attachment

23    was generated for me by someone, and it was

24    forwarded to me.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

112

1        Q    Okay.  As it was forwarded to you,

2    did you have an understanding as to what

3    "Present Investigations" meant?

4        A    Well, it --

5                 MR. ANDERTON:  I think you're

6        misreading the document --

7                 THE WITNESS:  Right.

8                 MR. ANDERTON:  -- Pete.

9                 But go ahead.

10                I think it's investigations by

11       product September 5, '07, to the present.

12                THE WITNESS:  Correct.

13                MR. MILLER:  Oh.  I stand

14       corrected.  The light just came on.

15       Sorry about that.

16                MR. ANDERTON:  She said that in

17       her earlier testimony.

18                MR. MILLER:  Sometimes you have

19       to listen and speak and that can be a

20       difficult thing.  Okay.  Fair enough.

21    BY MR. MILLER:

22        Q    Let's go back to the second entry,

23    Digitek, and it's investigation number 08-011.

24                Do you see that?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

113

1          A     Yes.

2          Q     And this investigation closed, the

3     very last column on the right, March 3rd of

4     2008.  Now, you were the senior manager of the

5     investigation group at that time; is that

6     correct?

7          A     Correct.

8          Q     And this investigation, the reason

9     for the investigation was one stainless steel

10    screw was found in the tablet well of the

11    BOSS-PACK filling machine during packaging.

12          Do you recall that particular

13    investigation?

14          A     I recall the incident, yes.

15          Q     Okay.  And do you recall doing

16    research on that incident to determine if

17    there was a history of that type of deviation?

18          A     I would actually need to see that

19    report in order to answer that question.

20          Q     How often do you go back and

21    historically look at deviations to determine

22    if there's a trend?  How often would that have

23    taken place in your employment in the QA

24    investigation group in January through April

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

114

1    of 2008?

2         A    That would be determined by the

3    procedure.

4         Q    No.  In your memory, how often do

5    you recall doing that?  Is that something you

6    did daily?  Weekly?

7         A    To what?  Perform a historical

8    review?

9         Q    Yes.

10        A    Typically, that should be done for

11   every investigation.

12        Q    The next investigation number is

13   08-017 for Digitek.  And this one was also

14   closed early March of 2008.  The reason for

15   investigation:  During compression of

16   Drums No. 5 and No. 6, the compressor operator

17   observed oil spots on some of the in-process

18   tablets.

19             My question is:  Does that

20   investigation stand out in your mind as you

21   sit here today?  Do you have any memory of

22   that investigation?

23        A    Well, it was, I believe, the

24   investigation that was discussed previously.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

115

1          Q    I believe you're correct.  Does this
2     jog your memory at all?
3          A    In regards to?
4          Q    Having any memory of this
5     investigation other than what's written here.
6          A    I don't recall the specifics of it.
7     I would have to see the document.
8          Q    But your earlier testimony, you felt
9     that all investigations warranted a historical
10    inspection of previous lots, so you believe
11    this would rise to that level as well?
12         A    Yes.  But, again, let me clarify.
13    It should be done historically; but once an
14    assignable cause is determined, if you -- it
15    should be assessed what the root cause of the
16    situation was, and then you can perform also a
17    historical review to see if that cause
18    occurred previously and was the reason for the
19    discrepancy.
20         Q    I understand.  And the inspections
21    we reviewed thus far on this exhibit, you
22    agree as it's labeled here, were Digitek
23    .125 milligrams; correct?
24         A    The investigations?  Correct.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

116

1      Q    And if we go down to the next entry

2      or line, it's titled "Digitek (digoxin

3      tablets)" .25 milligrams."  Those, you

4      understand, are the two different size options

5      or strength options that were produced by

6      Actavis?

7           A    Correct.

8           Q    And if we go down to the third

9      entry, Exhibit 08-030, and this is another

10     inspection that was closed March 7th of 2008.

11     And if we read the reason for investigation,

12     it says:  Operator noticed tablets that were

13     thinner than a typical tablet during the

14     inspection of Drum No. 2.

15               Did I read that correctly?

16          A    Correct.

17          Q    My question is to you, as the senior

18     manager of quality assurance in the

19     investigation group:  If you see thickness

20     issues in a product, albeit the two different

21     strengths of the product, does that become a

22     concern or do you keep it separated because

23     it's two different strengths?

24          A    It would -- again, it would -- I

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

117

1     would have to look at the overall issue and

2     the specifics of it to determine whether I was

3     going to correlate them or not.

4          Q     Ma'am, going back to Exhibit 141,

5     which was Investigation No. 08-060, you recall

6     this was 17 tablets with a higher weight?  Do

7     you recall us discussing that?

8          A     Yes.

9          Q     If this is a list of investigations

10    from September 7 to present, which I finally

11    sorted out, my question would be:  How would

12    it come to be that that investigation wouldn't

13    make this list?

14         A     Again, I -- I can't tell you that

15    because I didn't generate the list.  But,

16    again, what I indicated to you earlier, one of

17    the things that had been discussed with the

18    investigator was the efficiency of going --

19    you know, utilizing a paper-based system to

20    TrackWise.

21              So a lot of it was information,

22    again, the efficiency, how quickly we were

23    able to present information, how it would be

24    sorted, how it would be tracked.  So perhaps

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

118

1      that was the issue that caused it not to

2      appear on this, how it was categorized.

3          Q     Do you see any reason why

4      investigation 08-060 should not have been

5      included on this attachment that we're reading

6      now?

7          A     Looking at the information I have

8      currently, I don't see why it would have been

9      excluded.

10          Q     Well, given that there were higher

11      weight tablets in Investigation 08-060, and

12      that was in a .125-milligram tablet, and

13      there's .125-milligram tablets that we

14      addressed in Investigation 07-093 that were

15      approximately double the thickness, and then

16      digoxin .25-milligram we see

17      Investigation 08-030 where the operator

18      noticed tablets that were thinner than a

19      typical tablet; are these three findings

20      enough for a senior manager of a quality

21      investigation group to determine that a

22      historical review needs to be done of other

23      lots?

24          A     Perhaps.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

119

1      Q    Do you have a memory of doing just

2  that?

3      A    I don't recall.

4      Q    But, again, you believe that

5  information would be found in the final

6  investigation report?

7      A    Perhaps.

8              MR. MILLER:  I'm going to hand

9        you what I'm going to mark as

10        Exhibit 218.

11              (Plaintiff's Exhibit No. 218

12        was marked for identification.)

13              MR. ANDERTON:  I'm sorry.  What

14        number?  218?

15              MR. MILLER:  Yes.

16              MR. ANDERTON:  Thank you.

17  BY MR. MILLER:

18      Q    And, ma'am, for the record, this is

19  Actavis Document 01265670.  And I'll represent

20  to you that it was produced to us.  And you

21  agree that it's an e-mail from you?

22      A    Correct.

23      Q    It was be sent Thursday, April 24th,

24  2008, to Tony Delicato, and subject regarding

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

120

1     PR12181.

2              Does that mean anything to you now

3     as you sit here?

4        A    No.  It's just an investigation

5     number.

6        Q    And how does that investigation

7     number work?  We talked earlier about the ones

8     that identified the year and the sequential

9     number of the investigation.  What's the

10    breakdown of this type of investigation

11    number?

12       A    Well, this one is generated

13    automatically by the TrackWise system, which

14    was in place in Elizabeth.  So this is

15    pertaining to an Elizabeth investigation.

16       Q    I may have a different view on this

17    than you.  But it looks like at the bottom

18    it's the original e-mail that you're replying

19    to, and it's from Tony Delicato to you?

20       A    Correct.

21       Q    And it states:  Can you dig into the

22    details on this one and ensure QC has looked

23    at everything, reviewed method, et cetera.

24    I'm concerned because we have a history of

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

121

1    high assay/dissolution results, and we may

2    need to put MF on hold pending further

3    evaluation.  A campaign is in process, and the

4    next one is scheduled in two weeks.  We may

5    want to do this prior to FDA questioning.

6    Obviously this is high priority.

7              Did I read that correctly?

8        A    Correct.

9                   MR. ANDERTON:  Objection.  No,

10         you didn't.

11                   But go ahead.  You may answer.

12   BY MR. MILLER:

13       Q    Would you agree that Tony Delicato

14   is requesting your review of a product that

15   has a history of out-of-specifications and

16   he's asking for your review of that product?

17                   MR. ANDERTON:  Objection;

18         again, mischaracterizes the document.

19                   You may answer.

20                   THE WITNESS:  It doesn't say

21         anything about out of specification.

22   BY MR. MILLER:

23       Q    Okay.  Is a -- what is an

24   assay/dissolution?  If I'm saying that right.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

122

1          A     They're analyses.

2          Q     If that analyses is not within

3     specifications, would that be labeled an

4     out -- an OOS within the company?

5          A     If it's not within the

6     specifications?

7          Q     Right.

8          A     Then it would be an

9     out-of-specification.

10          Q     But you're saying that it could be

11     high but not be outside of the specifications?

12          A     Correct.

13          Q     And your response is:  No problem.

14     Just need to get a press release for digoxin

15     out within 45 minutes per Robert Wessman, and

16     then I'll look into this issue.

17               Were you communicating directly with

18     Robert Wessman regarding a press release for

19     digoxin around the time frame April 24th,

20     2008?

21          A     No, I was not directly dealing with

22     him.

23          Q     Who is Robert Wessman?

24          A     He was, I believe, the president of

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

123

1    Actavis.

2        Q    And how did his request that you

3    generate a press release for digoxin, how did

4    that request get to you?

5        A    The request to issue a press release

6    actually did not come from Robert Wessman, but

7    the time frame came from him.

8        Q    Okay.  What did you mean by had to

9    be out within 45 minutes per Robert Wessman?

10       A    He requested that we issue a press

11   release within 45 minutes.

12       Q    And who instructed you to generate

13   that press release?

14       A    I believe it was Phyllis Lambridis.

15       Q    And was that a press release

16   regarding a potential recall?

17       A    I believe so.

18       Q    And did you, in fact, draft the

19   press release?

20       A    I believe so.  I think -- yeah, I

21   did.

22       Q    And is the intent of a press release

23   to get information out to the public?

24       A    Yes.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

124

1          Q     Okay.  Is there a safety aspect to
2     that?
3          A     Perhaps.
4          Q     It could include potential health
5     risks?
6          A     It may include that.
7          Q     And how do you get -- as someone
8     who's drafting a press release for a drug
9     recall, what steps do you take in order to get
10    medical information to enter in the press
11    release?
12         A     Typically I would have to contact
13    the medical affairs department.
14         Q     Okay.  Do you have a memory of
15    putting together the press release for
16    Digitek?
17         A     Yes.
18         Q     What memory do you have regarding
19    gathering the medical information?
20         A     None specifically.  I know I had to
21    draft the press release, but that's pretty
22    much it.
23         Q     Okay.  Well, then I'll back up.  The
24    question before that I asked you if you have a

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

125

1      memory of putting that together, what memory

2      do you have of it?

3          A      The fact that I had to put it

4      together.

5          Q      Okay.

6          A      The circumstances surrounding it.

7          Q      Was there more than one product

8      being recalled at that time?

9          A      Yes.

10         Q      Were you involved in the press

11     release for the other products?

12         A      I don't recall there being a

13     press -- no, I don't recall being involved in

14     any of the other press releases at the time.

15         Q      Did you have someone put together a

16     draft for you, or did you actually write the

17     press release?

18         A      I think I may have put it together

19     myself using a template.  I'm not -- I'm not

20     entirely sure of the specifics.

21                  MR. MILLER:  I'm going to hand

22         you what I'm going to mark as

23         Exhibit 219.

24                  (Plaintiff's Exhibit No. 219

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

126

1       was marked for identification.)

2   BY MR. MILLER:

3       Q    Let me know when you've had a chance

4   to read this, ma'am.

