# EXHIBIT 4

Page 1

1        IN THE DISTRICT COURT OF OKLAHOMA COUNTY
                    STATE OF OKLAHOMA

2

3              CASE NO: CJ-2009-5292

4

5    SAM JOHNSON, as Personal Representative
     Of the Estate of Martha Bea Johnson, deceased,

6
              Plaintiff,

7

     vs.

8

     ACTAVIS TOTOWA, L.L.C., formerly known as

9    Amide Pharmaceuticals, Inc., MYLAN BERTEK
     PHARMACEUTICALS, INC., UDL LABORATORIES, INC.,

10   WAL-MART, INC., McBRIDE CLINIC ORTHOPEDIC
     HOSPITAL, INC.,

11
              Defendants.

12   _____/

13

14

                         401 2nd Street East
15                       Indian Rocks
                         Beach, FL 33785
16                       September 19, 2011
                         9:15 a.m. to 5:15 p.m.

17

18     VIDEOTAPE DEPOSITION OF DAVID BLIESNER, Ph.D.

19

20

21       Taken on behalf of the Defendants before

22   PHILIP RYAN, RPR, Court Reporter, Notary Public in

23   and for the State of Florida at Large, pursuant to

24   Defendants' Notice of Taking Deposition in the

25   above cause.

Page 2

```
 1    APPEARANCES:
 2    R. BRAD MILLER, ESQUIRE
      Durbin, Larimore & Bialick
 3    920 North Harvey
      Oklahoma City, OK 73102-2610
 4    (405) 235-9584
 5              Attorney for Plaintiff
 6    MICHAEL ANDERTON, ESQUIRE
      SETH H. WAMELINK, ESQUIRE
 7    Tucker, Ellis & West, LLP
      1150 Huntington Building
 8    925 Euclid Avenue
      Cleveland, OH 44115
 9    (216) 592-5000
10              Attorneys for Defendant
                Actavis Totowa, LLC,
11              Actavis Inc. and Actavis Elizabeth, LLC
12    ALICIA J. DONAHUE, ESQUIRE
      Shook, Hardy & Bacon, LLP
13    333 Bush Street
      Suite 600
14    San Francisco, CA 94014-2828
      (415) 544-1900
15
                Attorney for Defendant
16              Mylan Pharmaceuticals, Mylan, Inc.,
                Mylan Bertek Pharmaceuticals, and
17              UDL Labs
18    HAROLD ZUCKERMAN, ESQUIRE
      Eldrich, Cooper, Steichen & Leach, PLCC
19    110 West 7th Street
      Suite 200
20    Tulsa, OK 74119
      P.O. Box 3566
21    Tulsa, OK 74101-3566
      (918) 388-5555
22
                Attorney for Defendants
23
24    ALSO PRESENT:
25              Larry Tambini, videographer
```

1                            INDEX

2                                              PAGE

DIRECT EXAMINATION:

3   BY MR. ANDERTON                             5

    BY MS. DONAHUE                            235

4   FURTHER DIRECT EXAMINATION

    BY MR. ANDERSON                           264

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                        EXHIBIT INDEX

2                                                    MAR

Defendant's Exhibit

3      492    Folder with various documents.        30

4      493    Binder.                              171

5      494    Binder.                              174

6      495    Binder.                              174

7      496    E-mail from Terry Kilpatrick to DMB   189
              and others, dated August 22, 2011.

8

       497    UDL Internal Investigation record.    248

9

       498    Supply and distribution agreement.    259

10

       499    USB hard drive (with yellow stickie   280

11            marked lawyer attached)

12     Note:  The following were not marked by this court
       reporter but are included below for ease of

13     reference.

14     Plaintiff's Exhibit 253, Plaintiff's Exhibit 126,
       Plaintiff's Exhibit 16, Plaintiff's Exhibit 113,

15     Plaintiff's Exhibit 91, Plaintiff's Exhibit 139

16     Defendants' Exhibit 92, Defendants' Exhibit 620,
       Defendants' Exhibit 487.

17

       Documents referred to as M14 and M69.

18

19

20

21

22

23

24

25

1           THE VIDEOGRAPHER:  My name is Larry

2      Tambini of Veritext.  Today is September 19,

3      2011.  The time is approximately 9:15 a.m.

4      This deposition is being held at the Holiday

5      Inn located at 401 Second Street East, Indian

6      Rocks Beach.  The caption of the case is Sam

7      Johnson, personal rep. of the Estate of Martha

8      B. Johnson versus Actavis Totowa, et al., in

9      the District Court of Oklahoma County.  The

10      name of the witness is David Bliesner, Ph.D.

11           At this time will the attorneys please

12      introduce themselves for the record.

13           MR. MILLER:  Brad Miller for Plaintiff.

14           MR. ZUCKERMAN:  Harold Zuckerman, local

15      counsel for all defendants.

16           MS. DONAHUE:  Alicia Donahue, Shook,

17      Hardy & Bacon on behalf of the Mylan

18      defendants and UDL Labs.

19           MR. WAMELINK:  Seth Wamelink of Tucker,

20      Ellis & West For the Actavis Defendants.

21           MR. ANDERTON:  Michael Anderton from

22      Tucker, Ellis & West for the Actavis

23      Defendants.

24           THE VIDEOGRAPHER:  And would the court

25      reporter please swear in the witness?

Page 6

```
 1

 2    Thereupon:

 3                    DAVID BLIESNER, Ph.D.,

 4    Was called as a witness and, having been first

 5    duly sworn and responding "I do," was examined and

 6    testified as follows:

 7                    DIRECT EXAMINATION

 8    BY MR. ANDERTON:

 9        Q.    Good morning, Dr. Bliesner.

10        A.    Good morning, sir.

11        Q.    How are you?

12        A.    Okay.

13        Q.    You remember me, I trust?

14        A.    Yes, sir.

15        Q.    Okay.  As I just indicated, I am here on

16    behalf of the Actavis Defendants.  And you've been

17    deposed at least twice before that I know of --

18    we're going to ask you whether you've been deposed

19    in any other circumstance other than those two --

20    so I know you've been through the process with me

21    and with other colleagues of mine at least in the

22    last eight or nine months.  But I think it's

23    always good to kind of refresh and go over some of

24    the ground rules, if you will, before we start;

25    okay?
```

1      A.    Yes, sir.

2      Q.    All right.  So, most importantly -- from

3  my perspective at least -- if you -- if I ask you

4  a question, Dr. Bliesner and for whatever reason

5  you think you'd like me to restate it or rephrase

6  it, if you don't understand my question, if it

7  comes off poorly -- and that will happen from time

8  to time -- or if there's any reason at all you'd

9  like me to ask it again, please let me know that.

10     If you answer -- if I ask a question and you

11  answer it, I will assume that you understood it;

12  okay?

13     A.    Yes, sir.

14     Q.    I need verbal answers.  So -- I know

15  you're pretty good at that.  I know last time I

16  examined you about six months ago, seven months

17  ago, there were a couple of times where -- where

18  you forgot and didn't give verbal answers, but

19  that's easy to fix.