5       A    Okay.

6       Q    Ma'am, you agree with me this is an

7   e-mail generated by you on Thursday,

8   April 24th, 2008?

9       A    Correct.

10      Q    Okay.  And the subject matter is

11  News Release?

12      A    Correct.

13      Q    And you agree that's the same thing

14  as the press release that we were just

15  discussing?

16      A    Agreed.

17      Q    And it's got an attachment which

18  we'll discuss in a second.  But looking at the

19  context of what is in this e-mail, it's from

20  you to Chris Benson?

21      A    Correct.

22      Q    And who is Chris Benson?

23      A    Honestly I don't even recall.

24      Q    Okay.  Well, let's take a look at

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

127

1    what you wrote.  It says:  "Please note that

2    this press release is still in draft as the

3    FDA has just communicated that we need to

4    recall all lots of Digoxin Tablets (all

5    strengths)."

6                    MR. ANDERTON:  Pete, do you

7            have another copy?  For some reason, the

8            "to" is obliterated in my copy, not in

9            hers, not in yours.

10                   MS. CARTER:  I can switch with

11           you.

12                   MR. MILLER:  If you've got one,

13           that would be great.

14                   MR. ANDERTON:  Wait.  Same

15           thing.

16                   MR. MILLER:  I'll have to get

17           that copy to you because I have lots of

18           copies and not this one.

19                   MS. CARTER:  What's the Bates

20           number on this?

21                   MR. MILLER:  The Bates number

22           of mine is Actavis 0140080.

23                   MR. ANDERTON:  Not mine.

24                   MR. MILLER:  Do you want to

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

128

1        reviews hers before I go on?

2                    MR. ANDERTON:  I would

3        actually.

4                    MR. MILLER:  Okay.  Go ahead.

5                    MR. ANDERTON:  Thanks.

6                    Okay.  If you can get me --

7                    MR. MILLER:  I certainly will.

8                    MR. ANDERTON:  I'm sorry.  Give

9        me the Bates range on that one more time.

10                   MR. MILLER:  I will.  00140080.

11                   MR. ANDERTON:  140080.  Got it.

12       Thanks.

13   BY MR. MILLER:

14       Q   Ma'am, going back to what the

15   contents of this document are, I read that

16   first sentence.  For clarity, I'm just going

17   to go ahead and do it again.

18                   What you typed is:  "Please note

19   this press release is still in draft as the

20   FDA has just communicated that we need to

21   recall all lots of Digoxin Tablets (all

22   strengths)."

23                   My question to you is:  Does that

24   statement refresh your recollection of whether

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

129

1    or not this recall was voluntarily done on the

2    part of the company or voluntarily done at the

3    request of the FDA?

4                    MR. ANDERTON:  Objection.

5                    You may answer.

6                    THE WITNESS:  Again, it was

7         communicated to the FDA, but the decision

8         to recall had already been made by the --

9         Robert Wessman.

10   BY MR. MILLER:

11        Q    Were you aware that the decision to

12   recall by Robert Wessman had already been made

13   of all lots prior to April 24th of 2008?

14        A    No.  I found out when the FDA recall

15   coordinator called me.

16        Q    Is there anything in writing that

17   you saw that would suggest that Robert Wessman

18   made this decision prior to the request of the

19   FDA, request by the FDA?

20        A    No.

21        Q    Would you agree that up to this time

22   of this e-mail, you were concentrating on a

23   recall of just one lot?

24        A    Correct.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

130

1      Q     And your press release was

2  concentrated on just one lot up to this point

3  in time; is that correct?

4      A     Correct.

5      Q     And where did you go -- what did you

6  do to get your research in order to alter the

7  draft press release from a one-lot press

8  release to a multiple- or all-lot press

9  release?

10     A     Where did I get the information

11  from?

12     Q     Yes.

13     A     From various people.

14     Q     Which people did you talk to?

15     A     I don't recall specifically, but I

16  would need a lot of people to provide me with

17  the information.

18     Q     Fair enough.  Let's take a look at

19  the attachment.  And it's stated "News

20  release."

21          Who's the intended target when you

22  draft this, if you know?

23     A     I'm assuming it's everyone.

24     Q     Would you agree that it's targeted

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

131

1    to individual consumers that have been

2    prescribed the pharmaceutical that's being

3    recalled, specifically Digitek?

4          A    It can be any -- I mean, it could be

5    the consumer or could be someone who knows a

6    consumer.

7          Q    My question is:  You're not writing

8    this for -- specifically for doctors?  You

9    wouldn't want to write it at such a level that

10   a doctor would understand it but the -- but

11   someone who's actually ingested the pill would

12   be able to understand it; is that correct?

13         A    Correct.

14         Q    And is it your job title -- when did

15   you find out that it was your job title to

16   write the press release?

17                    MR. ANDERTON:  Objection.

18                    You may answer.

19                    THE WITNESS:  It has never been

20        my -- it wasn't a job title.

21   BY MR. MILLER:

22         Q    Right.

23         A    It was requested of me to draft one.

24         Q    And this is the attachment, if we

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

132

1     turn the page:  News release.  And it was

2     Actavis Totowa recalls one lot of Digitek

3     digoxin tablets, USP 125 -- what's mcg?

4              A     Microgram.

5              Q     -- micrograms as precaution.

6                    Did that language come from you, or

7     were you given the title of this document?

8              A    I don't recall.

9              Q    If we go down to -- and I'm going to

10    take a look at the fourth paragraph down.  And

11    it says:  "Digoxin is used to treat heart

12    failure and abnormal heart rhythms."

13                   You don't have any medical training;

14    right?

15             A    No.

16             Q    Where would you have gotten this

17    medical information from?

18             A    I don't recall specifically where I

19    got this one, but I may have gotten it from

20    medical affairs or I might have gotten it from

21    the insert, the product insert.

22             Q    Okay.  Fair enough.

23                   And it goes on to say:  "The

24    existence of double strength tablets poses a

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

133

```
 1      risk of digitalis toxicity in patients with
 2      renal failure."
 3              Did I read that correctly?
 4      A    Correct.
 5      Q    And when you wrote this, did you see
 6      this as a way to warn those that have been
 7      prescribed digoxin and are taking digoxin of
 8      the potential risk of the issues that were
 9      found with the lot that you originally were
10      writing the press release for?
11              MR. ANDERTON:  Objection.
12              You may answer.
13              THE WITNESS:  Can you ask the
14          question again?
15              MR. MILLER:  Would you read
16          that one back.
17              (The court reporter read the
18          preceding question.)
19              THE WITNESS:  I didn't -- my
20          intent was basically to indicate what the
21          dangers may be.  Whether it was to warn
22          them or whatnot, that -- I just wrote
23          what the issues may -- what may occur for
24          consumers.
```

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

134

1   BY MR. MILLER:

2       Q    Did you have a sense it was

3   important to be clear and concise in the

4   information that you were putting in the

5   letter?

6       A    To an extent, yes.

7       Q    Okay.  Did anyone in regulatory

8   affairs or anyone at the company above you

9   review this and approve it?

10      A    Yes.

11      Q    And who would that be?

12              MR. ANDERTON:  I'm going to

13          object.

14              You can identify the people

15          that approved it, but do not reveal any

16          privileged communication.  Any

17          communication with counsel relating to

18          the review and approval, you don't reveal

19          that.

20              THE WITNESS:  Okay.

21              I believe Phyllis Lambridis

22          reviewed it.  I believe John LaRocca

23          reviewed it.  I believe the Actavis

24          press -- the external communications

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

135

1          individual, Hjordis, reviewed it.

2     BY MR. MILLER:

3          Q    And John LaRocca, he's senior legal

4     for Actavis?

5                    MR. ANDERTON:   "LaRocca."

6     BY MR. MILLER:

7          Q    LaRocca.  Is that correct?

8          A    I believe so.

9          Q    And without offering up any

10    conversations you had with him, did he change

11    the document in any way as you recall?

12                    MR. ANDERTON:  Objection.  And

13         I instruct the witness not to answer.

14                    MR. MILLER:  I'm looking for a

15         yes or no.  I'm not looking for any

16         content.

17                    MR. ANDERTON:  You're getting

18         into information that reveals -- I mean,

19         if he did, that's going to reveal legal

20         advice, legal strategy.  I instruct the

21         witness not to answer.

22    BY MR. MILLER:

23         Q    It is -- has a signature or

24    identifies a point of contact for inquiries at

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

136

1    the bottom.  It's Sarita Thapar.  Did you work

2    with her on drafting this?

3          A    "Sarita Thapar."

4          Q    Thapar?  Thank you.  Did you work

5    with Sarita Thapar on this document?

6          A    I don't recall.

7                    MR. MILLER:  I want to hand you

8          what I'm going to mark as Exhibit 220.

9                    (Plaintiff's Exhibit No. 220

10         was marked for identification.)

11                   THE WITNESS:  I believe you

12         gave me two copies.

13                   MR. MILLER:  Oh, thank you very

14         much.

15   BY MR. MILLER:

16         Q    Let me know when you've had a chance

17   to review this, please.

18              All set, ma'am?

19         A    Yes.

20         Q    And this is -- well, have you ever

21   seen this document before?

22         A    Yes.

23         Q    You have?  And under what occasion

24   would you have seen this?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

137

1          A     Probably while I was performing

2     activities for the recall.

3          Q     Okay.  And this is April 25th, 2008,

4     the day after the e-mail we just discussed

5     with the draft press release.  Would you have

6     received this from Sarita Thapar?

7          A     Most probably.

8          Q     And it is from OMEGA Corporate and

9     Occupational Health Services.  Do you recall

10    working with them?

11         A     I may have, yes.

12         Q     And it says:  Dear Sarita -- it's

13    from the OMEGA Corporate and Occupational

14    Health Services -- please find enclosed the

15    HHEs that you have Dr. Leikin review.

16               What's an HHE?

17         A     A health hazard evaluation.

18         Q     Okay.  And it says:  As we

19    discussed, the -- redacted -- is still being

20    typed up and yet to be sent for signature by

21    your office.

22               If we turn the page, is -- you had a

23    chance to read this.  Is this the HHE where

24    you received the information to put in the

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

138

1    press release?

2         A    I may have.  I don't recall.

3         Q    Did you ever have occasion to

4    discuss anything with Dr. Leikin?

5         A    In regards to?

6         Q    Regards to Digitek health concerns.

7         A    I don't recall.

8         Q    If you would have, would you have

9    kept a record of it in any way?

10        A    If it was an e-mail, it might have

11   been an e-mail.  Otherwise, if it was a

12   telephone conversation, I don't recall.

13        Q    If we take a look at the language

14   Clinical conclusion, and it states:

15   "Potential risks to the patient depend upon

16   the constituency of the tablets.  If the

17   tablets contain double the dose, then it can

18   be expected that digitalis toxicity can occur

19   in individuals taking daily doses or in

20   patients with renal insufficiency."

21             Did I read that correctly?

22        A    Yes.

23        Q    And I can put the other exhibit on

24   there, but you also discussed patients with

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

139

1     renal insufficiency in the press release.

2     Would you agree that this is where the

3     language was taken from or would you like to

4     take the time to compare the two?

5          A     I don't recall.

6          Q     Let's go back to -- and you should

7     have it in front of you -- what was marked

8     Exhibit 219, just an exhibit back there.  And

9     take a look at the press release, the draft

10    of.

11            And here we discussed it says:

12    "Digoxin is used to treat heart failure and

13    abnormal heart rhythms.  The existence of

14    double strength tablets poses a risk of

15    digitalis toxicity in patients with renal

16    failure."

17            Did you have a feeling that that

18    statement was true?

19                  MR. ANDERTON:  Objection.

20        She's already testified she has no

21        medical training.

22    BY MR. MILLER:

23          Q     You can answer.

24          A     I have no medical training.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

140

1          Q     Well, I'm not going to argue that

2     point.  But you wanted to be honest when you

3     relayed information to users of the product

4     via a press release; is that correct?