20     So you need to remember to respond verbally

21  because the court reporter can't take down nods of

22  the head or shakes of the head; okay?

23     A.    I understand.

24     Q.    Will you state your name and spell it

25  for this record, please.

1    that.

2         Q.    Okay.

3         A.    I did see some bits and pieces of

4    methods and stuff, but on the grand scheme of

5    things, no.

6         Q.    Okay.  Dr. Bliesner, if we can pick up

7    the document marked as Exhibit 620.

8         A.    Yes.

9         Q.    That is the supplemental declaration

10   that we talked about several hours ago now.  Do

11   you remember --

12        A.    That is correct.

13        Q.    -- our initial conversation about that?

14        A.    I do.

15        Q.    Okay.  That contains sworn testimony

16   that you've given in the MDL; right?

17        A.    It does.

18        Q.    Does that document also reflect opinions

19   that you intend to testify about in this case?

20        A.    This document reflects opinions that

21   I've already expressed in the report.

22        Q.    So it's your opinion that that document

23   doesn't enhance or supplement the opinions you've

24   expressed in your report in any way?

25        A.    I haven't thought of it in those terms.

Page 185

1    It was a response to the question that was put by

2    your -- I think it was your organization.

3         Q.    I didn't have anything to do with

4    preparation of that declaration.  You understand

5    that; right?

6         A.    There was a -- I believe it's in the

7    folder.  What's it called?

8         Q.    It's a motion.

9         A.    A motion, yes.  And --

10        Q.    Well, just tell me what you know about

11   that.

12        A.    It was a response to the motion.

13        Q.    Okay.  How did that document come to be?

14        A.    This document came to be?

15        Q.    Yeah.

16        A.    I received a telephone call from -- was

17   it either Mr. Kilpatrick or Mr. Kerensky --

18        Q.    Okay.

19        A.    -- saying that there was a -- motion,

20   did you call it?

21        Q.    Correct.

22        A.    Yes.  To come out that needed to be

23   addressed.

24        Q.    Okay.

25        A.    Uh-huh.

Page 186

1      Q.    So how did we get from that telephone
2  call to that document?
3      A.    They sent me the motion.
4      Q.    And?
5      A.    And had me read it and think about it
6  and then we had a teleconference.
7      Q.    Okay.
8      A.    And they said, how would you address
9  point, whatever point, whatever point, whatever.
10     Q.    Okay.  We still don't have a declaration
11 as you've described it.  How did we get to
12 actually existing of a document?
13     A.    That document was -- with my input, a
14 draft was created by either one of those two to
15 put it in proper legal format, because they
16 realized that I didn't know anything about doing a
17 motion.  And it was sent back to me once or twice,
18 I think, and asked to review input, modify, review
19 the depositions to make sure that it matched my
20 input to fit this legal framework.
21     Q.    Did you review that document carefully
22 before you signed it?
23     A.    I thought at the time that I reviewed it
24 very carefully, but I noticed when I looked at it
25 the other day there's a typo or two.

1      Q.    Did you review it carefully for

2   substantive content?

3      A.    I did.

4      Q.    Have you seen -- by the way -- well, did

5   you discuss this document with Mr. Miller this

6   past weekend?

7      A.    Yes.

8      Q.    Did he have a copy or did you give him a

9   copy?

10     A.    I'm not sure, but I think I gave him a

11  copy.

12     Q.    Did you give him a copy before this

13  weekend?

14     A.    No.

15     Q.    You gave it to him this weekend?

16     A.    Uh-huh.

17     Q.    Is it your understanding that he had not

18  seen it before that time?

19     A.    I believe that he had not seen it before

20  this time.

21     Q.    What did you talk about it -- with

22  Mr. Miller, how did you discuss this declaration?

23     A.    He took a look at it, pointed out a

24  couple of things -- which I don't recall

25  specifically what they were -- and said looks like

Page 188

1    the report to me.

2         Q.    Okay.  Back to my question.  Did you

3    review that document carefully for substantive

4    content before you signed it?

5         A.    I did review it carefully for

6    substantive content.

7         Q.    Have you seen -- you said that you

8    saw --

9         A.    And the -- no, I'm sorry.

10        Q.    You said that you saw the motion --

11        A.    Yes.

12        Q.    -- that prompted Plaintiff's counsel in

13   the MDL to ask you to prepare this document.

14        A.    Yes.

15        Q.    Have you seen what are referred to as

16   the reply briefs that were filed after Plaintiff's

17   in the MDL filed their opposition?

18        A.    I'm sorry.  I missed that progression of

19   things.

20        Q.    Yeah.  I'll walk you through it.

21        A.    Okay.

22        Q.    You got a motion from the Plaintiffs in

23   the MDL, and they said, as you characterized it,

24   take a look at this, tell me how you might respond

25   to some of these things.  Is that a fair --

Page 189

1       A.      Respond to all of them, actually.

2       Q.      Okay.

3       A.      Uh-huh.

4       Q.      You understood at that time that the

5    declaration that you're looking at was going to be

6    filed with the court by the Plaintiffs as part of

7    their opposition to the motion?

8       A.      I believe I understood that, yes.

9       Q.      Okay.  And you know that now, right?

10      A.      Yes, I do know that now.

11      Q.      You know that it has been filed?

12      A.      No, I was not completely aware that it's

13   been filed.  But it's been filed.

14      Q.      But you knew that it was going to be?

15      A.      Yes, I did.

16      Q.      Okay.  And did you know then that the

17   Defendants replied to that opposition?

18      A.      The Defendants being?

19      Q.      The Actavis and Mylan and the others.

20      A.      No.

21      Q.      You did not know that?

22      A.      I did not know that.

23      Q.      Have you discussed any of those replies

24   with Plaintiff's counsel?

25      A.      Which replies are we talking about?

Page 190

1     Q.    Any of the Defendants's replies that

2     they filed with the MDL court.

3     A.    Okay.   This being filed, then Defendants

4     responded to -- yeah, after, after this was

5     signed --

6     Q.    Yes.

7     A.    -- I had no more conversations about it.

8     Q.    Okay.

9     A.    That I know of.

10    Q.    You've not spoken -- to the best of your

11    recollection, you've not spoken to the lawyers in

12    the MDL about the affidavit, the motion, the

13    circumstances around the affidavit, since that was

14    filed?

15    A.    Since it was filed.

16    Q.    Is that right?

17    A.    Not spoken to them, no.

18    Q.    Okay.

19    A.    There may be an e-mail saying thanks,

20    we're done.

21    Q.    Okay.

22    A.    But other than that, no conversation.

23    Q.    I apologize.   And to the best of your

24    recollection, you've not seen or reviewed any of

25    the reply briefs prepared and filed by Defendants?

Page 191

1        A.     As I understand, no.

2        Q.     Okay.

3               MR. ANDERTON:   Phil, would you mark this,

4        please?

5               (Defendants' Exhibit 496 was marked for

6        identification.)

7    BY MR. ANDERTON:

8        Q.     Dr. Bliesner, I'm handing you a document

9    that has been marked as Exhibit 496.   Have you

10   seen that document before?