5          A     Correct.

6          Q     Okay.  And it's important to warn

7     them about potential health risks; is that

8     correct?

9                    MR. ANDERTON:  Objection.

10                   You may answer.

11    BY MR. MILLER:

12         Q     Is that correct?

13         A     You would want to -- I mean, again,

14    it's not ultimately my decision as to what the

15    press release contains.  But, you know, the

16    information should be there to alert the

17    consumers of the product what the -- what

18    could occur.

19         Q     And you agree that you used the HHE,

20    the health hazard evaluation, from Dr. Leikin

21    as part of the input for your draft?

22                   MR. ANDERTON:  Again,

23         objection.  That mischaracterizes her

24         testimony.  You asked her that and she

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

141

1           says she didn't know.

2      BY MR. MILLER:

3           Q    It's okay to answer.

4                    THE WITNESS:  I -- again, as I

5           indicated before, I don't recall where I

6           got the information from, whether it was

7           from medical affairs, you know, through

8           this health hazard evaluation, whether it

9           was from a product insert.  I don't

10          recall.

11     BY MR. MILLER:

12          Q    Fair enough.  Let's go back to

13     Exhibit 219 -- I lied.

14                    MR. MILLER:  What's this last

15          one, Meghan?

16                    MR. ANDERTON:  220.

17     BY MR. MILLER:

18          Q    Let's go back to Exhibit 220, the

19     HHE received from the doctor.

20                    MR. ANDERTON:  After the press

21          release was issued?

22                    MR. MILLER:  After the press

23          release -- well, I don't believe it's

24          been issued.  We have a draft.

Confidential – Subject to Further Confidentiality Review

                                                                142

1                    MR. ANDERTON:  Why don't you

2          look at the cover letter for the press

3          release or for the HHE.

4                    MR. MILLER:  I appreciate your

5          input, but I'm going to move on.

6      BY MR. MILLER:

7          Q    Let's look at the HHE --

8                    MR. ANDERTON:  We want it to be

9          accurate.

10                   MR. MILLER:  Is accuracy

11         important?  We're going to get into that,

12         Mike.  If it's important to be

13         accurate -- well, never mind.  We're

14         going to move on.  I see the date.

15     BY MR. MILLER:

16         Q    This HHE from Dr. Leikin, he states

17     in his clinical conclusion -- and I'm going to

18     read it again, the sentence that starts with

19     "If the tablets contain."

20              Do you see that?

21         A    Yes.

22         Q    He says:  "If the tablets contain

23     double the dose, then it can be expected that

24     digitalis toxicity can occur in individuals

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

143

1      taking daily doses or in patients with renal

2      insufficiency."

3              Do you see that?

4          A    Yes.

5          Q    Do you understand that's two

6      different groups of people?  That's people who

7      are taking a daily dose or people that have

8      renal insufficiency?  Did you understand that

9      when you read the HHE?

10         A    Okay.  Yes.

11         Q    You did?  Okay.  Thank you.

12             Did you have any communications with

13     Dr. Leikin regarding that specific topic if

14     this pertained to both groups of individuals,

15     those that take a daily dose or those that

16     have renal insufficiencies?

17                 MR. ANDERTON:  Objection; asked

18         and answered.

19                 You may answer.

20                 THE WITNESS:  I don't recall.

21                 MR. MILLER:  I'm going to hand

22         you what I'm going to mark as

23         Exhibit 221.

24                 (Plaintiff's Exhibit No. 221

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

144

1        was marked for identification.)

2    BY MR. MILLER:

3        Q    Take a moment to review it or

4    however much time you need.

5                    MR. ANDERTON:  In light of the

6        size of this document, do you want to go

7        off the record for a few minutes so she's

8        not reviewing it on camera?

9                    MR. MILLER:  That's fine.

10       Let's go off the record.

11                   THE VIDEOGRAPHER:  Off the

12       record at 12:19 p.m.

13                   (Discussion off the record.)

14                   THE VIDEOGRAPHER:  Back on the

15       record at 12:24 p.m.

16   BY MR. MILLER:

17       Q    Ma'am, what I've handed you is

18   Actavis Document 0028178, been marked

19   Plaintiff's Exhibit 221.  And have you seen

20   this document before?

21       A    Yes.

22       Q    What is this document, ma'am?

23       A    It's a recall package for digoxin.

24       Q    And is it a recall package that you

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

145

```
 1     reviewed and approved?
 2          A    Yes.
 3          Q    And is that your signature --
 4          A    Yes.
 5          Q    -- on the bottom line?
 6               Okay.  And, ma'am, you'd agree with
 7     me you reviewed and approved it by May 23rd of
 8     2008?
 9          A    I reviewed and approved it on
10     May 23rd.
11          Q    Okay.  And do you have a memory of
12     going through this document and when you
13     reviewed it and approved it, as you sit here
14     now?
15          A    Yes.
16          Q    And it was prepared by a Connie T.
17     Truemper?
18          A    "Truemper."
19          Q    Truemper.  And who was Connie?
20          A    She's a senior compliance officer.
21          Q    Did you work with -- did she report
22     to you directly?
23          A    No.
24          Q    Who did she report to?
```

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

146

1        A     At the time I believe she also

2    reported to Tony Delicato.

3        Q     Okay.  And it says prepared by her.

4    Did you work with her in preparing this

5    document?

6        A     Yes, to an extent.

7        Q     Okay.  And the document -- is this

8    document prepared for the FDA?

9        A     Yes.

10       Q     And is it part of the requirements

11   when a product is recalled as per the Codified

12   Federal Rules?

13       A     Yes.

14       Q     And did you have those rules with

15   you?  I believe it's Section 710 of the

16   Federal Rules.  Would you have reviewed those?

17       A     I may have.

18       Q     And if we look at the second page,

19   it's the Recall Package 2008; Product:

20   Digitek; Page 2 of 21; and Type of Recall:

21   Class 1.

22             Is this a form that was empty, like

23   a boilerplate?  I don't know what the other

24   term would be.  But was there a blank form

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

147

1      that you filled out, or was this form

2      generated from scratch, if you understand what

3      I'm saying?

4           A    This form is a template.

5           Q    Okay.  But this is the final

6      document; correct?

7           A    Yes.

8           Q    Okay.

9           A    But you're asking the form in

10     general.

11          Q    Well, I was just curious if there

12     was -- how was it generated?  Was it started

13     where they -- is there a template to follow,

14     or was it generated from scratch?

15          A    No.  There was a template to follow.

16          Q    And if we go to Page Actavis 028180,

17     and it says reason for recall, and it's the

18     first block:  How product is defective and/or

19     violative; is that correct?

20          A    Correct.

21          Q    And where did you get the

22     information that states -- or did you gather

23     the information that says:  "Digoxin tablets

24     exceeded tablet thickness specifications"?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

148

1        A     This was prepared not by me.

2        Q     Okay.

3        A     So you would have to ask the person

4     who prepared it.

5        Q     Okay.  I don't have handy the person

6     who prepared it.  But as the person who

7     reviewed it, did you do any information beyond

8     just reading that information to determine if

9     you were going to approve this document or

10    not?  Did you do any research?

11       A     In what regards?

12       Q     My question is:  Did you just read

13    it and assume it was correct and move on, or

14    did you do any document review or any type of

15    review in order to determine if it was

16    accurate?

17       A     This particular statement?

18       Q     Yes.

19       A     I don't recall.

20       Q     And it goes on to say how the

21    problem was discovered.  And it states:

22    "During the packaging operation of Lot

23    70924A1, the packaging operator observed

24    tablets with approximately double the

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

149

1    thickness on the counter channel."

2              And date discovered 11/30/2007.

3              You recognize that as an incident

4    that we've discussed here today?

5        A    I recognize the lot number, yeah.

6    It might have been the same incident we

7    discussed earlier.

8        Q    At the time you reviewed this, this

9    document, did being informed that that was the

10   date it was discovered, did that trigger any

11   review to see if historically this was an

12   issue beyond that one lot?

13       A    I'm sorry?  Restate the question,

14   please.

15       Q    When you reviewed this document and

16   put your signature on it that you reviewed and

17   approved it, did reading the date of discovery

18   and how the problem was discovered, did that

19   trigger for you a reason to go back and

20   historically look at data for this product?

21       A    I don't recall.

22       Q    If we go to Page 6 of 21 in the

23   upper right corner of this document, it says:

24   Recall Strategy continued.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

150

1           Do you see that, ma'am?

2      A    Yes.

3      Q    Rationale for Consumer level.  It

4   says:  "Due to the severity of the health

5   risk, we recommend a Level I recall."

6           Do you know who entered those words

7   into this report?

8      A    I'm assuming the person who prepared

9   it.

10     Q    Okay.  You believe that information

11  came from Connie Truemper?

12     A    Yes.

13     Q    I want to go to -- if you look at

14  the bottom right corner, it's got the Bates

15  number.  And I want to go to 28204.  The last

16  three digits are 204.

17          Do you see that?

18     A    Yes.

19              MR. ANDERTON:  One more time,

20       please, Pete.

21              MR. MILLER:  Yes.  Lower right

22       corner, 204.

23              MR. ANDERTON:  Thank you.

24

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

151

1    BY MR. MILLER:

2         Q    And, ma'am, do you see where it says

3    this is Attachment V, Health Hazard

4    Evaluation?

5         A    Yes.

6         Q    And if we turn the page, if you'll

7    take a look at that, do you agree that this is

8    the same health hazard evaluation that we

9    reviewed previously with the same date,

10   18 April 2008, by Dr. Leikin?

11        A    It appears to be.

12        Q    Okay.  And you agree that when you

13   approved this document with Attachment V, that

14   Dr. Leikin's health hazard evaluation included

15   the line in the fourth paragraph here starting

16   with "If":  "If the tablets contain double the

17   dose, then it can be expected that digitalis

18   toxicity can occur in individuals taking daily

19   doses or in patients with renal

20   insufficiency"?

21             Did I read that correctly, ma'am?

22        A    Yes.

23        Q    Now, if we go to -- look at 213 in

24   the lower right corner.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

                                                                    152

1              MR. ANDERTON:  Do you mean

2         Bates Range 213?

3              MR. MILLER:  I do.

4              MR. ANDERTON:  Thank you.

5    BY MR. MILLER:

6         Q    Actually, I'd like to back up and

7    look at 208, if you would, please.  And this

8    is Urgent:  Drug Recall, Attachment 6.  And

9    it's a letter April 28, 2008, and it's "Dear

10   Valued Customer."

11             When you reviewed this document for

12   the FDA and signed that you approved it, did

13   you have an understanding of who the customer

14   was for the product?

15        A    Yes.

16        Q    And do you have an understanding

17   that -- who is the customer?

18        A    Anyone who consumes or knows of

19   anyone who consumes this drug.

20        Q    Do you know if this letter was sent

21   to individuals who were prescribed the drug?

22        A    Being that it was a Class I recall,

23   it should have been sent to all customers -- I

24   mean all individuals who take this product.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

153

1      Q    Would you be surprised if I told you

2    there's been testimony that customers used in

3    this form is not the individual who's

4    prescribed the drug but the customer who

5    purchased the product from Actavis?

6                    MR. ANDERTON:  Objection.

7                    THE WITNESS:  I'm sorry?

8                    MR. ANDERTON:  Mischaracterizes

9        prior testimony.

10                   You may answer.

11                   THE WITNESS:  Can you state --

12       can you ask the question again?

13                   MR. MILLER:  Well, we'll strike

14       that.

15   BY MR. MILLER:

16       Q    And you agree that in this letter --

17   or actually strike that.