11       A.     Yes.

12       Q.     It's an e-mail from Mr. Kilpatrick --

13       A.     Yes.

14       Q.     -- to you and some other folks.   Do I

15   read this accurately when I conclude from this

16   that they prepared an initial draft of this

17   declaration, the supplemental declaration, and

18   sent it to you for review and comment?

19       A.     Based on the conversation, the

20   teleconference, yes.

21       Q.     I understand.

22       A.     Yes.

23       Q.     But they prepared the initial draft?

24       A.     The draft, yes.   Put it in the proper

25   format to save time.   If I'm not mistaken, this

Page 192

1    was a very short timeline that was on this, yes.

2         Q.    Was -- the date of this e-mail is August

3    22.

4         A.    Uh-huh.

5         Q.    Was that the day you spoke to them about

6    this?  Do you know?

7         A.    I don't know.

8         Q.    Dr. Bliesner, you are, by training, an

9    analytical chemist?

10        A.    I am.

11        Q.    Will you take a look at the declaration

12   and turn to page 4?

13        A.    Yes.

14        Q.    You see that there are bullet points on

15   page 4?

16        A.    I do.

17        Q.    The fifth bullet point begins, "In

18   January 2008."  Do you see that?

19        A.    I do.

20        Q.    Do you see there that in this bullet

21   point you indicate that in January 28, there was

22   an internal e-mail at Mylan confirming two batches

23   of Digitek out-of-specification assays?

24        A.    I see that.

25        Q.    Okay.  Out of specification is a term

Page 193

```
 1   with meaning, isn't it?
 2        A.    It is.
 3        Q.    It means that the result is not within
 4   the approved specification, right?
 5        A.    That would be correct.
 6        Q.    Okay.  You see in your -- in that bullet
 7   point that you refer to Plaintiff's Exhibit M14.
 8   I'm handing you that same Exhibit M14.  If you'll
 9   read that to yourself and let me know when you've
10   read it.
11        A.    Carney 70 -- I'm sorry, to myself.
12   Okay.
13        Q.    Is this the document you're referring to
14   in that fifth bullet point on page 4?
15        A.    I'll look at my report.
16        Q.    Please.
17        A.    I believe that is.
18        Q.    Okay.  So -- by the way, in the body of
19   your report, do you mention this situation at all?
20        A.    This particular reference?
21        Q.    Yeah.
22        A.    I don't know.
23        Q.    Take your time.
24        A.    Can we take a break?
25        Q.    Of course.
```

1          THE VIDEOGRAPHER:  It is 2:37.  We're

2     going off the record.

3               (Discussion off the record.)

4          THE VIDEOGRAPHER:  This is tape number

5     5.  It is 2:45.  We are on the record.

6  BY MR. ANDERTON:

7     Q.    Dr. Bliesner, before we went off the

8  record, I asked you whether -- whether you refer

9  to the circumstances covered in the fifth bullet

10 point on page 4 of your declaration in the body of

11 your report.

12    A.    Okay.

13    Q.    You were undertaking that analysis, I

14 believe.

15    A.    I do not see it referenced in the body

16 of the report.

17    Q.    Okay.  So there is a reference to it at

18 page 57 of your report; correct?

19    A.    That is correct.

20    Q.    And at page 57, you refer to the assay

21 values discussed in Plaintiff's Exhibit M14 as

22 low; right?

23    A.    In the report here?

24    Q.    Yeah.

25    A.    It states I have low assay, right.

Page 195

1    Q.    Okay.  And that is consistent with the

2    information in Exhibit M14; right?

3    A.    That is correct.

4    Q.    The assay -- acceptable USP assay range

5    for this product is 90 to 105 percent?

6    A.    90 to 105 percent.

7    Q.    Right.  You are aware of that, right?

8    A.    I'll take your word for it without

9    looking at it.

10   Q.    Okay.  96.2 is within that range, isn't

11   it?

12   A.    It is.

13   Q.    97.3 is within that range?

14   A.    It is.

15   Q.    Turn back to your affidavit, the fifth

16   bullet point on page 4.

17   A.    Yes.

18   Q.    That says, "Confirms two batches of

19   Digitek tablets with out-of-specification assays."

20   Is that accurate?

21   A.    That's an incorrect statement.

22   Q.    Okay.  So this is sworn testimony?

23   A.    It is.

24   Q.    That's incorrect?

25   A.    Yes.  It's an error.

Page 196

1      Q.    And you're an analytical chemist?

2      A.    I am an analytical chemist.

3      Q.    Certainly capable of recognizing when an

4  assay value is in or out of specification?

5      A.    I'm capable of recognizing that, yes.

6      Q.    So when you reviewed this affidavit

7  drafted by Plaintiff's counsel --

8          MR. MILLER:  Let's be clear about who

9      you're talking about.

10         MR. ANDERTON:  Fair enough.  Good point.

11  BY MR. ANDERTON:

12     Q.    When you reviewed this affidavit drafted

13  by the Plaintiff's lawyers in the Digitek MDL --

14         MR. MILLER:  By the way, you also agreed

15     to call it a declaration, for whatever it's

16     worth.

17         MR. ANDERTON:  Good point.  Let me try

18     again.

19         MR. MILLER:  Come on, see if I can get

20     one more.

21         MR. ANDERTON:  Just pull the string.

22  BY MR. ANDERTON:

23     Q.    Dr. Bliesner, I want to take this very

24  seriously because I do take it very seriously.

25     A.    I understand.

Page 197

1      Q.    When you reviewed the draft declaration,

2      the supplemental declaration, drafted by the

3      Plaintiff's lawyers in the MDL, you obviously

4      didn't catch that, did you?

5      A.    I did not catch that, no.

6      Q.    If you had seen that and reviewed it

7      carefully, would you have changed it?

8      A.    I did review it carefully, but I did not

9      pick that up.  And if I'd have seen it, I would

10     have changed it.

11     Q.    Okay.  So that is --

12     A.    That's an incorrect statement.

13     Q.    Okay.

14     A.    Based on the, the exhibit.

15     Q.    And does that maybe shed some light on

16     why you didn't reference it in the body of your

17     report?

18     A.    No, I don't think there's any connection

19     to that at all.

20     Q.    Well, you were analyzing Actavis's

21     quality systems particularly or specifically with

22     respect to Digitek.  This is product in the hands

23     of UDL; right?

24     A.    It appears it is product in the hands of

25     UDL.

1       Q.     If you had known that product was in the

2     hands, that's out the door --

3       A.     I understand.

4       Q.     -- of Actavis --

5       A.     I understand.

6       Q.     -- you wouldn't have made the mistake of

7     characterizing it as out of specification, and you

8     wouldn't have missed it when you prepared your

9     report if, in fact, it was out of specification,

10    would you have?

11      A.     Run that by me again, please.

12      Q.     If you had seen out-of-specification

13    product out of Actavis's plant in the hands of

14    UDL, you would have referenced that in the body of

15    the report, wouldn't you?