18                   In this Urgent:  Drug Recall,

19   April 28, 2008, letter, "Dear Valued

20   Customer," if you'd come down with me in the

21   paragraph, it states that -- starting with the

22   word "Depending on the constituency" --

23                   MR. ANDERTON:  "Constituency"?

24                   MR. MILLER:  I don't know.  Am

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

154

1              I saying that right?  That's a brand-new
2         one on me.
3                        MR. ANDERTON:  "Constituency."
4    BY MR. MILLER:
5         Q    I don't understand why that's so
6    difficult, but do you see the line I'm
7    reading?
8         A    Yes.
9         Q    "Depending on the constituency of
10   the tablets, double the dose is taken, it can
11   be expected that digitalis toxicity can occur
12   in individuals taking daily doses or in
13   patients with renal insufficiency."
14                  I think I finally read that right.
15   Do you agree I read that right, ma'am?
16        A    Yes.
17        Q    And do you agree that it's important
18   for consumers, those that are prescribed this
19   product, to know that it can cause toxicity in
20   both those that take daily doses and those
21   that have renal insufficiency as it's worded
22   here?
23        A    Okay.  Yes.
24        Q    You do?  Okay.  Well, let's go to

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

155

1    213.  And this is Attachment 8 of the

2    document, and it's titled "News release."

3              Now, do you recall reviewing this

4    document when you approved this entire recall

5    package for the FDA?

6         A    Yes.

7         Q    Okay.  And the press release or news

8    release that is going to go out states,

9    starting here with "Digitek" in the third

10   paragraph:  "Digitek is used to treat heart

11   failure and abnormal heart rhythms.  The

12   existence of double strength tablets poses a

13   risk of digitalis toxicity in patients with

14   renal failure."

15             Ma'am, do you see anywhere in this

16   news release that it shows a potential risk of

17   digitalis toxicity to those who take a daily

18   dosage?

19                  MR. ANDERTON:  Objection;

20        mischaracterizes the document.

21   BY MR. MILLER:

22        Q    Do you see it anywhere in there,

23   ma'am?

24                  MR. ANDERTON:  You may answer.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

156

1          THE WITNESS:  I'm sorry.  Can

2     you ask the question again?

3          MR. MILLER:  Would you repeat

4     that back, please.

5          (The court reporter read the

6     record as follows:

7          "QUESTION:  Okay.  And the

8     press release or news release that is

9     going to go out states, starting here

10    with "Digitek" in the third paragraph:

11    "Digitek is used to treat heart failure

12    and abnormal heart rhythms.  The

13    existence of double strength tablets

14    poses a risk of digitalis toxicity in

15    patients with renal failure."

16          Ma'am, do you see anywhere in

17    this news release that it shows a

18    potential risk of digitalis toxicity to

19    those who take a daily dosage?")

20          THE WITNESS:  It doesn't

21    indicate -- I mean, it goes on further to

22    indicate that digitalis toxicity can

23    cause nausea, vomiting, dizziness, low

24    blood pressure, cardiac instability, and

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

157

1        bradycardia.

2    BY MR. MILLER:

3        Q    It does.  I see that, ma'am.  But

4    the way I would read that is it does all those

5    things to someone who receives digitalis

6    toxicity because they have renal failure.

7            Do you see anywhere in this document

8    that digitalis toxicity can cause nausea,

9    vomiting, dizziness, low blood pressure,

10   cardiac instability, and bradycardia in

11   someone who takes a daily dose?

12                MR. ANDERTON:  Objection.  The

13       document speaks for itself.

14   BY MR. MILLER:

15       Q    You can answer.

16       A    I -- it depends on -- I don't -- it

17   depends on who reads it.  I can't answer for

18   someone who's reading it and what they're

19   taking from this document.

20       Q    Someone who's reading it is relying

21   on you, the drafter of the press release and

22   someone who's approving the recall package, in

23   order to make sure that the right words are

24   used; would you agree with that?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

158

1          A     Not necessarily.  They're relying

2     on, you know, a whole -- a bunch of people.

3     And keep in mind that this news release is

4     approved by the FDA before it gets sent out.

5          Q     You send this to the FDA; is that

6     correct?

7          A     Correct.

8          Q     And so the FDA is relying on you to

9     review this recall before it's sent.  You've

10    signed it reviewed and approved; correct?

11         A     I -- no.  The press release was sent

12    before the package was reviewed and approved.

13    And the news release was approved by the FDA

14    prior to me reviewing and approving this

15    recall package.

16         Q     Do you feel this news release

17    adequately warns those that are prescribed

18    Digitek of the potential health risks?

19         A     It indicates what the issues are.

20    As far as how accurately, I mean, it indicates

21    what the issues with it are and what the

22    dangers of it are.

23                   MR. MILLER:  Lunch?

24                   THE VIDEOGRAPHER:  This

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

159

1          completes Videotape No. 2.  Off the

2          record at 12:41 p.m.

3                    (Luncheon recess taken from

4          12:41 p.m. to 1:28 p.m.)

5                    THE VIDEOGRAPHER:  This is

6          Videotape No. 3.  Back on the record at

7          1:28 p.m.

8     BY MR. MILLER:

9          Q    Ma'am, I'd like to switch gears, now

10    that we've had lunch, and talk about product

11    complaints.  And I'm correct in stating that

12    you were involved in the Digitek product

13    complaints following the recall?

14         A    Yes.

15         Q    Tough word to get out.

16              I'd like to hand you what I have

17    marked as Exhibit 222.

18                    (Plaintiff's Exhibit No. 222

19         was marked for identification.)

20    BY MR. MILLER:

21         Q    After you've had a chance to review

22    it, I have a couple questions.

23              All set?  This document is titled

24    "Actavis Product Complaint Form."  Not that

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

160

1     you would remember this specific one, do you

2     remember the form in general?

3          A     Yes.

4          Q     Is it the same product complaint

5     form that would have been used for a product

6     complaint prior to the Digitek recall?

7          A     Yes.

8          Q     And is there a separate form that

9     would be used for adverse events that we

10    addressed earlier?

11         A     I don't believe so.  Not in this

12    case, no.

13         Q     Okay.  And if we look at this, it's

14    dated 9/15/2008.  You agree that's after the

15    recall; correct?

16         A     Correct.

17         Q     And it's difficult to read there,

18    Product Name, but it's digoxin tablets,

19    .125 milligrams.  My question is:  If we go to

20    the Nature of the Complaint and it states:

21    "Was using Digitek and ended up in a

22    hospital," from our previous discussion, I was

23    under the influence that an adverse event was

24    more of a health issue and a product complaint

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

161

1    issue about the product would have been

2    something that would have wound up on a form

3    like this?

4         A    It is a medical issue.

5         Q    Right.

6         A    It's an adverse event.  However,

7    even if you have an adverse event to assess

8    that nothing -- there was nothing that may

9    have caused that adverse event, you are still

10   dictated to review any sort of batch records

11   or any records that pertain to the processing

12   of the product to assure that everything was

13   manufactured in accordance with the internal

14   specifications and regulatory requirements.

15   So you do a review to ensure that that was

16   done.

17        Q    And if it was determined that the

18   use of Digitek resulted in this complaint or

19   the individual who called in regarding this

20   complaint did go to the hospital, would this

21   be elevated to an adverse event?

22        A    It was already an adverse event

23   because if you look at the form, it says

24   "Type" and it's indicated as Medical.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

162

1        Q    Okay.  Help me with that.  Where are
2    you on the form?
3        A    If you -- do you see where it says:
4    Digoxin tablets .125-milligram?
5        Q    I do.
6        A    And on the right side it says Lot
7    number, Expiration date, and then it says
8    Type.
9        Q    Yes.
10       A    The Medical box is checked off.
11       Q    Okay.  So the fact that the Medical
12   box is checked off is --
13       A    Means --
14       Q    It's an adverse event?
15       A    Correct.
16       Q    Do you recall receiving a high
17   volume of these following the Digitek recall?
18       A    Yes, definitely.
19       Q    Did that become the majority of your
20   time spent at work was dealing with these
21   following the recall?
22       A    It was one of the things that I was
23   reviewing.
24       Q    Did you assemble a team or any

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

163

```
 1      additional personnel to help you with the
 2      processing of these product complaints?
 3           A    I -- yes.  I had one other
 4      individual who helped me.
 5           Q    And who was that?
 6           A    Daniel Comrie.
 7           Q    And what was her title?
 8           A    She was the complaint specialist in
 9      Elizabeth.
10           Q    And Sarita Thapar worked with
11      adverse events; is that correct?
12           A    Correct.
13           Q    And if marking the Medical box in
14      the field that we just discussed would dictate
15      that this is an adverse event, would Sarita
16      Thapar have been involved in these forms as
17      well?
18           A    Yes.  If you look on the last page
19      of this packet --
20           Q    Yes.
21           A    -- this is the initial notification
22      that quality assurance received.  And if you
23      look at the top, it indicates Actavis Medical
24      Affairs Case Form.
```

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

164

1        Q    Yes.

2        A    So that's the initial notification

3   that we get.  And if you -- where it says:

4   2.0, Triage Medical Affairs, if you go about

5   two thirds down --

6        Q    Okay.  Yes, I'm there.

7        A    You see where it says "AE"?

8        Q    Yes.

9        A    That indicates adverse event.  That

10  is generated by the medical affairs group,

11  which is headed by Sarita Thapar.

12       Q    All right.  And if we go along there

13  where it says "Triage Medical Affairs" and the

14  AE we've established is adverse event, Case

15  Priority, who is it that identifies that this

16  is going to be expedited, nonexpedited, or PC

17  or MI only?

18       A    That would be medical affairs.

19       Q    Okay.  And do you know what "PC or

20  MI only," do you know what the "PC" stands

21  for?

22       A    "PC" stands for product complaint.

23       Q    And what does "MI" stand for?

24       A    Medical inquiry.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

165

1          Q     And it says "Triaged by."  Do you
2     know what the "CF" signifies?
3          A     The individual who took in the
4     complaint or acknowledged the complaint.
5          Q     And triage date, then, would be the
6     initial call?
7          A     Or the initial -- when this
8     individual triaged it.
9          Q     And in this case it would have been
10    August 1st of 2008; do you agree?
11         A     Correct.
12         Q     Then if we go back to the first
13    page, what process would this document have
14    gone through, if you know, between August 1st
15    of 2008 and roughly 45 days later to
16    September 15th of 2008?  What was the process?
17         A     Again, there was an overwhelming
18    number of complaints that were received by
19    Actavis as a result of this Class I recall.
20    And in doing so, basically they would upload
21    them into the system.
22              The problem was there were so many
23    that they weren't being -- we, the quality
24    group, couldn't process them quickly enough.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

166

1    So, therefore, when the quality assurance

2    group actually received it, when they -- not

3    acknowledge it, but when they actually got

4    around to this particular complaint that was

5    issued, you know, that was triaged on 8/1, it

6    was actually 9/15.  So there's an explanation

7    of it in this packet as well.

8         Q    And if we look for that explanation,

9    would you agree with me that -- actually,

10   let's turn to Page 804 in the lower right

11   corner.  And it starts out with Complaint

12   File:  C08-3790.  Would you break down the

13   complaint file?  What's the significance of

14   C08-3790?

15        A    That's the number used to annotate

16   the complaint.

17        Q    Would it be accurate to say that

18   this is the 3,790th complaint in 2008?

19        A    Correct.

20        Q    And were the vast majority of those

21   3,790 complaints related to Digitek?

22        A    Yes.

23        Q    And the next statement says:  "The

24   lot number is unknown, therefore no formal

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

167

1      investigation to include records review or

2      retention sample evaluation is possible."

3              As the senior manager of quality

4      assurance investigation group, what steps did

5      you take in order to determine what the lot

6      number was that corresponded with a particular

7      complaint?

8          A    Well, given that this was an adverse

9      event, this is something that the medical

10     affairs group would have to take all

11     applicable steps to obtain the lot number --

12         Q    Okay.  So --

13         A    -- from the complainant.

14         Q    Fair enough.  So you're saying it

15     was Sarita Thapar's responsibility or her

16     department to determine what the lot number

17     was?