16      A.     I think that's a fair statement, yes.

17      Q.     Okay.  Does the word "defect" have

18    substantive meaning?

19      A.     To who?

20      Q.     To you.

21      A.     To me?

22      Q.     As an analytical chemist?

23      A.     Defect?  It does.

24      Q.     Is defect -- do you use the term defect

25    to mean out of specification?

Page 199

1      A.     It can.

2      Q.     Do you use it when something's not out

3  of specification?

4      A.     I don't know if I ever have or not.

5      Q.     Okay.  How long have you been an

6  analytical chemist in this industry?

7      A.     Since 1992.

8      Q.     Okay.  So 19 years?

9      A.     Uh-huh.

10      Q.     You don't think you've ever used the

11  word defect to refer to something that's not out

12  of specification; am I right?

13      A.     Probably not, no.

14      Q.     I'm right that you probably have not

15  done that, right?  Let's make sure this is clear.

16  I said it poorly.  I messed up your answer.  I

17  apologize.

18      What I understand you to say is that you don't

19  believe in 19 years of being an analytical chemist

20  in this industry that you have used the word

21  "defect" when referring to something that is not

22  out of specification; is that a correct statement?

23      A.     I wouldn't make that broad a statement.

24      Q.     Do you remember ever doing that?

25      A.     I don't recall anything right now, but

Page 200

1    it's a broad statement.

2        Q.    Okay.  Hold on one second.

3        Dr. Bliesner, I'm going go to hand you a

4    document that's marked as Exhibit 253.  It's

5    actually Plaintiff's Exhibit 253.  This was from

6    the MDL.  Can you look at your declaration?

7        A.    Yes.

8        Q.    And the top of page 4, the first bullet

9    point at the top of page 4, the declaration,

10   Dr. Bliesner?

11       A.    Yeah.

12       Q.    Do you see that there's a reference in

13   there to PLX 253 in that bullet point?

14       A.    Yes.

15       Q.    Is that Plaintiff's Exhibit 253?

16       A.    It is.

17       Q.    Okay.  And, again, looking at

18   Plaintiff's Exhibit 253 -- give me one second.  Go

19   to the last page of Exhibit 253.

20       A.    Yes.

21       Q.    Do you see the discussion there at the

22   last substantive paragraph on that page that

23   begins, "All data was reviewed"?

24       A.    Could you say that again?  I'm sorry.

25       Q.    Yeah.  Do you see the last substantive

Page 201

1    paragraph on that page that reads, "All data was

2    reviewed"?

3         A.    Uh-huh.

4         Q.    Read that sentence -- read the first,

5    I'm sorry, two sentences to yourself.  You don't

6    need to read them out loud.

7         A.    Okay.

8         Q.    You see that that first -- or, I'm

9    sorry, that second sentence refers to Batch 60319?

10        A.    Yes.

11        Q.    What does it say with respect to that

12   batch?

13        A.    I'm sorry.  Say that again.

14        Q.    Yeah.  What does the second sentence say

15   with respect to 60319?  It says, "The final blend

16   assay standard deviation was higher than other

17   batches reviewed," right?

18        A.    Correct.

19        Q.    Is that out of specification?

20        A.    I'm not familiar with what the

21   specification was, looking right at this document.

22        Q.    Well, if you turn to your report --

23        A.    Yes.

24        Q.    -- at page 43.

25        A.    Yes.

Page 202

1        Q.    You see your reference A27 there?

2        A.    I do.

3        Q.    You see your discussion of this issue,

4    that standard deviation being higher than other

5    batches?

6        A.    I do.

7        Q.    Do you characterize that as defective?

8        A.    As it's written here, it's just, from

9    what I can see, assay standard deviation is 4.5

10   percent higher than the other batches.   That's all

11   the statement means.

12       Q.    It's not 4.5 percent higher.   It is 4.5

13   percent and it is higher than other batches?

14       A.    Okay.

15       Q.    So it's not higher by a matter of 4.5

16   percent; correct?

17       A.    The standard deviation is 4.5 percent.

18       Q.    Which is itself higher than other

19   batches; right?

20       A.    That's correct.

21       Q.    Okay.   You don't say anything there

22   about defect?

23       A.    No.

24       Q.    And Exhibit 253 doesn't say anything

25   there about defect or out of specification?

1          A.     No, Exhibit 253 does not.

2          Q.     Okay.  Yet in your affidavit -- I'm

3     sorry, in your declaration, the first bullet point

4     on page 4, you refer to that as "blend uniformity

5     defects."  Do you see that?

6          A.     I do.

7          Q.     You didn't draft that, did you?

8          A.     What do you mean?

9          Q.     That bullet point.

10         A.     That bullet point?

11         Q.     Yeah.

12         A.     The draft was taken out of here and put

13    into the report.

14         Q.     You didn't do that?

15         A.     That actual bullet point, it was part of

16    the conversation that we had together.

17         Q.     Did you tell them that that was

18    defective?

19         A.     Did I tell them that what was

20    defective?

21         Q.     Plaintiff's lawyers in the MDL that that

22    standard deviation was a blend uniformity defect?

23         A.     Not that I recall specifically.

24         Q.     But you signed sworn testimony

25    indicating that it was.

Page 204

1      A.    It's an error.

2      Q.    Another error.

3      Did you read Dan Bitler's testimony or his

4  deposition before you prepared your report?

5      A.    Report, back to the original report?

6      Q.    Yes, the original report to your left

7  hand there.

8      A.    Uh-huh.

9      Q.    Do you recall reading Dan Bitler's

10  deposition testimony before you prepared that

11  report?

12          MR. MILLER:  I'm going to have to object

13      to the form because I don't know which time

14      you're talking about he testified.

15  BY MR. ANDERTON:

16      Q.    So Mr. Miller makes a good point.

17  Mr. Bitler has been deposed multiple times in

18  connection with various Digitek litigations.  Once

19  in the MDL, maybe more than once in the MDL, and

20  once by Mr. Miller himself about a year ago,

21  actually, in this case specifically.

22      Do you remember reading Mr. Bitler's report

23  before you prepared -- reading Mr. Bitler's

24  deposition testimony as he was deposed in the

25  Digitek MDL, before you prepared your report?

Page 205

1      A.     I don't recall that.  I would have to go
2    back and look.
3      Q.     Say that again.
4      A.     I'd have to go back and look
5    specifically.
6      Q.     You placed good -- not good, but you
7    placed a fair amount of significance on the notion
8    that Actavis had the same people in positions of
9    leadership for a long period of time; right?
10      A.     Yes.
11      Q.     And turn to page 19 of your report.  You
12    see the paragraph that starts 51 that starts on
13    page 18, you see your discussion there of --
14      A.     Excuse me.
15      Q.     -- the various individuals and how long
16    they were employed?
17      A.     I do.
18      Q.     You see that you indicate Mr. Bitler,
19    who was in charge of quality, according to you,
20    was there from 1995 until 2008.  Do you see that?
21      A.     That's what it says in the report.
22      Q.     Okay.  I'm going to hand you a document
23    that's been marked as Exhibit 487 and in the
24    interest of brevity, that is the cover page of
25    Mr. Bitler's first MDL deposition, and then an

Page 206

1    excerpted segment of his transcript.