18         A    If one could be obtained.

19         Q    Who would have generated this page

20     that we're looking at here?  Would it have

21     been your department or Sarita Thapar's?

22         A    No.  It would be my -- my

23     department.

24         Q    It goes on to say at the bottom:  As

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

168

1    a result of QA Investigation 07-093, where two

2    digoxin tablets .125-milligram were found with

3    approximately double the thickness, all

4    batches of digoxin have been voluntarily

5    recalled as a precautionary measure.

6          Where did you get that information,

7    specifically the fact that two digoxin tablets

8    with approximately double the thickness were

9    found?

10   A    Well, it would have to be in this

11   investigation that was referenced.

12   Q    As you sit here today, do you know

13   the total number of, approximately,

14   double-thick tablets were found in that lot?

15   A    I have -- I don't recall.

16   Q    Where would this form go other than

17   being stored at the company, the completed

18   product complaint form, this one and all

19   others?  Do they wind up being delivered to

20   the FDA or just stored in the company?  What's

21   the ultimate destination of this document?

22   A    Well, basically given that this was

23   a medical affairs complaint, we would provide

24   them all the information that we had.  So they

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

169

1     would close out their adverse event complaint.

2     We would hold onto the originals of the

3     information that we have and store it for

4     any -- yeah, if FDA requested to see it or

5     just within our retention policies.

6          Q     Does a copy of it go to the

7     complainant, the person who actually filed the

8     original complaint?

9          A     With the medical affairs, I'm not

10    really quite sure.  That would be -- medical

11    affairs handles it, so I don't know.  They

12    would be responsible.

13              If it was an adverse event, it would

14    be the medical affairs group that would be

15    responsible for communicating anything to the

16    complainant or -- to the complainant.

17         Q     If it was a product complaint and

18    not an adverse event, would a copy of the

19    document be sent to the person who called in

20    the original complaint?

21         A     If it was a product complaint, we

22    would send a letter indicating what actions we

23    took and what the results of that

24    investigation or batch record review or

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

170

1    anything entailed.  We would send a letter to

2    the complainant.

3        Q    Would that letter include a copy of

4    the press release?

5        A    The press release has to do with --

6    again, it depends what the product complaint

7    is for.

8        Q    Fair enough.  If we turn to the next

9    page, Page 805, there's a copy of the press

10   release maintained within this product

11   complaint.  Was it typical that a copy of the

12   press release was included in a product

13   complaint?

14       A    Excuse me?

15       Q    Was it typical -- I'm just trying to

16   determine why this product complaint has a

17   copy of the press release attached.

18       A    Again, it's not a product complaint.

19   It's an adverse event.  But the reason that

20   they included the press release is basically

21   to provide evidence that all batches had been

22   voluntarily recalled and to basically justify

23   the statement that was made on the previous

24   page.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

171

1      Q    If we look on the next page, 806,

2    and this is a letter, if I'm correct, to the

3    complaint file?

4          A    Correct.

5          Q    And it's from Shonise Moses?

6          A    Correct.

7          Q    And who is she?

8          A    She was a complaint coordinator.

9          Q    And it's regarding justification for

10    the subject complaint not being processed upon

11    receipt from medical affairs.  And it states

12    that the complaint, to paraphrase, was not

13    processed due to the overwhelming number of

14    complaints received during the first week of

15    May 2008 due to the Class I Digitek recall.

16          If this is an adverse event and not

17    a product complaint, why would it be that you

18    would have reviewed and signed this document?

19          A    Because given that we -- it's a --

20    even though it's a medical -- an adverse

21    event, there's a quality system in place.  And

22    I indicated to you that you have to annotate,

23    process, and document compliantly the receipt

24    of any complaints, whether they are adverse or

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

172

1    whether they are technical.

2            So you want to make -- again, the

3    whole reason for this is that you see this

4    elapsed time frame; you want to justify if

5    anyone from a regulatory body were to review

6    this complaint, what the reason for this delay

7    was.

8        Q    Were the complaints scanned in to

9    any typical -- or was there a software that

10   controlled all the complaints?

11       A    What do you mean by "software"?

12       Q    Well, once these documents were

13   gathered together and if it fell under the

14   category of product complaint and not an

15   adverse event, how did you keep track of the

16   high number of product complaints?

17       A    Well, all -- again, all of the

18   initial complaints, whether they were adverse

19   or technical in nature, were always received

20   by the medical affairs group, who would triage

21   it.  So there were always -- there was really

22   no set way for us to determine what was a

23   product complaint or what was an adverse event

24   because it was all scanned into one drive.  So

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

173

1    it was the order that we processed them.

2         Q    If you wanted to go back and look

3    for a product complaint by the complaint

4    number, is there any way to tell from the

5    number if it was a product complaint or if it

6    was an adverse event?

7         A    No.

8         Q    And was there any way for you to

9    search all the documents as scanned into the

10   drive, as you said, or would you have to open

11   up individual documents?

12        A    You would have to open up individual

13   documents.

14        Q    Was there a reason at any time or

15   need on your part to go in and review product

16   complaints after they were scanned in?

17        A    Myself?

18        Q    Yes.

19        A    No, I never reviewed the scanned

20   documents until they were processed and ready

21   for my review and approval.

22        Q    Once you did your review and

23   approval, was the completed, final document

24   scanned back in as well?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

174

1          A     I believe so.

2          Q     Was there a software that controlled

3     that document or was it just, again, a scanned

4     document that had to be opened up

5     individually?

6          A     Again, the only files that were

7     scanned were most probably the ones that had

8     to be sent back to medical affairs.

9     Otherwise, again, we always maintained the

10    hard copy.

11                    MR. MILLER:  I'm going to hand

12         you what I'm going to mark as

13         Exhibit 223.

14                    (Plaintiff's Exhibit No. 223

15         was marked for identification.)

16                    MR. ANDERTON:  223?

17                    MR. MILLER:  It is 223.

18                    MR. ANDERTON:  Thank you.

19    BY MR. MILLER:

20         Q     Actavis Document 0098099.  And after

21    you've had a chance to review it, ma'am, I'll

22    have a question for you.

23                    Ma'am, I'll represent to you it's an

24    e-mail from Anthony Castellazzo, Tuesday,

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

175

1    September 16th, 2008, and it's to several

2    individuals.  And do you see where you are one

3    of the recipients?

4         A    Yes.

5         Q    Okay.  The subject is QS Assessment

6    Status Updates.  Do you recall receiving an

7    e-mail regarding that subject?

8         A    I must have.  I don't recall the

9    specifics of it.

10        Q    Do you know what a QS assessment

11   status update is?

12        A    It was a quality systems assessment.

13        Q    And were you involved in the quality

14   systems assessment?

15        A    To a certain extent.

16             MR. MILLER:  I am going to hand

17        you what I'm going to mark as 224.

18             (Plaintiff's Exhibit No. 224

19        was marked for identification.)

20   BY MR. MILLER:

21        Q    And if I could -- well, why don't

22   you take a review of that document.  And I've

23   got a very specific question.  You can take

24   the time to review the entire thing if you

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

176

1    want, but it's one line I'm looking to ask you

2    about.

3            Just to make the record clear, we'll

4    take a look back at the original e-mail that

5    was sent which this was the attachment to.

6    Take a look at Document 223.  And Anthony

7    Castellazzo is sending to you and others.  And

8    it reads:  "The attached file contains

9    spreadsheets for all 6 assessed QS areas.

10   There will be no meeting this week, therefore

11   please provide updates via e-mail for all

12   items that you are designated as the

13   'Responsible Person.'"

14           And do you recall being the

15   responsible person on any of these designated

16   areas?

17       A    I see my name on them.  I don't

18   specifically recall.

19       Q    All right.  We'll take a look at the

20   QSIP, the quality systems improvement.  And

21   the line that has your name on it that I'd

22   like to ask you about is on Page 20 of 21,

23   Actavis 098120.

24           Ma'am, I'd like to ask you about

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

177

1    entry -- it's No. 19, Observation 17.  And

2    under the Responsible Person, it's

3    M. Sherwani.  And that's you; correct?

4         A    Correct.

5         Q    Okay.  And this says the target

6    completion date was 11 September.  And if we

7    review the observation, it's:  "Review of the

8    recall file for the 2008 Digoxin recall found

9    that the failure investigation was incomplete.

10   The root cause of the double-thickness tablets

11   was determined to most likely be caused by

12   inadequate clearance of either the tablet

13   deduster or metal detector, in spite of the

14   fact that both pieces of equipment are located

15   after the tablet press.  There was no mention

16   how the tablets may have gotten re-introduced

17   into the press; and no evaluation of either

18   the feed or dosing systems, or the ability of

19   the press to eject fully-pressed tablets."

20             Did I read that correctly, ma'am?

21        A    Yes.

22        Q    And the action item, Column F, (1)

23   is to evaluate the need for an addendum to

24   this investigation.

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

178

```
 1              Do you recall being the responsible
 2    person for that action item?
 3         A    I see my name on it.  I don't --
 4    again, as I indicated, I don't recall the
 5    specifics.
 6         Q    Do you recall looking at all -- do
 7    you have any memory of looking or evaluating
 8    the need for an addendum to the investigation?
 9         A    Honestly, no, I don't.  I don't
10    recall what took place, no.
11         Q    Do you recall having anyone that you
12    worked with or did you ask anyone to assist
13    you with that action item?
14         A    I don't even know -- I can't -- I
15    can't answer you because I don't know what was
16    done.  I don't recall specifics as to how we
17    addressed this observation.
18         Q    I'm going to hand you what I'm going
19    to mark as Exhibit 225.
20              The page is out, so we have to quit
21    now.
22         A    Really?
23              MR. ANDERTON:  I'll hide them.
24              MR. THOMPSON:  Don't make him
```

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

179

1          lose his place or we have to start over.

2                    MR. ANDERTON:  That could be

3          fun to watch.

4                    (Plaintiff's Exhibit No. 225

5          was marked for identification.)

6     BY MR. MILLER:

7          Q    Ma'am, this is Actavis

8     Document 00419719.  The top line, you agree,

9     is an e-mail from you to Abita Nanda?

10         A    Correct.

11         Q    Who is Abita?

12         A    She's a friend of mine and an

13    ex-colleague.

14         Q    And I see Roche.com, so she used to

15    work with you at Roche?

16         A    Correct.

17         Q    If we go down to halfway down the

18    first e-mail starting this e-mail chain, it's

19    from Abita Nanda to you.  And it's an article

20    titled "Congress Probes FDA's Inspection

21    Process of Actavis."

22              Did you get a chance to review that

23    article?

24         A    Yes.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

180

1        Q    And your reply to Abita Nanda was:

2   Now I'm getting worried, bold, with a frown

3   face; is that correct?

4        A    Okay.  Yes.

5        Q    Is that correct?

6             Do you recall typing that to her?

7        A    No, but I did.

8        Q    Do you recall what you might have

9   been worried about?

10       A    I don't recall.  I think it was just

11  the fact that this is the same time that there

12  was an issue with Ranbaxy, another

13  pharmaceutical company, and their issues at

14  one of their facilities in India.  And this

15  individual, Representative Dingell, he was

16  involved in the same -- he was highly

17  concerned, I suppose, about the recent

18  observations that the -- one of the Indian

19  facilities of Ranbaxy had.  And I think he was

20  just trying to lump Actavis into the same sort

21  of general -- basically he was trying to link

22  Actavis and Ranbaxy as having the same issues.

23       Q    Was Actavis having CGMP compliance

24  issues starting -- or strike that.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

181

1          Would you agree with the statement

2     that Actavis had a history of CGMP compliance

3     leading up to the recall of Digitek?

4          A    I'm sorry.  Can you state that

5     again.