2        A.    Got you.

3        Q.    If you can flip through Exhibit 487

4    until you find the page marked 31.  And then would

5    you read the last two pages?  Let me know when

6    you've completed that.

7        A.    Read 31?

8        Q.    And then to the end of the exhibit.

9        A.    Okay.  There's a blank page in here.  Is

10   that --

11       Q.    Yeah.  Yeah.

12       A.    All right.

13       Q.    Are you done reading that brief

14   passage?

15       A.    I have read it, yes.

16       Q.    When was Mr. Bitler employed by Actavis,

17   according to his testimony?

18       A.    It says here, "Let's go back to your

19   employment period.  Can you tell me when you began

20   in April 2004, what was your title?"

21       Q.    So he didn't start in 1995, did he?

22       A.    I'm not sure when he started based on

23   this statement, employment period, because it

24   talks about buildings and where I was and that

25   kind of stuff.  So I can't, from this selected

Page 207

1    beginning here, tell what the employment period

2    really was.

3             MR. MILLER:  Can I ask a question,

4        please?

5             MR. ANDERTON:  Sure.

6             MR. MILLER:  This is marked 487.  Does

7        that mean it's going to be part of this record

8        as Exhibit 487?

9             MR. ANDERTON:  Yes.  We picked up the

10       number and added it at the end of numbering

11       that we had used previously.

12            MR. MILLER:  In this case that you're

13       talking about?

14            MR. ANDERTON:  Yes, yes.

15   BY MR. ANDERTON:

16       Q.   Dr. Bliesner, I'm going to hand you a

17   document marked Plaintiff's Exhibit 126.

18       A.   Okay.

19       Q.   Have you seen that document before?

20       A.   I'm not sure.

21       Q.   Well, in any event, it's Doctor -- we'll

22   chase that down before the end of the day.  But do

23   you see that it is a CV of Daniel Bitler?

24       A.   I see that, yes.

25       Q.   And do you see that it indicates he was

Page 208

1     employed by Actavis beginning in 2004?

2          A.    I see that he was employed by Alpharma

3     in 2003, and which, if I'm not mistaken, became

4     Actavis in 2004.

5          Q.    Became Actavis Elizabeth.

6          A.    Right.   Okay.

7          Q.    Not Actavis Totowa.   Where was he before

8     2003?

9          A.    He was Sanofi-Synthelab.

10         Q.    Any connection to Actavis that you've

11    aware of?

12         A.    Not that I'm aware of.

13         Q.    Before that, Warner Lambert.   Any

14    connection to Actavis?

15         A.    Not that I'm aware of.

16         Q.    That goes back quite a ways.   Abbott

17    Labs before that.   Any connection to Actavis?

18         A.    Not that I'm aware of.

19         Q.    So your indication in your report that

20    doctor -- or that Mr. Bitler was employed

21    continuously and in charge of quality continuously

22    from 1995 until 2008, that's another error?

23         A.    It's a typographical error, yes.

24         Q.    It's not a typographical error.   You

25    actually comment as part of the basis for your

Page 209

1    conclusions about the continuity of people in

2    leadership positions, and in particular of

3    quality.

4        A.    Uh-huh.

5        Q.    So you don't -- it's not just a

6    typographical error in this section.  You rely on

7    the notion that Mr. Bitler was there for that

8    extended period of time as part of the basis for

9    your conclusion that Actavis's leadership somehow

10   had something to do with their quality systems

11   being deficient?

12            MR. MILLER:  Object to the form.

13            THE WITNESS:  If I'm not mistaken, he was

14       QA director in 2004.  And we had the

15       pharmacist complaint in June of 2004.  So he

16       was in that position when we had a

17       double-thick as the pharmacist tablet in

18       there.

19            So I don't see anything fundamentally

20       inconsistent with it other than a

21       typographical error.

22   BY MR. ANDERTON:

23       Q.    He had the complaint in 2004 of a tablet

24   manufactured in 2003.  Do you still not see

25   anything fundamentally different, Dr. Bliesner?

Page 210

1            MR. MILLER:  Object to the form.

2            THE WITNESS:  I don't have a record of

3        it, whether it was manufactured in 2003.

4    BY MR. ANDERTON:

5        Q.    If the record reflects that it was

6    manufactured in 2003, Dan Bitler was not involved

7    in the quality system that -- that was in place

8    when it was manufactured, was he?

9            MR. MILLER:  Object to the form.

10           THE WITNESS:  That particular case, no.

11   BY MR. ANDERTON:

12       Q.    Okay.

13       A.    However, subsequently, with the

14   difficulties that arose in 2007, 2008, he was in

15   charge.

16       Q.    Again, an error in your report to say

17   that Dan Bitler was in charge of quality from 1995

18   to 2008?

19       A.    It's a typographical error, yes.

20       Q.    I show you a document that's been marked

21   as Plaintiff's Exhibit 16.  Have you seen that

22   document before, Dr. Bliesner?

23       And I'll shortcut for you.  Turn to page 30 --

24   I'm sorry, 45 of your report.

25       A.    I see.

Page 211

1      Q.    Now, in paragraph 39 of your report, on

2   page 16, you discuss this investigation.  Will you

3   turn to that page?

4      A.    Which page was that?

5      Q.    Page 16.

6      A.    Okay.

7      Q.    Do you see paragraph 39?

8      A.    I do.

9      Q.    You see in there where you, in the

10  third -- or, I'm sorry, the fourth sentence where

11  you indicate that the product was released to

12  market on 5 December 2007?

13     A.    I do.

14     Q.    Okay.  And if you turn to your

15  declaration on page 4, again the third bullet

16  point, do you see where you say, "Following a

17  rapidly conducted visual inspection, the product

18  is released to market on December 5, 2007"?

19     A.    I do.

20     Q.    Okay.  You looked at Plaintiff's Exhibit

21  16 before you prepared your report, correct?

22     A.    Which report are we talking about?

23     Q.    The only report that's out there,

24  Dr. Bliesner.

25     A.    Sixteen.

Page 212

1  Q.  Dr. Bliesner, I pointed you to the

2 precise reference.  It's on page 45.

3  A.  It's on page 45.

4  Q.  You looked at it.

5    MR. MILLER:  Object.

6    THE WITNESS:  They don't have the same

7  numbers.  So I'm just trying to make sure.

8 BY MR. ANDERTON:

9  Q.  What number is different?

10  A.  Okay.  Got you.

11  Q.  A32, Plaintiff's Exhibit 16.

12  A.  Uh-huh.

13  Q.  Now, my question:  Did you look at

14 Plaintiff's Exhibit 16 before you prepared your

15 report?

16  A.  According to what I've written in the

17 report, I looked at it as I was preparing the

18 report.

19  Q.  Okay.  And this is the investigation

20 record for the internal investigation into the

21 double-thick tablets that were manufactured.

22 That's a pretty significant document, isn't it?

23  A.  I'm not sure I had this whole copy of

24 this whole document.