6                    MR. MILLER:  Would you read

7          that back.

8                    (The court reporter read the

9          preceding question.)

10                    THE WITNESS:  A history of CGMP

11          compliance?

12     BY MR. MILLER:

13          Q    Issues.  Did I not say that?  There

14     you go.

15                    MR. ANDERTON:  No.

16                    MR. MILLER:  All right.  You

17          got me there.

18     BY MR. MILLER:

19          Q    Would you agree with the statement

20     that Actavis had a history of CGMP compliance

21     issues leading up to the recall of Digitek?

22                    MR. ANDERTON:  Objection.

23                    You may answer.

24                    THE WITNESS:  What do you mean

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

182

1          by "issues"?

2     BY MR. MILLER:

3          Q     Violations.

4          A     In regards to?

5          Q     CGMP.

6          A     Would I agree they had a history?  I

7     don't -- I don't recall specifics.  As I

8     indicated to you before, there had been

9     warning letters and -- but I don't know what

10    you're requesting specifically.

11         Q     You agree that they had inspections

12    where observations were pointed out by the

13    FDA?

14         A     Correct.

15         Q     Observations of CGMP violations?

16              MR. ANDERTON:  Objection;

17         mischaracterizes facts in evidence and

18         documents.

19              You may answer.

20              THE WITNESS:  Not necessarily

21         violations.  There are observations.

22         Observations are not necessarily

23         violations.

24

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

183

1    BY MR. MILLER:

2        Q     Not necessarily, but you agree that

3    they certainly can be?

4                    MR. ANDERTON:  Objection.

5                    You may answer.

6                    THE WITNESS:  I'm sorry?

7    BY MR. MILLER:

8        Q     Observations can certainly be

9    violations; you agree with that?

10       A     Not necessarily.  Observations are

11   just an inspector's interpretation of whatever

12   the surrounding events may be.

13       Q     If you violate a CGMP, how does the

14   FDA typically relate that information to the

15   company?

16       A     I'm not sure what you're asking.

17   How does an FDA inspector relay the fact that

18   a company has violated policies?

19       Q     Yes.

20       A     There are several means.

21       Q     Is an FDA 483 inspection a report

22   that follows that inspection?  Is that a way?

23       A     That may be one way.  But, again,

24   like I said, not all observations are

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

184

1    violations.  So...

2         Q    Not all observations are.  Some

3    observations are violations; you just have to

4    look --

5         A    They may be.

6         Q    They may be.  You'd have to look

7    into each individual observation?

8         A    Absolutely.

9         Q    Why did it come to be that you

10   terminated your employment with Actavis?

11        A    I received a better opportunity.

12                  MR. MILLER:  Give me five

13        minutes.

14                  THE VIDEOGRAPHER:  Off the

15        record at 2:05 p.m.

16                  (Short recess.)

17                  THE VIDEOGRAPHER:  Back on the

18        record at 2:20 p.m.

19   BY MR. THOMPSON:

20        Q    Ms. Sherwani, my name's Fred

21   Thompson.  And I really have just two -- well,

22   one subject area to ask you about.  If you

23   recall the draft press release, I think it's

24   219, Exhibit 219, okay, now, I think you had

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

185

1       mentioned you had been asked to write a draft

2       of press release and that it was reviewed by a

3       series of reviewers who may have made changes

4       but that's not part of this.  This is

5       obviously a draft because it has blanks for

6       certain dates on it.  You see that?

7             A     Yes.

8             Q     The thing I'm interested in is that

9       the date on that draft press release is

10      April 24, 2008.

11                  Do you see that?

12            A     Yes.

13            Q     Now, is that at or about the time

14      that it was drafted, or is that at or about

15      the time that it was supposed to be released,

16      if you remember?

17            A     I believe it was actually being

18      drafted on the 24th of April.

19            Q     Can we say that as of April 24,

20      2008, Actavis intended to have a voluntary

21      recall of one lot of Digitek tablets,

22      .125 MCG?  Do you see that Lot 70924A2?

23            A     Correct.

24            Q     So when you drafted this press

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

186

1    release, your instruction was that there was

2    going to be one lot recalled; isn't that

3    right?

4         A    Correct.

5         Q    Now, if I look at the top sheet,

6    there's sort of an e-mail that says, more or

7    less, hold the presses; the FDA has just

8    communicated that we need to recall all lots

9    of digoxin tablets, all strengths.

10              Do you see that?

11        A    Correct.

12        Q    And the e-mail is dated April 24 at

13   2:41 p.m.  Can we be assured that that's

14   approximately the time that you wrote the

15   e-mail?

16        A    Yes.

17        Q    Now, what was the reason that the

18   FDA determined that Actavis needed to recall

19   all lots of digoxin tablets?

20        A    I don't know.  I wasn't privy to

21   that conversation.

22        Q    Okay.  And you were never part of a

23   group that had that explained to them?

24        A    I'm sorry?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

187

1      Q     You were never part of a group or a

2   meeting or an e-mail chain that had that

3   explained to you?

4      A     It might have been in conversation;

5   but as I indicated, my instruction was that it

6   had been expanded to include all batches based

7   on a conversation that Robert Wessman had with

8   the FDA.

9      Q     Now, you were going to have a large

10   undertaking to recall one lot of Digitek;

11   isn't that right?

12                  MR. ANDERTON:  Objection.

13                  You may answer.

14                  THE WITNESS:  What do you mean

15      by "large undertaking"?

16   BY MR. THOMPSON:

17      Q     Well, I mean that was going to cause

18   you a lot of work to undertake that and to

19   accomplish that recall program, wouldn't it?

20      A     I'm not sure what you mean by "a lot

21   of work."

22      Q     Okay.  I guess my question is:  To

23   recall all lots of Digitek and then within the

24   month to recall all lots of all products made

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

188

1    by the Actavis Totowa facility was an enormous

2    expansion of your work, wasn't it?

3                    MR. ANDERTON:  And it's also a

4        misrepresentation of facts in evidence.

5        I object.

6                    You may answer.

7                    THE WITNESS:  Can you ask the

8        question again?

9    BY MR. THOMPSON:

10        Q    I guess I'm confused because

11   Mr. Anderton has caused me to doubt my memory,

12   but I thought you said that you had requested

13   additional people because of additional work

14   that you were having to undertake.

15        A    No.  My statement to the question

16   before, I believe, was specific to

17   investigations.  And then I believe, if memory

18   serves me right, it was who I -- if I had any

19   additional help to process the complaints.  I

20   didn't mention anything about recall.

21        Q    Okay.  So the scope of the recall

22   would not add to or subtract from your work;

23   is that right?

24        A    I'm not sure -- I'm sorry.  I'm not

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

189

1    understanding what you're asking.

2         Q    My question is:  If the recall was

3    limited to one lot or if the recall was

4    expanded to include all drug products

5    manufactured by the Little Falls facility over

6    a two-and-a-half-year period, neither of those

7    options would subtract from or add to your

8    workload?

9                   MR. ANDERTON:  Objection; form.

10                  You may answer.

11                  THE WITNESS:  I was requested

12           to help with the recall activities, given

13           my prior experience.  There were other

14           individuals and other resources that were

15           also provided and who, once I had to deal

16           with other priorities, that they were

17           able to carry out the recall

18           requirements.

19    BY MR. THOMPSON:

20         Q    Now, am I hearing that you were, in

21    fact, asked to assist with the recall?

22         A    Which recall?

23         Q    Well, that's where we're headed to.

24         A    Okay.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

190

1        Q    But I understood your answer to mean

2    that part of your job task was that you were

3    asked to assist with the recall because of

4    your prior experience?

5        A    Correct.

6        Q    Now, let me ask the question again.

7    Did the scope of the recall, instead of a

8    single lot of Digitek, it being all Digitek

9    products and all products manufactured by the

10   Little Falls facility, did the scope of the

11   recall add to or subtract from your workload?

12                    MR. ANDERTON:  Objection.

13                    You may answer.

14                    THE WITNESS:  It was

15       additional -- it was additional activity

16       that I needed to perform.

17   BY MR. THOMPSON:

18       Q    Now, given that, were you not

19   curious as to the reason why the press release

20   that you drafted that encompassed one lot was

21   expanded to be an entire facility-wide recall

22   of all products?

23                    MR. ANDERTON:  Objection;

24       mischaracterizes that document,

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

191

1          mischaracterizes facts in evidence.

2                    You may answer.

3                    THE WITNESS:  I'm sorry.  Can

4          you ask the question again.

5                    MR. THOMPSON:  Can you read

6          that back for me, please.

7                    (The court reporter read the

8          preceding question.)

9                    MR. ANDERTON:  And same

10         objection.  That press release has

11         nothing to do with the other product

12         recalls.

13                   MR. THOMPSON:  All right.

14         Well, let me rephrase the question.

15    BY MR. THOMPSON:

16         Q    Taking the information that you had

17    at the time that you drafted this recall

18    notice on April 24, 2008, we're in agreement

19    that you drafted it for a single lot of

20    Digitek; isn't that right?

21         A    Correct.

22         Q    After this press release was drafted

23    but before it was enacted, you were given the

24    word that there would be a recall of all lots

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

192

1    of digoxin; isn't that right?

2        A    Correct.

3        Q    And, in fact, within the month, all

4    lots of all drug products manufactured by the

5    Little Falls plant were voluntarily recalled;

6    isn't that right?

7                    MR. ANDERTON:  Objection;

8        mischaracterizes facts in evidence.

9                    THE WITNESS:  I'm sorry.  I --

10       if you could just repeat the question.

11                   MR. THOMPSON:  Would you read

12       that back, please.

13                   (The court reporter read the

14       preceding question.)

15                   THE WITNESS:  It may --

16                   MR. ANDERTON:  Same -- hold on.

17                   Same objection; greatly

18       mischaracterizes facts in evidence.

19                   You may answer if you know.

20                   THE WITNESS:  I don't know the

21       time line.  I don't know if it occurred

22       within the month.  I don't recall.

23   BY MR. THOMPSON:

24       Q    Do you recall if it occurred at all?

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3377

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

193

1       A    If what occurred?

2       Q    If all lots were recalled.

3       A    All lots of what?

4       Q    Of all drug products of the

5   Little Falls plant.

6       A    That's not accurate.

7       Q    Okay.  What is accurate then?  What

8   happened to all the lots that were produced?

9   Not to the consumer level; it was not a Class

10  I recall.  But how would you characterize the

11  action that was taken by Actavis Totowa with

12  regard to all drug products manufactured by

13  the Little Falls plant?

14      A    The majority of them were recalled,

15  but not all products that were processed in

16  the Little Falls facility were recalled.

17      Q    Okay.  So my problem is that I said

18  "all" and that's incorrect?

19      A    Correct.

20      Q    Okay.  Now, with regard to the

21  decision to recall all lots of Digitek and

22  with regard to the decision within a period of

23  time thereafter to recall certain or many of

24  the other products manufactured by the Little

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

194

1    Falls plant, did you -- strike that.

2              With regard to these actions, the

3    recall of the all lots of Digitek, with regard

4    to the recall of many of the other lots, were

5    you curious as to the reason for such a wide

6    recall?

7                   MR. ANDERTON:  Objection; form.

8                   You may answer.

9                   THE WITNESS:  I'm not sure what

10        you mean by "curious."  Given my role,

11        there was a certain understanding of why

12        certain products were being recalled

13        voluntarily.

14   BY MR. THOMPSON:

15        Q    And what was your understanding?

16                   MR. ANDERTON:  Objection.  I

17        instruct the witness to answer only with

18        respect to Digitek.

19   BY MR. THOMPSON:

20        Q    Let me ask you a couple questions

21   about that.  How much of your day was spent

22   with regard to the Digitek recall?

23        A    I don't recall.

24        Q    Was it 90 percent of your day?  Was

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

195

1    it 10 percent?  Was it half?

2         A    I don't -- it varied depending on

3    the day.