25  Q.  Is there a reason to think that you

1    didn't?

2         A.    I don't recognize the content in it.

3         Q.    You offer very harsh criticism of the

4    investigation conducted by Actavis.  Is it now

5    your testimony that you might have offered that

6    criticism without having the full investigation

7    report?

8         A.    I'm not saying that.

9         Q.    Well, which is it, Doctor?

10        A.    I'd like to confirm, if I'm going to be

11   making statements on it, that I did have the whole

12   thing.

13        Q.    If you had not had the whole thing,

14   wouldn't you have said to Plaintiff's counsel in

15   the MDL, I need the whole investigation report?

16        A.    Not necessarily.

17        Q.    Really?

18        A.    No.  Because sometimes --

19        Q.    Go ahead.

20        A.    Sometimes you can't tell whether you've

21   gotten the whole thing or not.

22        Q.    This one has page numbers at the top.

23   One of 67, 2 of 67 all initialed by Dan Bitler.

24        A.    Okay.

25        Q.    You could easily have been able to tell

Page 214

1    if you had the entire thing; correct?

2         A.    Not necessarily.  I've seen --

3         Q.    You may continue.

4         A.    I've seen bits and pieces of documents

5    that were provided to me that don't necessarily

6    reflect what was actually the whole document.

7         Q.    You would have been able to tell by

8    looking at the page numbering --

9         A.    Not necessarily.  Could have had a first

10   draft or something like that, that didn't have the

11   page numbering on it.  There's been all kinds of

12   different things that are going on with these

13   documents.  I've got, for instance, I've got an

14   EIR that has a redaction in one, one copy and

15   another copy, it doesn't.

16        Q.    Dr. Bliesner, you cite to this document

17   as the basis for portions of your expert report.

18   Are you now saying you don't have any idea whether

19   you reviewed the whole thing?

20        A.    That's not what I'm saying at all.

21        Q.    Well, what are you saying, Dr. Bliesner?

22             MR. MILLER:  I object to the form of the

23        argument and the argumentative nature of the

24        way you're asking these questions.  There's

25        absolutely no reason for it.  And you have

Page 215

1       done a good job of trying to bulldog him
2       around.  I saw how you did it in the first
3       deposition you took of the man.  I know that's
4       what you're trying to do now.  But I object to
5       it.  And I just want to make it clear that at
6       least from my perspective, all these questions
7       and the answers are subject to an
8       understanding of just how you're acting.  It's
9       just the form of the whole thing is
10      unnecessary, and I object to it.
11  BY MR. ANDERTON:
12      Q.   Dr. Bliesner, what are you saying?  I
13  can't tell what you're saying.
14      A.   What I'm saying is that this document I
15  have in front of me, I'm not sure if it's exactly
16  the full copy that I reviewed.  That's what I'm
17  saying.
18      Q.   How would you determine that, as we sit
19  here today, on September 19th --
20      A.   Okay.
21      Q.   -- how would you know?
22      A.   I can go over here or to this folder and
23  pull out A32 and do a comparison and tell you
24  whether it's the same thing.
25      Q.   Let's go off the record and you can do

Page 216

1    that.

2        A.    Okay.

3            THE VIDEOGRAPHER:  It's 3:24.  We're

4    going off the record.

5                (Discussion off the record.)

6            THE VIDEOGRAPHER:  It is 3:28.  We're on

7    the record.

8    BY MR. ANDERTON:

9        Q.    Dr. Bliesner, we were off the record for

10   a moment, and you had the opportunity to review a

11   portion of your file and determine whether the

12   document that I've put in front of you as

13   Plaintiff's Exhibit 16 is something that you've

14   seen before.

15       A.    It is.

16       Q.    You've reviewed that document?

17       A.    I have reviewed that document.

18       Q.    You reviewed it before you prepared your

19   report?

20       A.    While I was preparing the report.

21       Q.    And it forms part of the basis for the

22   opinions set forth in your report, correct?

23       A.    Part of the basis.

24       Q.    And as I mentioned earlier --

25       A.    It's a data point.

Page 217

1      Q.    Okay.  As I mentioned earlier, that's

2  a -- double-thick tablets being manufactured is a

3  significant event in the context of this

4  litigation and your analysis; isn't that right?

5      A.    Double thick tablets are the crux or

6  oversized tablets are the crux.

7      Q.    Okay.  You agree then that that's a

8  significant event with respect to your analysis;

9  am I right?

10     A.    I would say it is supportive evidence of

11 the fact that they had problems manufacturing

12 them.

13     Q.    Do you think it's a significant event or

14 not?

15     A.    I don't know if I would use the term

16 significant or not, but it's an event.  It's a

17 data point.

18     Q.    Okay.

19     A.    If it had been one time and no others,

20 it would just have been a single data point.  So

21 it is an additional data point.

22     Q.    Okay.  If you look at the Plaintiff's

23 Exhibit 16, you know that when they conducted the

24 investigation into this batch, that they emptied

25 the entire batch onto trays and did a visual

1    inspection of the entire batch; right?

2         A.    I'd have to read the report again.    I

3    don't have total recall of all documentation I've

4    read by any stretch of the imagination.    It's a

5    lot of stuff.

6         Q.    Okay.  Well, will you turn to page 57 of

7    67?  I am referring to the handwritten notation in

8    the top right corner of Plaintiff's Exhibit 16.

9    So near the back.

10             MR. MILLER:  Can you repeat that again?

11             MR. ANDERTON:  57 of 67.

12   BY MR. ANDERTON:

13        Q.    It says packaging operation signature

14   sheet.  Do you see that document?

15        A.    I do see that, yes.

16        Q.    Okay.  Do you see the dates where the

17   folks who are initialing that are conducting the

18   inspection?

19        A.    I do.

20        Q.    What are they?

21        A.    1/15/08, 1/16/08, 1/17/07, 1/18/08.

22        Q.    Turn back three pages to page 60.  Well,

23   actually turn back to page 16 of 67.  You see that

24   that reflects information collected during a

25   tightened AQL inspection of that batch?

Page 219

1      A.     I do see that.

2      Q.     Do you remember enough from your review

3   to remember that there was a visual inspection and

4   then an additional tightened AQL inspection of

5   this batch?

6      A.     I do recall that there was that.

7      Q.     What date was that tightened AQL

8   inspection conducted?

9      A.     If we go by the signature, it would

10  be --

11     Q.     I'm looking at page 61, not 60.  I'm

12  sorry.  I directed you to 60 and then I pushed to

13  61.  I apologize.

14     So now my question is, with respect -- and

15  looking at the information on page 61 of 67, what

16  dates was that tightened AQL -- what date was the

17  tightened AQL inspection for that particular?

18     A.     All of these entries it looks are

19  1/22/08.

20     Q.     January 22nd, 2008?

21     A.     That's correct.

22     Q.     So, they're finishing up the inspection

23  in the third week in January of 2008; right?

24     A.     That's correct.

25     Q.     Turn back to your report.

1      A.     Uh-huh.

2      Q.     Paragraph 39.  Dr. Bliesner, paragraph

3  39, please.