4         Q    Okay.  In fact, were you assigned

5    Digitek as your responsibility?

6         A    In regards to?

7         Q    Was there anything special and

8    unique about the Digitek recall that differed

9    from the recall of all the other products that

10   were recalled?

11        A    Were there any differences?

12        Q    Was there anything that made Digitek

13   special and unique with regard to the other

14   products?

15                    MR. ANDERTON:  Objection.

16                    You may answer if you

17        understand.

18                    THE WITNESS:  I'm not quite

19        sure I do understand what you're asking

20        me.

21   BY MR. THOMPSON:

22        Q    Was there anything that made your

23   handling of the Digitek recall different than

24   your handling of any of the other

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

196

1    contemporaneous recalls that were undertaken

2    at the --

3        A    All recalls are going to be handled

4    per internal procedures and regulatory

5    requirements.

6        Q    And who does that?  I mean, who did

7    that?

8        A    Who did what?

9        Q    Who did all the recalls?

10       A    For digoxin?

11       Q    Well, no; for all of them.

12       A    Well, it was a team.  Some of the

13   information for the other recalls, some of the

14   other recalls I was working on.  There were

15   other recalls that other individuals were

16   working on.

17       Q    Now, when I hear the word "team" --

18   as a matter of fact, I think I overheard us

19   defining a team.  A team is a group of people

20   unified by a goal or an objective, working

21   together collegially; you agree with that?

22       A    Yes.

23       Q    Was the team at Actavis working

24   together to pursue all of the recalls of all

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

197

1    of these products?

2         A    Do you mean were they working

3    towards completing the recall activities once

4    the decision was made?

5         Q    Yes, ma'am.

6         A     Yeah, there were many individuals

7    who were working on that.

8         Q    Now, was one person assigned

9    OxyContin and one person was assigned gel caps

10   and one person was assigned Digitek and one

11   person -- or did everybody work on all the

12   recalls?

13        A     Initially it was just a few

14   individuals who were working on the recalls.

15   Once it expanded, there was additional

16   resources that were provided.

17        Q    Well, now, in your case, I think

18   we've already mentioned that you worked on

19   Digitek, but you also worked on other things

20   as well; is that right?

21        A    Correct.

22        Q    Did all of the drug products that

23   were recalled, were they recalled because of

24   departures from current good manufacturing

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

198

1    practices?

2                    MR. ANDERTON:  Objection.

3                    I instruct the witness to

4         answer only with respect to Digitek.

5                    Do you understand my

6         instruction?

7                    THE WITNESS:  Yes.

8                    The one lot of digoxin that was

9         agreed to be recalled was as a result not

10        so much of a departure; it was the

11        inspector's opinion that for that one

12        particular lot, there was -- that, you

13        know, there may have been -- there may

14        have been an occurrence where

15        double-thick tablets may have been

16        distributed to the market.

17   BY MR. THOMPSON:

18        Q    Okay.  That's the one lot.  And I

19   understand that lot.  I don't understand all

20   the other lots.  Why were all the other lots

21   recalled?

22        A    I have no idea.  As I indicated to

23   you previously, I was told that that was the

24   directive that the company had taken.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

199

1          Q    Now, let's pull out the
2     Plaintiff's 141 as well.  It should be a
3     one-page document that says "Investigation."
4                    MR. ANDERTON:  Right there.
5          You had it.
6                    THE WITNESS:  Okay.
7     BY MR. THOMPSON:
8          Q    Now, this was the lot that was the
9     subject of that e-mail correspondence back and
10    forth between various people.  And this was
11    the lot that had been released to Mylan but
12    had been captured en route, and so it did not
13    reach the consuming public.  Okay?
14                   MR. ANDERTON:  Objection.
15    BY MR. THOMPSON:
16         Q    I think we're in agreement to that.
17                   MR. ANDERTON:  Objection.  I
18         think nobody's in agreement to that.
19         That is a deliberate mischaracterization
20         of facts and evidence.
21                   MR. THOMPSON:  All right.
22    BY MR. THOMPSON:
23         Q    Was this lot released to Mylan?
24         A    No.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

200

1          Q    Oh, you are exactly right.

2     Mr. Anderton is exactly right.  I'm wrong

3     about that.

4               Pull out Plaintiff's 142.

5                    MR. ANDERTON:  We wouldn't have

6          let the record stand wrong for long.

7     BY MR. THOMPSON:

8          Q    Pull out Exhibit 142 as well.  I

9     apologize.

10         A    I have it.

11         Q    I was misreading that the 80202A,

12    80228A.  So let's look at the Plaintiff's 141

13    first.  Okay?

14              Now, this is an Investigation 08-060

15    and it is -- it says Control Number 80228A1.

16    Now, is that the same as a lot number?

17         A    Correct.

18         Q    Now, in this batch or this lot, the

19    tablets weighed out of spec; isn't that right?

20         A    I believe it indicates that the

21    filled bottle weight was going higher than the

22    set range.

23         Q    And it looks like the packing

24    manager or the PKG manager took random sample

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

201

1     tablets and checked the weight.

2              Do you see that?

3        A     Correct.

4        Q     And it looks like he checked 30; and

5     out of 30, 17 of them were higher weight.

6              Do you see that?

7        A     Yes.

8        Q     Now, this lot number has nothing to

9     do with the lot number that had the

10    double-stamped pills, does it?

11       A     Which lot are you referring to?

12       Q     The lot that was the subject of your

13    draft press releases, Lot No. 70924A2; right?

14       A     Yes.

15       Q     And this lot is Lot 80228A; right?

16       A     Correct.

17       Q     And when these guys are talking

18    about higher weight, they're talking about a

19    weight that's above the range that's allowed

20    per pill.  They're not talking about a

21    double-thickness pill; aren't we right about

22    that?

23       A     That's what it indicates, yes.

24       Q     Now, Lot 80228A, will you agree that

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

202

1      that lot was manufactured in violation of

2      current good manufacturing practice?

3                          MR. ANDERTON:  Objection.

4                          You may answer.

5                          THE WITNESS:  I don't agree

6          that it was -- I don't agree.

7      BY MR. THOMPSON:

8          Q    You believe that current good

9      manufacturing practice would permit the

10     manufacture of a lot of pills in which 17 of

11     30 tablets would measure out above the

12     120-milligram weight against target weight of

13     105?

14         A    I'm sorry.  Can you repeat the

15     question?

16         Q    You believe that a lot in which 17

17     of 30 tablets were found to be of a weight

18     higher than the accepted range would be within

19     current good manufacturing practice standards?

20         A    It depends.  I'd have to have more

21     information about the issue before I make a

22     determination.

23         Q    What additional information would

24     you, as the senior manager of quality

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

203

1    assurance, what would you need to decide that

2    17 out of 30 tablets above specification was

3    not in violation of current good manufacturing

4    practice?

5         A    Well, there are criteria.  You have

6    an AQL, which is an acceptance quality --

7    basically an acceptance level that is

8    prescribed.  So I don't know what the AQL for

9    this particular batch was.  I would need to

10   know what the in-process checks and other

11   processing parameters were before I made that

12   determination.

13        Q    Okay.  In any event, are we in

14   agreement that we're not talking about

15   double-stamped pills here?

16        A    It just indicates that it's an issue

17   with weight.  I don't see anything about

18   thickness here.

19        Q    All right.  Would you agree that the

20   production of Digitek at Actavis Totowa was

21   plagued with systemic deviations from current

22   good manufacturing practices for the period

23   2006 through April of 2008?

24                    MR. ANDERTON:  Objection.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

204

1               You may answer.

2               THE WITNESS:  I can only speak

3       to when I was in employment at Actavis,

4       which was from January 2008 to October of

5       2009.

6               MR. THOMPSON:  Okay.  Thank you

7       very much.  I appreciate your time.

8               MR. ANDERTON:  We're not done.

9       I'm going to ask some questions.  Let's

10      go off the record.

11              THE VIDEOGRAPHER:  Off the

12      record, 2:45 p.m.

13              (Short recess.)

14              THE VIDEOGRAPHER:  Back on the

15      record at 2:48 p.m.

16  BY MR. ANDERTON:

17      Q    Ms. Sherwani, my name is Michael

18  Anderton.  I'm here on behalf of the Actavis

19  defendants.  And I am going to take a few

20  minutes to ask you some questions as well.

21  Okay?

22      A    Sure.

23      Q    And I'll be brief on each subject.

24  Will you find in your pile of exhibits

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

205

1    Exhibit 222?  It's the product complaint form

2    that you gave some testimony about previously.

3    Right there.

4              Do you remember Mr. Miller, I

5    believe, asked you about the product numbering

6    or -- I'm sorry -- the complaint numbering set

7    forth at the top right corner of this first

8    page?

9         A    Yes.

10        Q    And asked you to confirm that the

11   3790 indicated that that's the 3,790th

12   complaint for 2008?

13        A    Correct.

14        Q    How many of the Digitek

15   complaints -- you gave some earlier testimony

16   about the volume of Digitek complaints.  What

17   is your experience or what was your experience

18   about the volume of Digitek product complaints

19   pre recall versus post recall of Digitek?

20        A    Oh, it was in -- phenomenal.  There

21   were -- prior to the recall, there were

22   perhaps a handful; whereas, after the recall,

23   it just skyrocketed.

24        Q    So, for example, the 3,790

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

206

1    complaints or 3,789 complaints that preceded

2    the one that is reflected in Exhibit 222, do

3    you have a recollection of approximately how

4    many, what percentage of those were Digitek

5    complaints?

6         A    The majority of them were Digitek

7    complaints.

8         Q    Well, the majority could be

9    51 percent.  Was it higher than --

10        A    Yeah, it was definitely higher.  I

11   would probably say 95-plus percent post recall

12   were related to digoxin.

13        Q    And of those 95 percent that were

14   digoxin-related, how many of those were post

15   recall?

16        A    The majority of them.

17        Q    Again, the majority, is that over

18   half or is it --

19        A    Oh, absolutely, yes.

20        Q    You talked about -- and I know

21   you've now been asked questions by Mr. Miller

22   and Mr. Thompson about the expansion of the

23   Digitek recall from one lot to a single lot.

24   You've given some testimony about your

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

207

1    involvement and about a conversation or a

2    statement you made in an e-mail about the

3    recall expanding from one lot to all lots.  I

4    did want to follow up on that and ask a few

5    additional questions just to make sure the

6    record is clear, at least in my mind.

7              When you testified about it, about

8    the recall initially, you testified that the

9    decision to recall Digitek was a voluntary

10   decision made by the company; correct?

11        A    Correct.

12        Q    When you spoke with the FDA -- well,

13   let me strike that.

14             The decision to expand it from a

15   single lot to all lots, was that a voluntary

16   decision made by the company?

17        A    Let me clarify that.

18        Q    Please.

19        A    Where I was involved, I actually

20   received a call from the recall coordinator

21   that indicated to me that I had to issue a

22   press release not just for that one lot, but

23   we were going to have to expand the recall to

24   all lots for both strengths.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

208

1           And I was taken aback.  I asked why.

2    And I never got a reason except the recall

3    coordinator from the FDA indicating that she

4    had spoken to Robert Wessman and he had agreed

5    to the voluntary recall of all lots.

6           Q    You gave some testimony about filing

7    field alert reports.  Do you remember that

8    testimony?

9           A    Yes.

10          Q    Under what circumstances, again,

11   generally -- first, under what circumstances

12   to the extent you were involved in filing

13   field alert reports, what would prompt the

14   company to file a field alert report?

15          A    A field alert report is issued when

16   you have a significant quality issue related

17   to a lot or lots of product that have been

18   distributed to the market.

19          Q    So product that is in the market?

20          A    Correct.

21          Q    If you have a quality issue that

22   doesn't -- that doesn't relate to product that

23   was distributed to the market, to defective

24   product that was distributed to the market,

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

209

1    would that require filing a field alert

2    report?