4      A.     I'm sorry.

5      Q.     Page 16.

6      A.     Yes.

7      Q.     Where you say "Product was released to

8  market on 5 December 2007," that's not correct, is

9  it?

10     A.     Based on A31 and 32, it's an incorrect

11  date.

12     Q.     And then in your declaration, on page 4,

13  where Plaintiff's counsel in the MDL was kind

14  enough to make that even stronger for you, it

15  says, "Following a rapidly conducted visual

16  inspection, the product is released to market on

17  December 5, 2007."  Did I read that correctly?

18     A.     Which bullet are we talking about?

19     Q.     The third one on page 4.

20     A.     Okay.  Got you.

21     Q.     The fourth sentence reads, "Following a

22  rapidly conducted visual inspection, the product

23  is released to market on December 5, 2007."

24     A.     That's what it says.

25     Q.     That's not correct, is it?

Page 221

1        A.     It is not.

2        Q.     Another error.

3        How do you make a mistake like that,

4    Dr. Bliesner?

5        A.     How do you make a mistake like that?

6    When you're reviewing thousands and thousands and

7    thousands of documents that have -- pages of

8    documents that have no lineage or connection to

9    it, it's very easy to get a date messed up.

10   That's how you mess it up.

11       And then the basis for the report, errors are

12   propagated and goes into a summary like this.

13   That's how it happens.

14       Q.     Too much information for you to review?

15           MR. MILLER:  Object to the form.

16           MR. ANDERTON:  I mean, is that my take

17       away from that response?

18           MR. MILLER:  Object to the form.  You

19       know, that is more than argumentative.  Go

20       ahead and answer it.

21           THE WITNESS:  Not as I see it.

22   BY MR. ANDERTON:

23       Q.     And so that we're clear, Dr. Bliesner,

24   that's not just making a mistake about a date.

25   That's an affirmative statement about when the

Page 222

1    product was released to market.

2        A.    It's a mistake on the date.

3        Q.    On when the product was released to

4    market.

5        A.    It's a mistake on the date.

6        Q.    Okay.  You're willing to tell the Court

7    in sworn testimony that it was rapidly released to

8    market on December 5 when, in fact, it wasn't

9    until late January?

10       A.    It's a mistake on the date.

11       Q.    Dr. Bliesner -- let's take a quick

12   break, catch your breath.

13            THE VIDEOGRAPHER:  It is 3:36.  We're

14       going off the record.

15                (Discussion off the record.)

16            THE VIDEOGRAPHER:  It's 3:45.  We're on

17       the record.  This is tape number 6.

18   BY MR. ANDERTON:

19       Q.    Dr. Bliesner, will you turn to paragraph

20   44 of your report, please?

21       A.    Yes.

22       Q.    Page 18, you see that it refers to the

23   Digitek recall?

24       A.    Yes.

25       Q.    And then with respect to your affidavit,

Page 223

1    on the top of page 5, you have a bunch of these,

2    but I can tell you that that is the seventeenth

3    bullet point, the very top one there.

4        A.    Got you.

5        Q.    Out of 22 total.  I'm going to read

6    that.  Do you see that in the declaration on page

7    5 it says, "On April 24, 2008 a Class One

8    nationwide recall of all Digitek tablets

9    manufactured by Actavis is announced due to double

10    thickness tablets, overweight tablets, and/or

11    blending defects."

12        A.    I do.

13        Q.    Do you see that?

14        A.    Uh-huh.

15        Q.    Do you see that as the basis for that in

16    your declaration you cite to Plaintiff's Exhibit

17    113?

18        A.    Got you.

19        Q.    Do you see that?

20        A.    Yes.

21        Q.    In your report on page 18 at paragraph

22    44 when you reference the recall, you don't say

23    anything about blending defects, do you?

24        A.    In the report here?

25        Q.    Yeah.

Page 224

1     A.     No, I don't.

2     Q.     And Plaintiff's Exhibit 113, which I'm

3   handing you, which is the basis for the bullet

4   point, the information in bullet point 17, have

5   you seen that document before?

6     A.     I have.

7     Q.     That document doesn't say anything about

8   blending defects, does it?

9     A.     It does not.

10     Q.     So when Plaintiff's counsel in the MDL

11   prepared this affidavit or this declaration for

12   you --

13     A.     They didn't prepare it for me.  We

14   worked on it together.

15     Q.     Oh, so you're validating it?

16     A.     No.  It was a teleconference with my

17   input, as I said earlier in my deposition.

18     Q.     Did you tell them to include blending

19   defects in that bullet point?

20     A.     Not that I recall.

21     Q.     But you signed it with that language in

22   there?

23     A.     Yes, I did.

24     Q.     So you didn't obviously compare that to

25   Plaintiff's Exhibit 113 before you did that, or

Page 225

1    did you do that?  Did you do that knowingly?

2         A.    I compared to my A35.  And this one,

3    which I'm not sure what it is.

4         Q.    Which you're not sure what is?

5         A.    What my A number would be on this.

6         Q.    Well, that's referenced in your A35 as I

7    see it.

8         A.    Okay.

9         Q.    Again, that doesn't say anything about

10   blending defects, does it?

11        A.    This one here?  No.

12        Q.    Nor does your A35, page 47.

13        A.    Got you.  No, it doesn't.

14        Q.    Another error?

15        A.    It looks like it is, yes.

16        Q.    Dr. Bliesner, I just handed you a

17   document that has been marked previously as

18   Plaintiff's Exhibit 91.  You've seen that document

19   before?  And if you need to, you should look at

20   page 47, reference A37 of your report.

21        A.    Which one did you say is A.?

22        Q.    A37.

23        A.    A37?

24        Q.    Yes, sir.

25        A.    Yes.

Page 226

1    Q.    You've seen that document?

2    A.    Yes.

3    Q.    In A37 at your report, you indicate that

4  the -- and this is at the beginning of page 47 and

5  continuing on to page 48, under description of

6  contents, you indicate, "This inspection was

7  conducted as a qualifying GMP inspection for the

8  new Riverview facility."

9    Did I read that correctly from your report?

10   A.    Yes, which it says in the beginning of

11  the document.  So...

12   Q.    Beginning of Plaintiff's Exhibit 91?

13   A.    Yes.

14   Q.    Okay.  So your report accurately

15  indicates that the reason for that inspection was

16  to conduct a qualifying GMP inspection for the new

17  Riverview facility?

18   A.    That's how it started.

19   Q.    So that's what -- why the FDA was

20  inspecting Actavis?

21   A.    According to the FDA, yes.  It was a

22  qualifying inspection to start with.

23   Q.    Okay.  The FDA knows --

24   A.    Right.

25   Q.    -- why they are inspecting Actavis,

1    right?

2        A.    Yes.

3        Q.    Okay.  So as you wrote in your report,

4    and as you just said, according to the FDA, they

5    were inspecting Actavis because they were

6    conducting a qualifying GMP inspection for the

7    Riverview site; is that right?

8        A.    That's a fair statement, yes.

9        Q.    Okay.  At page 4 of your declaration,

10   the very last bullet point -- and, again,

11   referring to the FDA inspection and referring to

12   attachment A37 which we were just reading from.