3         A    No.

4         Q    So if you have an

5    out-of-specification result, for example, you

6    identify the out-of-specification result and

7    deal with it from a quality assurance

8    perspective and that product -- and no

9    defective product goes to market, would you

10   issue a field alert report in that context?

11        A    No.  Unless it's marketed to --

12   unless it's distributed to the market, it is

13   not the subject of a field alert.

14        Q    Thank you.  Will you find

15   Exhibit 217 and at the same time Exhibit 141.

16             All right.  Exhibit 217 is an e-mail

17   that -- well, it includes two e-mails, as I

18   read it, but the last of which is an e-mail

19   from you -- and I don't have the correct copy,

20   but I think it was Chris Jensen.  I don't have

21   the correctly marked copy -- dated April 15,

22   2008; correct?

23        A    Yes.

24        Q    And in that e-mail, you forwarded

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

210

1      to -- and I'm sorry.  Who did you send that

2      to?  That's missing from that copy as well.

3                    MR. ANDERTON:  Where is your

4           copy of 217, Mr. Miller?  Just so I

5           can -- can I work from that for the

6           moment?

7                    MR. MILLER:  I don't believe

8           any of them have the "to" line.

9                    MR. ANDERTON:  One of them did.

10          One of them did.

11                   MR. MILLER:  I don't believe

12          so.  Can I get my copy back?

13                   MR. ANDERTON:  Yes, you can.

14     BY MR. ANDERTON:

15          Q    And you testified about the

16     attachment.  Do you remember talking about the

17     attachment that reflects investigations that

18     had been -- that had occurred from

19     September 5, 2007, up to sometime prior to

20     you -- to the time you sent this?

21          A    Yes.

22          Q    The attachment to your April 15

23     e-mail, do you know when that was actually

24     created?

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

211

1          A     No, I don't.  I don't recall.

2          Q     So you don't know the cutoff date,

3     if you will, for investigations and what could

4     be included, what would be excluded just

5     because it might have been started at or after

6     the time this list was created?

7          A     Agreed.

8          Q     And turning to Exhibit 141, does

9     that document indicate the date of occurrence

10    for the underlying circumstances?

11         A     Yes.

12         Q     And what is that date?

13         A     April 1st, 2008.

14         Q     And "date of occurrence" means what?

15         A     The date that the supposed

16    discrepancy occurred.

17         Q     And does that mean that's the date

18    the investigation was opened?

19         A     Not necessarily.

20         Q     How long typically after that until

21    an investigation is opened?

22         A     It honestly depends on when the

23    discrepancy was observed or noticed by

24    someone.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

212

1        Q     Okay.  Well, assuming that the
2    occurrence -- well, all right.  Is there any
3    way to tell whether the attachment in
4    Exhibit 217 was prepared after or before the
5    occurrence and the investigation opened in --
6    before Investigation 08-060 was opened?
7        A     No, I can't.  No.
8        Q     I want you now to find,
9    Ms. Sherwani, the Exhibits 220 and 221,
10   please, and I'm going to ask you some
11   questions about those.
12             Exhibit 220 is a cover letter from
13   the office of Dr. Leikin with the attached
14   Digitek or digoxin health hazard evaluation.
15             Do you remember testifying about
16   those documents?
17       A     Yes.
18       Q     If you look at the health hazard
19   evaluation that is attached to the cover
20   letter from Dr. Leikin's offices that is part
21   of Exhibit 220 -- well, looking at both of
22   these documents together, is there any way to
23   tell when the company received this health
24   hazard evaluation?

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

213

1        A     Well, I mean, the first page

2    indicates that it was sent via FedEx on

3    April 25th.

4        Q     Sent via Federal Express overnight;

5    correct?

6        A     Correct.

7        Q     So the earliest the company could

8    have received that health hazard evaluation

9    was April -- the one that's attached to this

10   letter was April 26th, 2008?

11       A     That would be right.

12       Q     Okay.  And turning to Exhibit 221

13   now, do you remember giving some testimony

14   about the recall package?

15       A     Yes.

16       Q     If you would turn to Bates Page

17   No. 28213, and you remember that that is the

18   press release the company issued.  What's the

19   date of that press release?

20       A     April 25th.

21       Q     Is that before the company received

22   the health hazard evaluation that is set -- or

23   that is part of Exhibit 220?

24       A     It appears to be, yes.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

214

1      Q    Turning to Bates Page 28208 of the
2  recall packet, which is Exhibit 221, do you
3  remember giving some testimony about that
4  document?
5      A    Yes.
6      Q    What's the date of that document?
7      A    April 28th, 2008.
8      Q    Is that after the company received
9  the health hazard evaluation that is part of
10 Exhibit 220?
11     A    It would appear to be, yes.
12     Q    And does the document that is -- or
13 I'm sorry.  Yeah.  Does the document that is
14 set forth at Bates Page 28208, does it contain
15 the additional language Mr. Miller was asking
16 you questions about with respect to, as
17 Mr. Miller put it, identifying potentially two
18 different classes of people?
19          And if you need a moment to compare
20 the two, please do.
21     A    Yes.
22     Q    So Mr. Miller focused on the -- and
23 I want to get this correct -- the second
24 sentence of the fourth paragraph of the health

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

215

1    hazard evaluation that refers to the two

2    classes of people being those with renal

3    insufficiency or those taking daily doses.

4         A    Correct.

5         Q    The same language appears in the

6    April 28, 2008, document that the company

7    prepared after receiving this health hazard

8    evaluation, doesn't it?

9         A    Yes.

10                   MR. ANDERTON:  I have no

11              further questions.  Thank you.  I'm sure

12              Mr. Miller will have a few more now that

13              I've --

14                   MR. MILLER:  I do.  Five

15              minutes.

16    BY MR. MILLER:

17         Q    Ma'am, only a couple of follow-up

18    questions on going back to the recall package

19    that you signed and approved for the FDA on

20    May 23rd of 2008.  I believe you have a copy

21    of it in front of you?

22         A    Yes.

23         Q    Am I correct in saying that all

24    these documents were together, all

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

216

1     attachments, when you approved this on

2     May 23rd of 2008?

3          A    Yes.

4          Q    So if we look at Actavis

5     Page 0028213, you would agree with me that you

6     approved this document with this news release

7     that included the line in the third paragraph

8     that starts with "Digitek":  "Digitek is used

9     to treat heart failure and abnormal heart

10    rhythms"; the next sentence being:  "The

11    existence of double strength tablets poses a

12    risk of digitalis toxicity in patients with

13    renal failure"?

14              And you agree that you approved this

15    document with this statement when, in fact,

16    you did have a copy of the health hazard

17    evaluation from Dr. Leikin; is that correct?

18              MR. ANDERTON:  Objection;

19         mischaracterizes the facts.

20              You may answer.

21              THE WITNESS:  I'm sorry.  I'm

22         not understanding.

23              MR. MILLER:  Would you read

24         that back, please.

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

217

```
 1                    (The court reporter read the
 2           preceding question.)
 3                    THE WITNESS:  I don't -- again,
 4           this press release was issued on
 5           April 25th of 2008.
 6   BY MR. MILLER:
 7           Q    Yes.
 8           A    And apparently this health hazard
 9   assessment was received by Actavis, based on
10   the copy that I have here, around April 26th.
11           Q    Okay.  And my -- but if you look --
12   look at Actavis 28205.
13           A    Okay.
14           Q    28205.
15           A    Oh, 205.  I'm sorry.  Okay.
16           Q    And that is an attachment,
17   Attachment V, which you would agree is a copy
18   of the health hazard evaluation; correct?
19           A    Correct.
20           Q    And you had this document on
21   May 23rd when this recall package was approved
22   by you?
23           A    I had the copy of this health hazard
24   evaluation, yes.
```

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

218

1        Q    And at the same time you also had a

2   copy of the news release as part of this

3   recall package?

4        A    Yes.

5        Q    You were asked what would prompt a

6   field alert.  And correct me if I'm wrong, but

7   I believe you stated that it would be a

8   significant quality issue with a product that

9   was distributed to the market; is that

10  correct?

11       A    Correct.

12       Q    Is that also a valid reason to

13  conduct a recall?

14       A    Not necessarily.

15       Q    Was Digitek recalled because there

16  was a significant quality issue with the

17  product that was distributed to the market?

18            MR. ANDERTON:  Objection; asked

19       and answered multiple times.

20  BY MR. MILLER:

21       Q    It's okay to answer.

22            MR. ANDERTON:  You may answer

23       if you know.

24            THE WITNESS:  I don't know the

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

219

1          reason.

2                    MR. MILLER:  That's all I have.

3                    MR. ANDERTON:  No, no further

4          questions from me.

5                    THE VIDEOGRAPHER:  This

6          completes Videotape 3.  Off the record at

7          3:08 p.m.

8                    (Whereupon the deposition

9          adjourned at 3:08 p.m.)

10                        -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

220

CERTIFICATE

I HEREBY CERTIFY that the
witness was duly sworn by me and that the
deposition is a true record of the testimony
given by the witness.

It was requested before
completion of the deposition that the witness,
MISBAH SHERWANI, have the opportunity to read
and sign the deposition transcript.

_____
KIMBERLY A. OVERWISE
Certified Realtime Reporter
Notary Public
Dated:  March 30, 2010

(The foregoing certification of
this transcript does not apply to any
reproduction of the same by any means, unless
under the direct control and/or supervision of
the certifying reporter.)

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

221

1                    INSTRUCTIONS TO WITNESS

2

3              Please read your deposition over

4    carefully and make any necessary corrections.

5    You should state the reason in the appropriate

6    space on the errata sheet for any corrections

7    that are made.

8                    After doing so, please sign the

9    errata sheet and date it.

10                   You are signing same subject to the

11   changes you have noted on the errata sheet,

12   which will be attached to your deposition.

13                   It is imperative that you return the

14   original errata sheet to the deposing attorney

15   within thirty (30) days of receipt of the

16   deposition transcript by you.  If you fail to

17   do so, the deposition transcript may be deemed

18   to be accurate and may be used in court.

19

20

21

22

23

24

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

222

1                         E R R A T A   S H E E T

2                               - - - - - -

3

4      PAGE    LINE        CHANGE

5      _____   _____       _____

6              REASON:     _____

7      _____   _____       _____

8              REASON:     _____

9      _____   _____       _____

10             REASON:     _____

11     _____   _____       _____

12             REASON:     _____

13     _____   _____       _____

14             REASON:     _____

15     _____   _____       _____

16             REASON:     _____

17     _____   _____       _____

18             REASON:     _____

19     _____   _____       _____

20             REASON:     _____

21     _____   _____       _____

22             REASON:     _____

23     _____   _____       _____

24             REASON:     _____

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

223

ACKNOWLEDGMENT OF DEPONENT

I, MISBAH SHERWANI, do hereby
certify that I have read the foregoing pages,
1-222, and that the same is a correct
transcription of the answers given by me to
the questions therein propounded, except for
the corrections or changes in form or
substance, if any, noted in the attached
Errata Sheet.


_____        _____
MISBAH SHERWANI                      DATE




Subscribed and sworn
to before me this
_____ day of _____, 2010.

My commission expires:_____


_____
Notary Public

Misbah Sherwani
Confidential – Subject to Further Confidentiality Review

224

LAWYER'S NOTES

PAGE  LINE

1  _____  _____  _____

2  _____  _____  _____

3  _____  _____  _____

4  _____  _____  _____

5  _____  _____  _____

6  _____  _____  _____

7  _____  _____  _____

8  _____  _____  _____

9  _____  _____  _____

10  _____  _____  _____

11  _____  _____  _____

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  _____  _____

16  _____  _____  _____

17  _____  _____  _____

18  _____  _____  _____

19  _____  _____  _____

20  _____  _____  _____

21  _____  _____  _____

22  _____  _____  _____