13       A.    Uh-huh.

14       Q.    You say in sworn testimony, "From March

15   to May of 2008, the FDA inspects Actavis's

16   facilities due to significant GMP deficiencies

17   relating to the prevention and remediation of

18   double-thick tablets and blending failures."  Did

19   I read that correctly?

20       A.    You did.

21       Q.    That is not why the FDA conducted --

22       A.    No.

23       Q.    -- that inspection, is it?

24       A.    It's clearly not.  The findings that

25   came out of it.

Page 228

1    Q.    But you say --

2    A.    It's what --

3    Q.    -- due to significant --

4    A.    It's an incorrect statement.

5    Q.    Another incorrect statement?

6         MR. MILLER:  Objection to the form.  It's

7    just making a little speech there.  It's not a

8    question.

9         THE WITNESS:  As we talked about very

10   early on in the deposition, I pointed out that

11   I knew that there were errors in this report

12   after I -- the declaration, after I signed it.

13   BY MR. ANDERTON:

14   Q.    Quite a few?

15   A.    There are.  There are.  I wouldn't

16   classify it as quite a few, considering the volume

17   of documents that built up the original report to

18   go into this as a summary.  There are errors.  I,

19   I'm not going to say that there aren't.

20   Q.    Does an analytical chemist inadvertently

21   characterize an assay value that is clearly within

22   specifications?

23   A.    That question has no relevance to this

24   whatsoever.  In an analytical chemistry

25   environment and in the pharmaceutical industry in

Page 229

1   general, a document like this would have a second-

2   and a third-party review for content.  All right?

3   Just like anything else around here, including

4   this report.  And they don't, the way the system

5   is set up this legally.

6        So that comparison is totally inaccurate.  You

7   can't do -- because there's errors in the written

8   document after a review of various other documents

9   that are all thrown together and handed out in

10  piecemeal fashion and say that's because you've --

11  somebody has got poor analytical skills.  That's

12  just a total stretch, and I won't stand for that.

13       Q.    It's kind of the same analysis you're

14  making to come to your overall conclusion.

15       A.    Absolutely nothing whatsoever to do like

16  that.  That's a mischaracterization.

17       Q.    These are data points, Dr. Bliesner.

18  Each of these errors is a data point.  At what

19  point do the conclusions in your report crumble

20  for the inaccurate data points?

21       A.    Each of these data points has nothing to

22  do with the accuracy and the overall conclusion of

23  the report.  There's a lack of compliance across

24  the board from the beginning.  Products made it to

25  the market, and there's been a continuous lack and

1    failure of quality systems for many, many years.

2    The fact that I have individual errors within a

3    report or a declaration doesn't change those facts

4    at all.  Not at all.

5        Q.    How can we or the Court know that, how

6    can we rely on your conclusions when you're -- you

7    obviously don't pay attention to detail enough to

8    get these things accurate?

9            MR. MILLER:  Object to the form.

10           THE WITNESS:  I don't think that there's

11       any correlation between errors in a report and

12       the overall conclusion in the end.

13           MR. ANDERTON:  The --

14           THE WITNESS:  The major --

15           MR. ANDERTON:  I'm sorry, Dr. Bliesner.

16   I didn't mean to talk over you.

17           THE WITNESS:  The major facts here are

18       that there was a total failure of the quality

19       system.  I don't think anybody can argue that

20       data.  And in the end, product that was out of

21       specification, thick, thin or whatever, has

22       made it to the market from very early on,

23       probably as early as 2000 or something, all

24       the way up to the last batch that was made and

25       shipped out.  I don't think you can argue with

Page 231

1       that with the data.

2           So to characterize errors within a single

3       document that was done substantially after the

4       original document was made that actually in

5       the grand scheme of things, if you look at it,

6       has very few, is a total mischaracterization.

7       You can't make that extrapolation, in my

8       opinion.

9    BY MR. ANDERTON:

10      Q.    Says nothing about your attention to

11   detail and reliability of your overall conclusion?

12          MR. MILLER:  Object to the form.

13          THE WITNESS:  No.  And I don't appreciate

14      you characterizing me as having a lack of

15      detail, or attention to detail.

16   BY MR. ANDERTON:

17      Q.    I'm just pointing out 8 or 10 what I can

18   only conclude are mischaracterizations in this

19   affidavit, in this declaration, that you signed

20   providing sworn testimony that I now have to deal

21   with as potentially -- because you might try to

22   give this testimony in this case.

23      Do you understand I have to address these?

24      A.    I'm not saying that --

25          MR. MILLER:  Object to the form.  There

Page 280

1          MR. MILLER:  Oh, come on.  Object to the

2      form.

3  BY MR. ANDERTON:

4      Q.    But we don't have any proof that it

5  happened otherwise, Dr. Bliesner.

6          MR. MILLER:  Object to the form.  I think

7      you got about two minutes left.

8  BY MR. ANDERTON:

9      Q.    Dr. Bliesner, in your declaration, you

10  indicate on page -- you indicate on page 9, the

11  obvious chance that -- well, you don't like the

12  inspection protocol that Actavis used, and you

13  indicate, "After the recall, Actavis did not test,

14  examine, or do anything to determine the magnitude

15  of their manufacturing problem of

16  out-of-specification Digitek tablets.  They simply

17  stored the recalled product in a warehouse and

18  kept on producing Digitek."

19      Did you sign that declaration with that

20  statement in it?

21      A.    I did.

22      Q.    They didn't make any other Digitek after

23  the recall, did they?

24      A.    They did not.  That was my understanding

25  that they continued to produce.  It's an error.

Page 281

1      Q.     Another error?

2      A.     Yeah.   Kind of like the QA document that

3   had a misspelling in it a few minutes ago.

4           MS. DONAHUE:   Objection, move to strike.

5           MR. ANDERTON:   Dr. Bliesner, I have no

6      further questions.   Thank you for your time.

7           THE WITNESS:   You're welcome.

8           MR. MILLER:   We'll read it.

9           THE VIDEOGRAPHER:   It is 5:13.   We are

10     going off the record.   This concludes the

11     deposition.

12          MR. ANDERTON:   So, Phil, we're going to

13     mark this as the next exhibit, it looks like

14     it's 499.   You're going to take it with you.

15     You're going to make a copy of it, and you're

16     going to return the original to Dr. Bliesner.

17     Then you're going to distribute a copy to me,

18     and you'll contact Mr. Miller, and he'll tell

19     you whether he wants a copy.

20          MR. MILLER:   Let me ask you this

21     question.   Does that mean it will come back on

22     a CD?

23          MR. ANDERTON:   Some sort of media.   It

24     won't be a hard copy, it will be a drive or

25     something.

Page 282

1          MR. MILLER:  I'll take an electronic copy

2     just like you give Mr. Anderson.

3                   (Whereupon, Defendants' Exhibit 499

4     was marked for identification)

5          (THEREUPON, the taking of the deposition was

      concluded at 5:15 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25